IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PFIZER INC., PFIZER IRELAND PHARMACEUTICALS UNLIMITED COMPANY, and BRISTOL-MYERS SQUIBB COMPANY, | ) ) ) ) | |
| | ) | C.A. No. 24-621 (CFC) |
| Plaintiffs, | ) | CONSOLIDATED |
| | ) | |
| v. | ) | **ANDA CASE** |
| | ) | |
| APOTEX INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com

OF COUNSEL:

Dimitrios T. Drivas
John P. Scheibeler
Kevin J. Georgek
Samantha J. Kokonis
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
(212) 819-8200

*Attorneys for Plaintiffs Pfizer Inc.,*
*Pfizer Ireland Pharmaceuticals, and*
*Bristol-Myers Squibb Company*

MORRIS JAMES LLP
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

OF COUNSEL:

Deepro R. Mukerjee
Lance A. Soderstrom
Christopher B. Prescott
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY  10020-1605
(212) 940-8800

*Attorneys for Defendants Apotex Inc.
and Apotex Corp.*

Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tryon Street, Suite 2900
Charlotte, NC  28202-4213
(704) 444-2000

Jillian M. Schurr
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200

COZEN O'CONNOR
Kaan Ekiner (#5607)
1201 North Market Street, Suite 1001
Wilmington, DE  19801
(302) 295-2046
kekiner@cozen.com

OF COUNSEL:

W. Blake Coblentz
Aaron S. Lukas
COZEN O'CONNOR
1200 19th Street, NW
Washington, DC  20036
(202) 912-4800

*Attorneys for Defendants Aurobindo
Pharma Limited and Aurobindo
Pharma U.S.A., Inc.*

Keri L. Schaubert
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY  10007
(212) 509-9400


SMITH KATZENSTEIN JENKINS LLP
Neal C. Belgam (#2721)
Daniel A. Taylor (#6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
dtaylor@skjlaw.com
nbelgam@skjlaw.com

OF COUNSEL:

Howard Wang
RIMÔN PC
100 Overlook Center, 2nd Floor
Princeton, NJ  08540
(973) 966-3200

*Attorneys for Defendant
Changzhou Pharmaceutical Factory*

iii

COZEN O'CONNOR
Kaan Ekiner (#5607)
1201 North Market Street, Suite 1001
Wilmington, DE  19801
(302) 295-2046
kekiner@cozen.com

OF COUNSEL:

W. Blake Coblentz
Aaron S. Lukas
COZEN O'CONNOR
1200 19th Street, NW
Washington, DC  20036
(202) 912-4800

*Attorneys for Defendants MSN
Laboratories Private Ltd. and MSN
Pharmaceuticals Inc.*

Keri L. Schaubert
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY  10007
(212) 509-9400

RICHARDS, LAYTON & FINGER, P.A.
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

*Attorneys for Defendant*
*Natco Pharma Ltd.*

OF COUNSEL:

Christopher J. Sorenson
W. Reid Morris
MERCHANT & GOULD PC
150 South Fifth Street, Suite 2200
Minneapolis, MN  55402
(612) 332-5300

Andrew O. Larsen
MERCHANT & GOULD PC
500 Fifth Avenue, Suite 4100
New York, NY  10110
(212) 223-6520

Jason M. Wiener
MERCHANT & GOULD PC
191 Peachtree Road NE, Suite 3800
Atlanta, GA  30303
(703) 684-2500

MORRIS JAMES LLP
Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
OF COUNSEL:                                 Wilmington, DE  19801-1494
                                            (302) 888-6800
Stephen R. Auten                            kdorsney@morrisjames.com
Jaimin H. Shah                              chitch@morrisjames.com
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600           *Attorneys for Defendant Rubicon*
Chicago, IL  60601                          *Research Private Ltd.*
(312) 527-4000

Aaron M. Johnson
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South Eighth Street
Minneapolis, MN  55402
(612) 977-8400

OF COUNSEL:

Elaine H. Blais
Daryl L. Wiesen
Emily L. Rapalino
Molly Grammel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1000

Madeline R. Bordynoski
GOODWIN PROCTER LLP
1900 N. Street, N.W.
Washington, DC  20036-1612
(202) 346-4000

Gabriel Bruno Ferrante
Magdalin Peña Jimenez
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
(212) 813-8800

September 5, 2025

SHAW KELLER LLP
Karen E. Keller (#4489)
Nathan R. Hoeschen (#6232)
Emily S. DiBenedetto (#6779)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for Defendant Teva
Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

Page

II.  INTRODUCTION .........................................................................1

  A.  Plaintiffs' Introductory Remarks ........................................1

    1.  Procedural Background ................................................1

    2.  '724 Patent Background .............................................2

  B.  Defendants' Introductory Remarks ......................................6

  C.  Plaintiffs' Reply Introduction .............................................8

  D.  Defendants' Sur-Reply Introduction ...................................10

II.  AGREED-UPON CONSTRUCTIONS .....................................11

III.  DISPUTED CONSTRUCTIONS .................................................11

  A.  Plaintiffs' Opening Position ...............................................11

    1.  Plaintiffs' Opening Position for "Molded" ..............11

      a.  The Intrinsic Evidence Supports Plaintiffs' Proposed
          Construction of "Molded" .............................12

      b.  Extrinsic Evidence Supports Plaintiffs' Proposed
          Construction .......................................................14

      c.  Defendants' Proposed Construction of "Molded" Is
          Flawed ................................................................15

        i.  Defendants' Proposed Construction Improperly
            Reads Limitations from an Exemplary
            Embodiment into the Claim ...............................15

       ii.      Defendants' Proposed Construction Improperly Imports a Process Limitation into Product Claims ...........................................................................17

       iii.     Remington Is Not Intrinsic Evidence Because the Specification Neither Identifies with Detailed Particularity the Specific Material it Incorporates Nor Clearly Indicates Where that Material Is Found.................................................................19

    2.    Plaintiffs' Opening Position for "Solid Molded" ....................23

B.    Defendants' Answering Position.........................................................24

    1.    The intrinsic evidence supports Defendants' construction........25

       a.      The specification's consistent use of the phrase "solid molded" supports Defendants' construction. .................25

       b.      The specification incorporates prior art references supporting Defendants' construction.............................32

    2.    The extrinsic evidence supports Defendants' construction. .....35

    3.    Plaintiffs' attacks on Defendants' construction fail.................36

    4.    Plaintiffs' construction should be rejected...............................39

C.    Plaintiffs' Reply Position ...................................................................43

    1.    Defendants' Proposed Construction Is Incorrect Because It Limits the Claimed Dosage Forms to Tablets that Are Dried In a Mold ......................................................................................43

    2.    Defendants' Construction Improperly Limits the Claims to a Preferred Embodiment and Reads a Process Limitation into Product Claims.......................................................................46

       a.      The Cases Defendants Rely on to Support Their Implicit Disavowal Theory Do Not Apply Here..........................48

        b.     The Examples in the '724 Patent Do Not Support Defendants' Proposed Construction ...............................56

    3.    Defendants' Extrinsic Evidence Confirms that Defendants' Construction Is Unduly Narrow Because It Excludes Oral Solid Molded Dosage Forms that Are Not Dried in a Mold .............59

D.    Defendants' Sur-Reply Position ...........................................................62

    1.    Plaintiffs' broad construction of "molded" ignores the specification's consistent use of the term. ...............................62

        a.     General disclosures in the specification encompassing both claimed and unclaimed embodiments do not support Plaintiffs' construction. ..................................................64

        b.     Despite Plaintiffs' attempts to distinguish Defendants' cases, they cannot avoid the plain meaning of "molded." ..................................................................67

        c.     The doctrine of claim differentiation does not support Plaintiffs' construction. ..................................................68

        d.     Disavowal is not relevant where the proposed construction is the plain and ordinary meaning.............70

        e.     To the extent extrinsic evidence is relevant, it also supports Defendants' construction. ...............................71

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Advanced Display Sys., Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000) ....................................................................20

*Andersen Corp. v. Fiber Composites, LLC*,
  474 F.3d 1361 (Fed. Cir. 2007) .......................................................18, 19, 55, 56

*Applications in Internet Time, LLC v. Salesforce, Inc.*,
  No. 2024-1133, 2024 WL 4456271 (Fed. Cir. Oct. 10, 2024) ..........................46

*AstraZeneca LP v. Breath Ltd.*,
  542 F. App'x 971 (Fed. Cir. 2013) ....................................................................18

*Baxalta Inc. v. Genentech, Inc.*,
  972 F.3d 1341 (Fed. Cir. 2020) ........................................................................46

*Cave Consulting Grp., LLC v. OptumInsight, Inc.*,
  725 F. App'x 988 (Fed. Cir. 2018) .............................................................. 69-70

*Cont'l Cirs. LLC v. Intel Corp.*,
  915 F.3d 788 (Fed. Cir. 2019) ..........................................................................57

*Exeltis USA, Inc. v. Lupin Ltd.*,
  C.A. No. 22-434-RGA, 2024 WL 688489 (D. Del. Feb. 20, 2024) .............46, 47

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
  750 F.3d 1304 (Fed. Cir. 2014) ...................................................................16, 17

*Harris Corp. v. IXYS Corp.*,
  114 F.3d 1149 (Fed. Cir. 1997) ...................................................................16, 38

*Horizon Pharma, Inc. v. Dr. Reddy's Labs Inc.*,
  839 F. App'x 500 (Fed. Cir. 2021) ........................................................28, 56, 63

*Impax Labs, Inc. v. Lannett Holdings, Inc.*,
  No. 14-984-RGA, 2015 WL 7737309 (D. Del. Dec. 1, 2015) ..............22, 23, 33

*Indivior Inc. v. Dr. Reddy's Labs, S.A.*,
  752 F. App'x 1024 (Fed. Cir. 2018) ..........................................................*passim*

iv

*Intel Corp. v. Qualcomm Inc.*,
  No. 2022-1046, 2023 WL 4196901 (Fed. Cir. June 27, 2023)..........................33

*Intell. Ventures LLC v. Motorola Mobility LLC*,
  870 F.3d 1320 (Fed. Cir. 2017) .......................................................................70

*InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*,
  690 F.3d 1318 (Fed. Cir. 2012) .......................................................................45

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) ....................................................16, 17, 46, 55

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
  814 F.3d 1343 ...................................................................................................47

*Markman v. Westview Instruments, Inc.*,
  52 F.3d 967 (Fed. Cir. 1995) ...........................................................................14

*MasterObjects, Inc. v. Meta Platforms, Inc.*,
  No. 2023-1097, 2024 WL 630330 (Fed. Cir. Feb. 15, 2024).....................47, 71

*Medicines Co. v. Mylan, Inc.*,
  853 F.3d 1296 (Fed. Cir. 2017) ..............................................................*passim*

*Merck & Co., Inc. v. Teva Pharm. USA, Inc.*,
  395 F.3d 1364 (Fed. Cir. 2005) .......................................................................24

*Netcraft Corp. v. Bay, Inc.*,
  549 F.3d 1394 (Fed. Cir. 2008) .......................................................................24

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc) ..............................................*passim*

*ResQNet.com, Inc. v. Lansa, Inc.*,
  346 F.3d 1374 (Fed. Cir. 2003) .......................................................................50

*SkinMedica, Inc. v. Histogen Inc.*,
  727 F.3d 1187 (Fed. Cir. 2013) ..................................................................21, 34

*Sys. Div., Inc. v. Teknek LLC*,
  59 F. App'x 333 (Fed. Cir. 2003) .....................................................................34

*TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008) .......................................................30, 37, 65, 66

*Trustees of Columbia Univ. v. Symantec Corp.*,
    811 F.3d 1359 (Fed. Cir. 2016) ..................................................................*passim*

*Unwired Planet, LLC v. Apple Inc.*,
    829 F.3d 1353 (Fed. Cir. 2016) ...........................................................................47

*Vanguard Prods. Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000) ...........................................................................18

*Vectura Ltd. v. GlaxoSmithKline LLC*,
    981 F.3d 1030 (Fed. Cir. 2020) ...........................................................................18

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996) .............................................................................59

*Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*,
    853 F.3d 1272 (Fed. Cir. 2017) ...........................................................................24

## I.     INTRODUCTION

### A.     Plaintiffs' Introductory Remarks

#### 1.     Procedural Background

This consolidated Hatch-Waxman litigation concerns Pfizer's NURTEC ODT®, a novel fast-dispersing orally disintegrating tablet ("ODT") containing the active ingredient rimegepant.    NURTEC ODT® is indicated for the acute and preventative treatment of migraine in adults.    Seven generic pharmaceutical companies seek Food and Drug Administration approval to market rimegepant ODT drug products before the expiration of one or more of three Orange Book-listed patents protecting NURTEC ODT®: U.S. Patent Nos. 8,314,117 ("the '117 patent"), 8,759,372 ("the '372 patent"), and 11,083,724 ("the '724 patent").    These patents cover rimegepant (the '117 patent), solid state forms of rimegepant (the '372 patent), and pharmaceutical compositions and use of rimegepant in fast-dispersing dosage forms (the '724 patent).    Plaintiffs assert the '117 and '372 patents against Apotex Inc., Apotex Corp., and Changzhou Pharmaceutical Factory, the only Defendants to file Paragraph IV challenges to those patents.    Plaintiffs assert the '724 patent against all Defendants.

No terms from the '117 and '372 patents are disputed.    The parties agreed on constructions for two terms in the '724 patent (*see infra* § II); however, two terms

from the '724 patent, "molded" and "solid molded," remain in dispute (*see infra* § III).  The disputed terms are present in all independent claims of the '724 patent.

Plaintiffs' proposed constructions of "molded" and "solid molded" are faithful to the intrinsic record and to the patent specification, which is "the single best guide to the meaning of a disputed term."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) (citation omitted).  In contrast, Defendants' proposed constructions depart from the plain and ordinary meaning, violate basic principles of claim construction by reading limitations from exemplary embodiments in the specification into the claims, and improperly incorporate process limitations (particularly, the step of "drying") into product claims.  Defendants also define "molded" and "solid molded" using the term "mold," which does not resolve the meaning of the disputed term.  Furthermore, Defendants' single definition for "molded" and "solid molded" renders the word "solid" superfluous.

Plaintiffs respectfully urge the Court to adopt Plaintiffs' proposed constructions.

## 2.    '724 Patent Background

The '724 patent covers novel pharmaceutical compositions containing therapeutically effective amounts of rimegepant in fast-dispersing dosage forms, and methods of treating migraine by administering those pharmaceutical compositions to patients.  Claim 11 of the '724 patent is representative:

> 11. A pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, wherein the pharmaceutical composition is in a form of an oral solid ***molded*** fast-dispersing dosage form.

Exhibit 1, U.S. Patent No. 11,083,724 ("'724 patent"), cl. 11 (A028)[1] (emphasis added).

Rimegepant was first synthesized by scientists at Plaintiff Bristol-Myers Squibb Company, and rimegepant belongs to a class of compounds known as "CGRP receptor antagonists." Calcitonin Gene-Related Peptide ("CGRP") is a neuropeptide present in elevated levels in the body during migraine attacks. When CGRP binds to CGRP receptors in the brain, patients experience characteristic symptoms of migraine. Treatment with CGRP receptor antagonists, like rimegepant, normalizes CGRP activity and ameliorates migraine symptoms in patients.

Unexpectedly, the inventors of the '724 patent found that formulating rimegepant in the fast-dispersing dosage forms of the claims leads to significantly faster drug absorption and higher systemic exposure than non-fast-dispersing dosage forms. *See, e.g.*, *id.* at Table 5 (A021). The claimed fast-dispersing dosage forms result in an earlier onset of action and improved efficacy, which are highly desirable

---

[1] "(A###)" are citations to the Joint Appendix submitted herewith.

properties for a drug used to treat migraine—a disorder characterized by debilitating pain, nausea, and sensitivity to sound and light. *See, e.g.*, *id.* at 1:29-60 (A009).

The '724 patent explains that the compositions of the invention can be prepared in a variety of dosage forms "such as tablets, capsules, nasal sprays, powders, granules, ointments, solutions, suppositories, injections, inhalants, gels, microspheres, and aerosols." *Id.* at 9:19-23 (A013).

These disclosed dosage forms comprise multiple states of matter, including solids and liquids. Consistent with this disclosure of dosage forms in multiple states, the patent provides examples of different routes of administration that can be used with the invention. *See id.* at 11:36-39 (A014) ("Typical routes of administering the pharmaceutical compositions of the invention include, without limitation, oral, topical, transdermal, inhalation, parenteral, sublingual, buccal, rectal, vaginal, and intranasal."). The patent distinguishes between solid and liquid compositions of the invention and gives typical unit dosage ranges for each of those states of matter. *See id.* at 11:53-61 (A014) ("Solid compositions are normally formulated in dosage units providing from about 1 to about 1000 mg of the active ingredient per dose. . . . Liquid compositions are generally in a unit dosage range of 1-100 mg/mL.").

The '724 patent claims are directed to pharmaceutical compositions in the "solid" state that are administered "orally." *See id.* at cls. 1, 8, 11 (A028) (independent claims containing the limitation "***oral solid*** molded fast-dispersing

4

dosage form" (emphasis added)).  A person of ordinary skill would understand that the molded form (i.e., the shape) of an oral solid pharmaceutical composition impacts how the composition functions.  Exhibit 2, Declaration of Cory J. Berkland, Ph.D. in Support of Plaintiffs' Opening Claim Construction Brief with Exhibits A-C, dated July 1, 2025 ("Berkland Decl.") ¶¶ 17, 35 (A035-A036, A042).  For example, the shape of an oral solid dosage form can be one factor that impacts how "fast-dispersing" the dosage form is, as certain shapes impart greater surface area, and greater surface area imparts faster dissolution and thus faster dispersion.  *Id.* at ¶¶ 34, 35 (A041, A042).  Moreover, the solid dosage form is typically in a shape conducive to the patient placing the pharmaceutical composition on the tongue, under the tongue, and/or pocketed in the cheek, so that saliva can contact and dissolve the composition rapidly.  *Id.* at ¶ 35 (A042).  The term "molded" in the '724 patent and claims relates to forming the composition into a desired shape.

The '724 patent states that the "pharmaceutical compositions of the present invention may be manufactured in conventional methods known in the art, for example, by means of conventional mixing, dissolving, granulating, dragee-making, levigating, emulsifying, encapsulating, entrapping, lyophilizing processes and the like."  Ex. 1, '724 patent, 9:58-63 (A013).  A brief technological overview of these conventional manufacturing methods can be found in Exhibit 2, Declaration of Cory

J. Berkland, Ph.D. in Support of Plaintiffs' Opening Claim Construction Brief with Exhibits A-C, dated July 1, 2025 ("Berkland Decl.") ¶¶ 19-33 (A036-A041).

### B.    Defendants' Introductory Remarks

The parties' only claim construction dispute concerns the terms "solid molded" and "molded," which are part of the clause "oral solid molded fast-dispersing dosage form" in all claims of U.S. Patent No. 11,083,724.

Defendants propose that "solid molded" and "molded" be construed to mean "a [solid] form obtained by placing a composition in a mold and then drying the composition." This comports with the plain and ordinary meaning of the term to a POSA, as demonstrated by the '724 patent's specification and the well-established meaning in the relevant art. By contrast, Plaintiffs seek to impermissibly broaden the claim by relying on its meaning to a layperson, not a POSA with experience in pharmaceutical formulation. Indeed, Plaintiffs primarily rely upon general-purpose dictionaries *outside* the relevant pharmaceutical formulation field to broaden the term "molded" beyond what it means to a POSA.

The '724 patent claims an "oral solid molded fast-dispersing dosage form" of the known drug rimegepant. As of the '724 patent's effective filing date of March 25, 2018, the pharmaceutical formulation field was well developed. In the context of the '724 patent, a POSA would be a person with a graduate degree (e.g., Ph.D.) in pharmaceutical science or a related discipline and a few years of experience in

6

formulation of pharmaceutical dosage forms, including the design and development of ODT formulations. Ex. 13, Declaration of Dr. Kinam Park, Ph.D. ("Park Decl.") ¶19 (A443). The POSA would have been familiar with different types of oral pharmaceutical dosage forms, their manufacture, advantages, and drawbacks. Ex. 1 ('724 patent) 9:24-37; 11:36-52 (A013; A014) ("Compositions that will be administered to a subject or patient may take the form of one or more dosage units. Actual methods of preparing such dosage forms are known, or will be apparent, to those skilled in this art.").

Tablet dosage forms were well-established in the art by the time of the '724 patent. Ex. 13 (Park Decl.), ¶¶22-36 (A444-A450). A POSA would have understood tablets to be generally divided into two categories: compressed tablets and molded tablets. *Id*. ¶22 (A444-A445).

As Dr. Park explains, "compressed" tablets are made by placing a composition as a solid, dry mixture into a die or punch and applying high pressure to form a tablet. *Id*. ¶22 (A444-A445). In contrast, "molded" tablets are made by placing a composition as a wetted solid or solution into a mold and then drying the composition with little or no pressure applied. *Id*. ¶22 (A444-A445). The two categories of tablets were well-known as of the priority date of the '724 patent. *See id*. ¶22-36 (A444-A450); Ex. 13-D (Remington: The Science and Practice of Pharmacy, 20th Edition (Philadelphia College of Pharmacy and Science, 2000)

7

("Remington")), 858-59, 881 (A564-A565, A587); Ex. 13-E (Chapter 8 of Ansel's Pharmaceutical Dosage Forms and Drug Delivery Systems (Tenth Edition, 2014) ("Ansel")), 263-298 (A607-A642); Ex. 13-F (United States Pharmacopeia 35 (2012), <1151> Pharmaceutical Dosage Forms ("U.S. Pharmacopeia")), 1566.

## C.    Plaintiffs' Reply Introduction

The parties dispute whether the Court should construe "molded" (and "solid molded") in the asserted product claims according to its plain and ordinary meaning or whether the Court should incorporate extraneous process limitations from exemplary embodiments into its construction.  Plaintiffs assert that the meaning of the term "molded" (i.e., "formed in a desired shape") is clear from the intrinsic evidence and that nothing in the intrinsic record requires reading a process limitation (i.e., drying the composition in a mold) from an exemplary embodiment in the specification into the claims.  Defendants maintain that "a POSA would have understood the solid 'molded' dosage forms of the '724 patent to refer to tablets, and more specifically 'molded tablets.'" Defendants' Answering Position, *infra* at 25. Defendants therefore propose a construction that limits the claims to a process used in the specification to make exemplary tablets.

Plaintiffs' construction is true to the intrinsic evidence and reflects the specification's stated purpose of the mold—to produce a solid form in any desired shape.  In contrast, Defendants' construction narrows the claims to tablets despite

clear language in the specification and the claims of the '724 patent demonstrating that the claims are not so limited. Defendants also have not identified any clear and unambiguous language in the specification or file history that rises to the level of a disavowal, evidences the applicants' intent to limit the "dosage form[s]" of the claims to tablets dried in a mold, or establishes that drying the composition in a mold is an essential component of the claimed invention. Defendants therefore have not overcome the prohibitions against reading limitations from exemplary embodiments in the specification into the claims and incorporating process limitations into product claims. While the Court need not rely on extrinsic evidence to construe the terms at issue, Defendants' extrinsic evidence actually confirms that their proposed construction is unduly narrow because Defendants' references expressly describe oral solid molded dosage forms that are neither tablets nor dried in a mold.

For the foregoing reasons, Plaintiffs respectfully request that the Court adopt their proposed construction.[2]

---

[2] Plaintiffs initially identified the term "molded" for construction and Defendants initially identified "solid molded" for construction. *See* Exhibit 11, Joint Claim Construction Chart at Exhibit B (Disputed Terms to be Construed by the Court) (A236-A237). The parties do not appear to dispute that "solid molded" requires the claimed dosage forms to be "solid." The parties continue to dispute the meaning of the term "molded."

### D.    Defendants' Sur-Reply Introduction

Defendants' construction comports with the examples in the specification, the prosecution history, and the POSA's understanding.    In contrast, Plaintiffs' construction relies on selective, strained readings of the intrinsic evidence and use of irrelevant extrinsic evidence.    Defendants' construction should be adopted.

Plaintiffs set up a strawman, characterizing Defendants' construction as limiting the claimed "dosage forms" to tablets, and then knock down their own strawman by arguing that the term "dosage forms" is broader than tablets.    Plaintiffs' Reply Introduction, *supra* § I.C.    Defendants' construction is not limited to tablets, as discussed in greater detail below; indeed, the terms to be construed are "molded" and "solid molded," not "dosage form."    Plaintiffs cite an isolated sentence in Defendants' answering position that rightly notes that the solid molded dosage forms of the '724 patent "refer" to tablets, while ignoring the following sentence that specifies the plain meaning of "solid molded" to a POSA: "a solid *form* obtained by placing a composition in a mold and then drying the *composition*," (Defendants' Answering Position, *supra* § III.B.). Defendants' construction is not limited to tablets.    Even if Defendants' construction were so limited, the Court should still adopt Defendants' construction based on the intrinsic and extrinsic evidence.

10

## II.     AGREED-UPON CONSTRUCTIONS

The parties have agreed to the following constructions:

| Claim Term | Parties' Agreed Construction |
|---|---|
| **"fast-dispersing"**<br><br>'724 patent claims 2, 4, 6, 9, 11-15, 18-20 | "Disintegrating or dispersing within 1 to 60 seconds after being placed in contact with a fluid" |
| **"therapeutically effective amount"**<br><br>'724 patent claims 2, 4, 6, 9, 11-15, 18-20 | "Any amount of an agent that, when used alone or in combination with another agent, protects a subject against the onset of a disease or promotes disease regression evidenced by a decrease in severity of disease symptoms, an increase in frequency and duration of disease symptom-free periods, or relief from impairment or disability due to the disease affliction" |

## III.     DISPUTED CONSTRUCTIONS

### A.     Plaintiffs' Opening Position

#### 1.     Plaintiffs' Opening Position for "Molded"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **"molded"/"solid molded"**<br><br>'724 patent claims 2, 4, 6, 9, 11-15, 18-20 | Plain and ordinary meaning, i.e., "formed in a desired shape" | "solid molded" means "a solid form obtained by placing a composition in a mold and then drying the composition" |

11

### a.  The Intrinsic Evidence Supports Plaintiffs' Proposed Construction of "Molded"

The intrinsic record uses the term "molded" in accordance with its plain and ordinary meaning—i.e., formed in a desired shape.  Ex. 1, '724 patent 10:23-25 (A013).  Plaintiffs' proposed construction of "molded" is rooted in how the term is used in the specification.  *Id.* at 10:23-25 (A013).  The Court need not look past the specification to ascertain the meaning of "molded."  *Phillips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.") (citation modified).

The '724 patent describes an exemplary formulation of the claimed pharmaceutical composition "in the form of an oral solid molded fast-dispersing dosage form."  Ex. 1, '724 patent 5:1-8 (A011).  The specification also gives non-exclusive examples of how to prepare the claimed pharmaceutical compositions "in the form of an oral solid molded fast-dispersing dosage form" in which the dosage form can be "molded" through a freeze-drying (i.e., lyophilization) process by referring to two patents that it incorporates by reference.  *Id.* at 9:63-67 (A013) ("***In one aspect of the invention*** the pharmaceutical compositions are prepared in [an] oral solid molded fast-dispersing dosage form, ***such as*** described in U.S. Pat. No. 9,192,580, issued Nov. 24, 2015." (emphasis added)); *id.* at 10:15-18 (A013) ("The dosage forms according to the invention ***can*** be prepared according to the process

disclosed in Gregory et al., U.K. Patent No. 1,548,022 using fish gelatin as the carrier." (emphasis added)).[3]   In those exemplary manufacturing processes, the specification states that "[t]he composition can be contained in a mold" during lyophilization.  *Id.* at 10:23-24 (A013).  The patent further states the purpose of the mold in the exemplary processes: "to produce a solid form in any desired shape." *Id.* at 10:24-25 (A013).  Plaintiffs' proposed construction of "molded" flows directly from this stated purpose of the "mold" in the exemplary manufacturing processes described in the specification.  Although the particular mold might vary depending on which process is used to make the claimed dosage form (e.g., granulation, lyophilization, etc.), the purpose of the mold is to form the composition into a desired shape.  *See, e.g.*, *id.* at 10:23-25 (A013); Ex. 2, Berkland Decl. ¶¶ 22, 23, 25 (A037-A040).   For example, the granulation process described in Example 1 of the '724 patent uses a rotary tablet press to form a tablet in a desired shape.  Ex. 1, '724 patent 14:20-26 (A015); Ex. 2, Berkland Decl. ¶ 22 (A037-A039).  Although the tablets made from the process described in Example 1 are not "fast-dispersing," they are still examples of "molded" dosage forms.

---

[3]U.S. Patent No. 9,192,580 is attached hereto as Exhibit 3 (A087-A095), and U.K. Patent No. 1,548,022 is attached hereto as Exhibit 4 (A096-A103).

### b.     Extrinsic Evidence Supports Plaintiffs' Proposed Construction

While not necessary to construe the term "molded," extrinsic evidence is consistent with Plaintiffs' proposed construction.  A court may, in its discretion, consider extrinsic evidence, provided it does not contradict the meaning expressed in the patent specification.  *Phillips*, 415 F.3d at 1317; *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 981 (Fed. Cir. 1995).

Publications before the March 25, 2018 filing date of the '724 patent confirm that Plaintiffs' proposed construction of molded (i.e., "formed in a desired shape") is consistent with the understanding of that term by those skilled in the art.  *See, e.g.*, Exhibit 5, AM. PHARMACISTS ASS'N TABLETING SPECIFICATION MANUAL 8 (Linda L. Young ed., 7th ed. 2006) (describing "Dies" in a section on "Die Terminology" as "[a] tool that serves as the mold in which the product is compressed to form the desired peripheral (outer) size and shape of a tablet.") (A109); Exhibit 6, U.S. Patent Application Publ'n No. 2013/0203791, [0003] (A129) ("A typical method of making tablets involves compressing a mixture of active pharmaceutical ingredient(s) and excipient(s) in a die or mold to give the tablet the desired shape and hardness."); Exhibit 7, U.S. Patent Application Publ'n No. 2017/0247381, [0090] (A186) ("In the tableting step, a tableting die mold is filled with final blend material and the mixture is compressed to form a tablet core that is ejected. . . . Generally, each tablet

14

is made by pressing the granules inside a die, made up of hardened steel.  The die is typically a disc shape with a hole cut through its center.").

Similarly, numerous dictionaries define "molded" in the same way as Plaintiffs' construction—i.e., as forming a particular shape.  *See, e.g.*, Exhibit 8, *Mold*, MERRIAM-WEBSTER DICTIONARY at 2 (A210) (last visited June 30, 2025), https://www.merriam-webster.com/dictionary/mold (defining "mold" as "to knead or work (a material, such as dough or clay) into a desired consistency or shape"); Exhibit 9, *Mold*, DICTIONARY.COM at 2 (A216) (last visited June 30, 2025), https://www.dictionary.com/browse/mold (defining "mold" as "to work into a required shape or form; shape"); Exhibit 10, *Mold*, COLLINS ENGLISH DICTIONARY at 2 (A223) (last visited June 30, 2025), https://www.collinsdictionary.com/us/dictionary/english/mold (defining "mold" contextually:  "[i]f you mold a soft substance such as plastic or clay, you make it into a particular shape or into an object").

        c.      **Defendants' Proposed Construction of "Molded" Is Flawed**

                i.      **Defendants' Proposed Construction Improperly Reads Limitations from an Exemplary Embodiment into the Claim**

As a preliminary matter, Defendants' proposed construction of "molded" includes the term "mold," which does not resolve the meaning of the disputed term.

*See Harris Corp. v. IXYS Corp.*, 114 F.3d 1149, 1152 (Fed. Cir. 1997) (finding circularity of proposed construction a "compelling reason" to reject it).

In addition, Defendants' proposed construction of "molded" violates a core tenet of claim construction because it reads limitations from an exemplary embodiment described in the specification into the claims. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004) ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited.").  The '724 patent does not state at any point that the claimed composition needs to be "dr[ied]," much less "plac[ed] . . . in a mold and then dr[ied]."  Defendants' proposed limitation "placing a composition in a mold and then drying the composition" improperly reads into the claims a preferred process for creating "an oral solid molded fast-dispersing dosage form," i.e., drying in a lyophilization mold. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309-10 (Fed. Cir. 2014) (determining that the district court erred in importing limitations from the only disclosed embodiment into the claim where the specification neither disavowed or disclaimed the plain meaning of the claim term nor otherwise limited the claims to the disclosed embodiment).

Even where the specification describes only a single embodiment, "the claims of the patent will not be read restrictively unless the patentee has demonstrated a

clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co.*, 358 F.3d at 906 (citation omitted); *see also GE Lighting Sols., LLC*, 750 F.3d at 1309-10. There is no such "clear intention to limit claim scope" here. Indeed, the '724 patent specification explicitly discloses methods for manufacturing "pharmaceutical compositions of the present invention" that do not require drying the composition in a mold. Ex. 1, '724 patent 9:58-63 (A013) ("[T]he pharmaceutical compositions of the present invention may be manufactured in conventional methods known in the art, for example, by means of conventional mixing, dissolving, granulating, dragee-making, levigating, emulsifying, encapsulating, entrapping, lyophilizing processes and the like."); *see also* Ex. 2, Berkland Decl. ¶¶ 21-33 (A037-A041). For example, the pharmaceutical compositions "of the present invention" may be manufactured by granulation, which can produce molded tablets without drying the composition in a mold. *See* Ex. 2, Berkland Decl. ¶¶ 21-22 (A037-A039). In other words, drying the claimed pharmaceutical composition in a mold is an optional step for manufacturing a "molded" dosage form.

ii.    **Defendants' Proposed Construction Improperly Imports a Process Limitation into Product Claims**

Defendants' proposed construction of "molded" fails for the independent reason that it improperly imports a process limitation (i.e., drying) into product

claims. The asserted claims recite a product, namely, a "pharmaceutical composition" and methods of using that product to treat migraine patients. The appearance of the term "molded" in the claim does not automatically open the door for Defendants to read in process limitations. Process steps may be treated as part of a product claim only if "the patentee has made clear that the process steps are an essential part of the claimed invention." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007). "The method of manufacture, even when cited as advantageous, does not of itself convert product claims into claims limited to a particular process. . . . A novel product that meets the criteria of patentability is not limited to the process by which it was made." *Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372-73 (Fed. Cir. 2000).

The Federal Circuit has consistently determined that the use of a specific method in a preferred embodiment does not automatically meet the standard required for importing a process limitation into a product claim. *See, e.g.*, *Vectura Ltd. v. GlaxoSmithKline LLC*, 981 F.3d 1030, 1037-38 (Fed. Cir. 2020) (rejecting argument that the term "composite active particles" should have been construed to require that the particles be produced by the high-energy milling process referred to in the specification, even though the specification contained a few statements suggesting that high-energy milling is required, alongside many that said it was preferred); *AstraZeneca LP v. Breath Ltd.*, 542 F. App'x 971, 975-78 (Fed. Cir. 2013) (holding

18

that the district court erred in reading the limitation "heat sterilized" into the claim phrase "micronized powder composition" because the intrinsic evidence did not show a clear disclaimer, despite the specification "refer[ring] only to dry heat sterilization as the preferred method of achieving the claimed "micronized powder composition" and criticiz[ing], often sharply, other forms of sterilization"). Nowhere does the '724 patent specification state that "placing [the claimed] composition in a mold and then drying the composition" is an essential part of the claimed invention. The patent's identification of freeze-drying in a mold as a preferred step in an exemplary preferred embodiment is not "language of requirement." *Andersen*, 474 F.3d at 1372-73, 1375.

### iii. Remington Is Not Intrinsic Evidence Because the Specification Neither Identifies with Detailed Particularity the Specific Material it Incorporates Nor Clearly Indicates Where that Material Is Found

Based on the parties' exchanges to date, Plaintiffs expect Defendants to rely on Remington: The Science and Practice of Pharmacy, 20th Edition (2000) ("Remington") as intrinsic evidence to support Defendants' proposed construction. *See* Ex. 11, Joint Claim Construction Chart at Ex. B, 2 (A237) (citing Remington "e.g., at 858-885" among "Defendants' Intrinsic Evidence"). Remington, however, is not intrinsic evidence.

Remington is a 2,000-page treatise that is generally cited in the specification of the '724 patent to support the statement that methods of preparing dosage forms for typical routes of administration which "include, without limitation, oral, topical transdermal, inhalation, parenteral, sublingual, buccal, rectal, vaginal, and intranasal" are known to those skilled in the art. *See* Ex. 1, '724 patent 11:36-52 (A014). Remington is not cited in the section of the specification describing an exemplary process for manufacturing an oral solid molded fast-dispersing dosage form. The '724 patent's non-specific citation to the entirety of Remington is insufficient to incorporate by reference anything therein. Therefore, the exemplary excerpt Defendants identified ("e.g., at 858-885") is not intrinsic evidence.

The standard for incorporation by reference is exacting. "To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents." *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282-83 (Fed. Cir. 2000). Whether and to what extent material has been incorporated by reference into a host document is a question of law. *Id*. at 1283.

The '724 patent specification does not identify with any particularity, let alone with "detailed particularity," what specific material from Remington it incorporates. Remington is generally cited as an exemplary source to support the statement that

20

"[a]ctual methods of preparing such dosage forms are known, or will be apparent, to those skilled in this art." Ex. 1, '724 patent 11:47-49 (A014). The referenced dosage forms are those that are suitable for a non-limited list of typical routes of administration including "oral, topical, transdermal, inhalation, parenteral, sublingual, buccal, rectal, vaginal, and intranasal." *Id.* at 11:36-41 (A014). The inventors did not cite Remington to define what they meant by "molded." Indeed, the word "molded" does not even appear in the paragraph in the specification where Remington is cited. *See SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1193, 1207-08 (Fed. Cir. 2013) (refusing to consider "a voluminous technical treatise ['Doyle'] that the written description stated to be 'incorporated by reference' in its 'entirety,' without further relevant citation to specific contents" and stating that "because Doyle does not define culturing with beads as 'three-dimensional' and the inventors did not refer to Doyle for the purpose of defining what they meant by three-dimensional culturing, it does not inform our analysis in this case").

Nor does the '724 patent specification clearly indicate where the material it allegedly incorporates is found in Remington. There are no pincites to specific pages or other relevant citations to specific contents. The specification simply generically cites the entirety of Remington without indicating where any allegedly incorporated material is found.

21

Judge Andrews' opinion in *Impax Laboratories, Inc. v. Lannett Holdings Inc.* is instructive. 246 F. Supp. 3d 1024 (D. Del. 2017) (Andrews, J.). The issue in *Impax* was whether PCT/US99/12751, which published as WO99/64044 ("Marquess"), disclosed all the limitations of certain asserted patent claims directed to nasal formulations for the treatment of migraine. Marquess did not expressly disclose the claimed pH for the nasal formulations at issue. Defendants argued that Marquess nevertheless disclosed every limitation in the asserted claims because Marquess allegedly incorporated by reference Remington in its entirety and Remington disclosed the claimed pH. The incorporation by reference language in Marquess recited:

> 30    Actual methods of preparing such dosage forms are known, or will be apparent, to those skilled in this art; for example, see Remington's Pharmaceutical Sciences, Mack Publishing Company, Easton, Pennsylvania, 19th Edition, 1995, the complete disclosure of which is hereby incorporated by reference. The composition or formulation to be
>
> 33

Exhibit 12, International Patent Application Publication No. WO 99/64044 ("Marquess") at 33:28-31 (A278). The incorporation-by-reference language in Marquess tracks, almost verbatim, the incorporation-by-reference language in the '724 patent. *See* Ex. 1, '724 patent 11:47-52 (A014) ("Actual methods of preparing such dosage forms are known, or will be apparent, to those skilled in this art; for

example, see [Remington].”); *id.* at 39:3-7 (A028) (“The disclosures of these publications are hereby incorporated in their entireties by reference. . . .”).

Even in the face of the express incorporation-by-reference language in Marquess, the *Impax* court determined that the non-specific reference to the entirety of Remington was insufficient to disclose the allegedly incorporated material. As in *Impax*, the '724 patent does not incorporate Remington by reference, and it is therefore not intrinsic evidence.

### 2. Plaintiffs' Opening Position for "Solid Molded"

| Claim Term | Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| **"solid molded"**<br><br>'724 patent claims 2, 4, 6, 9, 11-15, 18-20 | Plain and ordinary meaning, i.e., "formed in a desired shape that is in the solid state" | "solid molded" means "a solid form obtained by placing a composition in a mold and then drying the composition" |

Plaintiffs incorporate by reference their arguments pertaining to "molded" above. As explained in Section I.A.2, a person of ordinary skill would understand that the dosage forms disclosed in the '724 patent specification comprise multiple states of matter, including solids and liquids. The word "solid" simply modifies "dosage form" to limit the term to only those dosage forms in the solid state of matter, such as tablets, capsules, powders, and granules, in contrast with dosage forms typically in another state, such as solutions, injections, inhalants, and aerosols. *See* Ex. 1, '724 patent 9:19-23 (A013). The word "molded" further limits solid

23

"dosage form" to those formed in a desired shape, which would typically exclude powders and granules. *See id.* at 9:19-23 (A013). Because "solid" modifies "dosage form" rather than "molded," Plaintiffs believe it is more proper to construe the term "molded" apart from "solid." If the Court finds it appropriate to construe "solid molded" as a single phrase, a person of ordinary skill would understand the term in accordance with its ordinary meaning, i.e., "formed in a desired shape that is in the solid state."

Defendants' single proposed definition for "molded" and "solid molded" is additionally flawed for rendering the word "solid" superfluous. *Wasica Fin. GmbH v. Cont'l Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous."). As shown above, "solid" and "molded" have different meanings and modify "dosage form" in different ways. Defendants' single proposed definition erases these distinctions. The Court should adopt Plaintiffs' constructions because they give meaning to all terms of the claims. *Merck & Co., Inc. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

### B. Defendants' Answering Position

Claim terms are to be interpreted from the perspective of a POSA in the relevant field, not with a layperson's understanding. *Netcraft Corp. v. Bay, Inc.*, 549

F.3d 1394, 1397 (Fed. Cir. 2008). Here, a POSA would have understood the solid "molded" dosage forms of the '724 patent to refer to tablets, and more specifically "molded tablets." Ex. 13 (Park Decl.) ¶21 (A444). The extrinsic and intrinsic evidence demonstrates that the plain and ordinary meaning of "solid molded" to a POSA is a solid form obtained by placing a composition in a mold and then drying the composition.

### 1. The intrinsic evidence supports Defendants' construction.

The specification of the '724 patent makes clear that a "solid molded" dosage form is one that is obtained by placing a composition in a mold and then drying the composition, consistent with its plain and ordinary meaning in the art. Ex, 1 ('724 patent), 10:16-34 (A013). The specification is the most important source of evidence regarding the meaning of the claim term "solid molded." *See Phillips*, 415 F.3d at 1315.

### a. The specification's consistent use of the phrase "solid molded" supports Defendants' construction.

The claim term "solid molded" should be construed as Defendants propose in light of the specification's consistent, repeated use of the term in the specific context. *See Trustees of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1368 (Fed. Cir. 2016). The specification refers to "solid molded" (or simply "molded") dosage forms ***only*** when describing dosage forms prepared by drying—and ***not*** when describing dosage forms prepared by other methods (e.g., compression).

The '724 patent indicates that "[i]n one aspect of the invention the pharmaceutical compositions are prepared in oral solid *molded* fast-dispersing dosage form, such as described in U.S. Pat. No. 9,192,580, issued Nov. 24, 2015." Ex. 1, ('724 patent), 9:64-67 (A013) (emphasis added).  As discussed below, U.S. Pat. No. 9,192,580 (the '580 patent), incorporated by reference into the specification of the '724 patent (*see* Ex. 1 ('724 patent), 39:3-7 (A028)), unambiguously relates to solid molded dosage forms prepared by drying molded compositions, and explicitly not to solid forms prepared by compression.  The '724 patent also provides more detailed disclosure of how to prepare a type of "solid fast-dispersing dosage" form using a mold:

> The dosage forms according to the invention can be prepared according to the process disclosed in Gregory et al., U.K. Patent No. 1,548,022 using fish gelatin as the carrier. Accordingly, an initial composition (or admixture) comprising the active ingredient and a solution of the fish gelatin carrier in a solvent is prepared followed by sublimation. The sublimation is preferably carried out by freeze drying the composition. The composition can be contained in a *mold* during the *freeze-drying process* to produce a solid form in any desired shape.

Ex. 1 ('724 patent), 10:16-25 (A013) (citing U.K. Patent No. 1,548,022 ("GB'022") (emphasis added)).  This description, as well as other disclosures in the specification, explain that the initial composition of the active ingredient and a solution of fish gelatin carrier turns into the "solid molded" dosage form after a freeze-drying process.  *See* Ex. 1 ('724 patent), 11:9-11 (A014) ("One or more matrix forming

26

agents may be incorporated into the solution or suspension prior to solidification (freezing).").  GB'022 is cited as disclosing "solid molded" dosage forms by the '580 patent, to which the specification explicitly directs the POSA.  Ex. 3 ('580 patent), 4:19-30 (A090). As discussed below, like the '580 patent, GB'022 is unambiguously directed to solid molded dosage forms prepared by drying molded compositions, in explicit contrast to solid dosage forms prepared by compression.

The '724 patent's only subsequent use of the term "solid molded" occurs in Example 5, where it discusses "an oral solid molded fast-dispersing dosage form *made with* fish gelatin as described herein . . ." Ex. 1 ('724 patent), 19:65-20:3 (A018) (emphasis added).  Example 5 explicitly links the term "solid molded" dosage form to the process of preparing that "solid molded" dosage form previously described in the specification.  *Id*.  As discussed above, the '724 patent describes making "solid molded" dosage forms by reference to the methods of the GB'022 and '580 patents.  These methods require placing a composition in a mold and then drying it, resulting in the claimed solid dosage form.  Thus, the specification repeatedly and consistently uses the terms "molded" and "solid molded" in connection with a *process* of making dosage forms by placing compositions in a mold and then drying them, supporting Defendants' construction.

The specification uses "molded" to describe only dosage forms that are made by placing a composition in a mold and then drying it, and not other types of dosage

forms.  The choice of different words in a specification supports the inference that "the patent applicants were aware of their separate meanings."  *See Horizon Pharma, Inc. v. Dr. Reddy's Labs Inc.*, 839 F. App'x 500, 504 (Fed. Cir. 2021).  Here, the specification ***does not use*** the terms "solid molded" or "molded" when discussing non-molded dosage forms.

Plaintiffs are wrong to allege that "[a]lthough the tablets made from the process described in Example 1 [of the '724 patent] are not 'fast-dispersing,' they are still examples of 'molded' dosage forms."  *See* Plaintiffs' Opening Position, *supra* at 13.  A POSA would know Example 1 does not describe a "molded" dosage form.  Ex. 13 (Park Decl.) ¶42 (A453).  The specification notably does not use the term "mold" to describe the tablets made with a "rotary tablet press" used in Example 1 and never describes them as "molded."  Ex. 1 ('724 patent), 14:20-26 (A015); *see also* Ex. 13 (Park Decl.) ¶42 (A453).  Even Dr. Berkland does not offer an opinion that the tablets of Example 1 are "molded."

If Example 1's tablets were actually "molded," as Plaintiffs allege, the specification could and would have used the term "molded" to describe them*.  See Horizon*, 839 F. App'x at 504.  The specification did not do so and, instead, further differentiated the compressed tablets of Examples 1-3 from the claimed invention. Examples 1-3 are comparative examples, ***not*** examples of the alleged invention.  Ex. 1 ('724 patent), 19:66-20:3 (A018) (Example 5 stating "oral solid molded fast-

dispersing dosage form made with fish gelatin, as described herein ('ODT') at a dose of 75 mg of rimegepant *was compared* to the 75 mg tablets used in the studies described in Examples 2 and 3." (emphasis added)).  Thus, the specification limited use of the terms "molded" and "solid molded" to specific disclosures of dosage forms obtained by placing a composition in a mold and then drying it, consistent with the common usage of these terms in the art.

Notably, in a parent application to the '724 patent, Plaintiffs attempted to obtain claims to compositions "in the form of an oral tablet."  In support of these claims, Plaintiffs cited to the specification's disclosure of a conventional compressed tablet, and *not* to disclosures of an "oral solid molded fast-dispersing" dosage form. *See* Ex. 14 (File History Excerpts of US Pat. App. No. 16/767,134 ("'134 App. PH"), Dec. 15, 2022 Response to Non-Final Office Action, (to support addition of claim 22 to "oral tablet" formulation, citing specification p. 6, ll. 6-14 (A747)); *id*. at May 27, 2020 Specification as Filed, at p. 6, ll. 6-19 (A674), p. 18 (A686) (p. 6 lines 6-14 disclosing conventional compressed tablet formulation similar to Example 1 formulation on p. 18, compared to p. 6 lines 15-19 separately disclosing "oral solid fast dispersing" formulation); Ex. 13 (Park Decl.), ¶¶44-47 (A454-A455) (discussing corresponding portions of '724 patent specification to '134 App. PH specification p. 6, ll. 6-19).  The claims were abandoned after an obviousness

rejection over prior art rimegepant formulations. *Id*. at Feb. 22, 2023 Office Action, Aug. 29, 2023 Notice of Abandonment (A757-A761).

This history confirms that, while the '724 patent specification separately describes both conventional compressed tablets, Plaintiffs have unsuccessfully tried to separately claim (using different language) the conventional compressed tablets they now try to shoehorn into the scope of its presently-claimed oral solid molded dosage forms. *See TIP Sys., LLC v. Phillips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008) ("[T]he claims of the patent need not encompass all disclosed embodiments."). The Court should reject Plaintiffs' attempt to expand the meaning of "solid molded" (or "molded" solid dosage forms, under their framing of the term) to dosage forms like those of Example 1, which the specification declined to describe as "molded" or as "solid molded" dosage forms. The Federal Circuit's "precedent is replete with examples of subject matter that is included in the specification, but is not claimed." *Id*. As discussed above, the specification deliberately described some dosage forms, such as those in Example 5, as "solid molded" dosage forms (and then used that terminology in the patent's claims) and described others, such as those of Example 1, differently (and did not claim them).

Accordingly, the Court should adopt a construction of "solid molded" that does not encompass the dosage forms of Example 1, because those dosage forms are not described as "solid molded" dosage forms as required by the claims. Where the

30

specification uses a term repeatedly and consistently, the Federal Circuit has adopted constructions that rely on the specification to limit claims, including where doing so requires using a particular process to prepare a product. For example, in *Medicines Co. v. Mylan, Inc.*, the Federal Circuit held that the specification's consistent description of the claim term "batches" in conjunction with an "efficient mixing" process justified affirming a construction of "batches" that required using the "efficient mixing" process. 853 F.3d 1296, 1304 (Fed. Cir. 2017).

Here, the specification's consistent use of the term "molded" only in the context of a process of making a molded tablet by placing a composition in a mold and then drying it supports Defendants' construction, which incorporates that process. *Indivior Inc. v. Dr. Reddy's Labs, S.A.*, 752 F. App'x 1024, 1033 (Fed. Cir. 2018) is likewise instructive. The *Invidior* court considered a specification that described two ways to make certain claimed films, "wet casting and extrusion." *Id*. Based on the consistent disclosures of the specification, the court construed the claim term "continually cast film" to be "film formed by the wet casting method described in the specification, which necessarily requires drying." *Id*. (emphasis added). Here, the specification discloses multiple ways of making tablets, including the compressed tablets of Example 1 and the "solid molded" tablets disclosed in the GB'022 and '580 patents, and later discussed in Example 5. Each employs claim language that clearly requires the latter process. Like the *Invidior* court, this Court

31

should follow the teachings of the specification and adopt a construction of "solid molded" that requires drying a composition in a mold.

### b. The specification incorporates prior art references supporting Defendants' construction.

Further, the '724 patent specification incorporates prior art references that reinforce that the term "solid molded" requires drying a composition after placing it in a mold. Specifically, the specification repeatedly cites the '580 and GB'022 patents in the context of "solid molded" dosage forms. Indeed, the specification of the '724 patent copies near-verbatim almost two columns from the '580 patent's disclosure, all of which describes solid molded dosage forms as including the drying process used to achieve them. *Compare* Ex. 1 ('724 patent), 10:7-11:35 (A013-A014) *with* Ex. 3 ('580 patent), 4:10-65, 5:27-6:5 (A090, A091). The '580 patent explicitly discloses and claims "[a] pharmaceutical composition in an oral solid molded fast-dispersing dosage form." Ex. 3 ('580 patent), 13:2-3 (A095). This process is clearly described as a molding process wherein the composition is placed into a mold and then dried. *Id.*, 3:51-54; 4:36-39 (A090).

A POSA would recognize that the '724 patent adopted ***identical*** phrasing as the '580 patent (which is also incorporated by reference as a whole, *see* Ex. 1 ('724 patent), 39:4-7(A028)) and that the '580 patent's disclosures are therefore informative about the scope of the '724 patent's claims. *See id.*, 9:64-67 (A013) (explicitly pointing to the '580 patent's disclosure). "'Proper claim construction

demands interpretation of the entire claim in context, not a single element in isolation.'" *Intel Corp. v. Qualcomm Inc.*, No. 2022-1046, 2023 WL 4196901, at *4 (Fed. Cir. June 27, 2023) (quoting *Hockerson-Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999), ellipsis omitted)).  Here, the context includes the wholesale adoption of phrasing of the '580 patent, which discloses preparing "solid molded" dosage forms by placing a composition in a mold and then drying it. Ex. 3 ('580 patent), 4:19-46 (A090).

Similarly, the '724 patent specification identifies Remington, a general reference pharmaceutical formulation textbook (*see* Ex. 13 (Park Decl.) ¶24 (A445), as informative, noting that "[a]ctual methods of preparing such dosage forms are known, or will be apparent, to those skilled in this art; for example, see Remington." Ex. 1 ('724 patent), 11:47-52 (A014).  Remington, like all of the references cited, is "incorporated in [its] entiret[y] by reference into [the '724 specification] in order to more fully describe the state of the art as known to those skilled therein as of the date of the invention described and claimed herein."  *Id*., 39:4-7 (A028).  Further, and as discussed below, Remington's status as a well-respected pharmaceutical formulation text makes it also authoritative extrinsic evidence of the plain meaning of terms to a POSA in the relevant field.  *Cf. Impax Labs, Inc. v. Lannett Holdings, Inc.*, No. 14-984-RGA, 2015 WL 7737309, at *6 (D. Del. Dec. 1, 2015) (characterizing Remington as "a recognized authority on pharmaceutical science"

33

and relying on it as evidence of how disputed "term would have been understood by" a POSA).[4]

Remington teaches that the "usual[]" method for making "molded" tablets is "from moist material, using a triturate mold that gives them the shape of cut sections of a cylinder."  Ex. 13-D (Remington) at 859 (A565).  As Dr. Park explains, Remington's discussion of molded tablets is consistent with the understanding of a POSA: the ordinary meaning of a "molded" tablet is one prepared by placing a composition in a mold and then drying it.  Ex. 13 (Park Decl.), ¶22 (A444-A445).

Moreover, as discussed, even if Remington is not intrinsic evidence, it is nevertheless consistent with both the specification and a POSA's understanding of

---

[4] Although Remington's authoritative status regarding a POSA's understanding of the meaning of terms in pharmaceutical formulation science makes Plaintiffs' argument about its status as intrinsic evidence a red herring, Plaintiffs are also wrong.  *See Sys. Div., Inc. v. Teknek LLC*, 59 F. App'x 333, 340 (Fed. Cir. 2003) (reference "patent was incorporated by reference in its entirety into the [challenged] patent, thus rendering [it] intrinsic evidence with respect to the patents-in-suit."). Plaintiffs' cited cases refused to allow lengthy references to be used to contradict the specification but do not bar lengthy references from being intrinsic evidence as a matter of law.  *See* Plaintiffs' Opening Position, *supra* at 21.  Here there is no contradiction between Remington's discussion and the '724 patent specification of the term "molded." *See, e.g.*, Ex. 13 (Park Decl.) ¶ 24-29 (A445-448).  Moreover, Remington is explicitly cited for its disclosure of "[a]ctual methods" of making the relevant pharmaceutical dosage forms, and thus, even if ***all*** of Remington were not intrinsic evidence, at least the sections of Remington, like Chapter 45, discussing "molded" dosage forms, are indeed incorporated by reference into the '724 patent. *Cf. SkinMedica, Inc. v. Histogen Inc.*, 727 F.3d 1187, 1207 (Fed. Cir. 2013) (considering the context in which treatise was cited in specification).

34

the meaning of the term "solid molded" in the context of the '724 patent, as dosage forms obtained by placing compositions in a mold and then drying them.

### 2.    The extrinsic evidence supports Defendants' construction.

As is clear from the intrinsic record above, and as corroborated by the extrinsic evidence discussed below, "molded" is a term of art in pharmaceutical science, with a plain meaning that would be apparent to a POSA, and which *differs* from the meaning a layperson might assign without the requisite technological context. "[D]etermining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art." *Phillips*, 415 F.3d at 1314. Extrinsic evidence can be helpful in determining the ordinary meaning in a particular scientific domain, especially where, in that context, the term may be used in more specific ways than in common speech. *Id.* at 1317-19.

Here, the extrinsic evidence further supports Defendants' construction. First, as discussed above, the specification of the '724 patent incorporates prior art references that disclose "molded" dosage forms and defines those as prepared by placing a composition in a mold and then drying it. Even apart from the '724 patent's incorporation by reference of Remington, it is furthermore highly relevant extrinsic evidence to how a POSA would understand "molded" dosage forms.

And as Dr. Park explains, Remington, Ansel, and the U.S. Pharmacopeia are additional authoritative and well-known references in the field of formulation

science that describe solid molded tablets as being prepared by placing a composition in a mold and then drying, which is entirely consistent with a POSA's understanding. Ex. 13 (Park Decl.), ¶¶22-37 (A444-A451). For example, the U.S. Pharmacopeia, a well-established standard-setting organization in the pharmaceutical field, defines "Molded tablet" as one "that has been formed by dampening the ingredients and pressing into a mold, then removing and drying the resulting solid mass." Ex. 13-F (U.S. Pharmacopeia), 783 (A662); Ex. 13 (Park Decl.) ¶36 (A450). These references reveal a POSA's understanding of the term "solid molded" even apart from the citations to such evidence directly in the specification. *Id*.

### 3.    Plaintiffs' attacks on Defendants' construction fail.

Defendants' construction does not improperly limit the claims. Plaintiffs argue that Defendants' construction "reads limitations from an exemplary embodiment described in the specification into the claims." *See* Plaintiffs' Opening Position, *supra* at 16. Not so. Plaintiffs' cases stand for the general proposition that a specification's only disclosed embodiment should not be read to limit the claims absent clear language of exclusion. Plaintiffs' Opening Position, *supra* at 15-19 (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309-10 (Fed. Cir. 2014 and *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004)). That is not what Defendants' construction does. As discussed above, the Federal

Circuit has frequently adopted constructions based on the consistent usage of terms in the specification. *Trustees of Columbia Univ.*, 811 F.3d at 1368; *Medicines Co.*, 853 F.3d at 1304; *Indivior*, 752 F. App'x at 1033. Where, as here, the specification's use of a claim term sheds light on its meaning, it would be error to ignore that context and improperly broaden the term. *Medicines Co.*, 853 F.3d at 1304; *Indivior*, 752 F. App'x at 1033.

Defendants' construction is also proper even where Example 1 of the '724 patent is outside the claims' properly construed scope. As discussed above, the prosecution history supports a distinction between Example 1 and the claimed molded solid dosage forms. And a patent's claims need not be construed to reach every embodiment, because patentees can and often do obtain claims directed to subsets of a patent's disclosure. *TIP*, 529 F.3d at 1373. So too here, Plaintiffs' expert points only to parts of the specification that are much broader than what is claimed. *See, e.g.*, Berkland Decl. ¶34 (A041) ("The pharmaceutical compositions of the present invention can be prepared in any suitable dosage form including, for example, such as tablets, capsules, nasal sprays, powders, granules, ointments, solutions, suppositories, injections, inhalants, gels, microspheres, and aerosols.") (citing Ex. 1 ('724 patent), 9:19-23; 9:19-23 (A013)). Various of these dosage forms (like solutions, injections, and aerosols) are clearly outside the scope of the claimed "oral solid molded fast-dispersing dosage form." Ex. 13 (Park Decl.) ¶51 (A457).

The specification's disclosure of clearly-unclaimed dosage forms cannot be used to expand the meaning of the term "molded" beyond its plain meaning to a POSA in the context of the claims and specification.

By contrast, Defendants' proposed construction properly relies on the intrinsic evidence, which uses the term "solid molded" in a specific way, consistent with its widely accepted and understood meaning to a POSA in the relevant field, and this clear meaning informs the proper construction.

For the same reasons, Plaintiffs' argument that Defendants' construction improperly imports a process limitation into the claims fails. When, as here, the specification makes clear that a claim term implicates the use of a particular process, the Federal Circuit has agreed that a construction incorporating that process is not improper. *Medicines Co.*, 853 F.3d at 1304; *Indivior*, 752 F. App'x at 1033. Furthermore, Plaintiffs construe a "molded" dosage form as one "*formed* in a desired shape"—use of the verb "formed" necessarily implicates a process limitation. Plaintiffs' construction concedes that the claims require a process limitation.

Defendants' construction is not circular. Plaintiffs' Opening Position, *supra* at 15-16. The only case on which Plaintiffs rely, *Harris Corp. v. IXYS Corp*, rejected a construction that was ***logically*** circular. 114 F.3d 1149, 1152 (Fed. Cir. 1997). In contrast, Defendants' construction of "solid molded" merely uses the term "mold" as part of providing the necessary explanatory context for the ordinary meaning of

the term to a POSA, which is prepared by placing a composition in a mold and then drying it. Indeed, "mold" is a noun in the proposed construction, and "molded" is an adjective in the claims. Thus, the presence of the word "mold" in Defendants' construction creates no circularity. Federal Circuit precedent is in accord. *See Indivior*, 752 F. App'x at 1033 (approving construction of claim term "continually **cast film**" to be "**film** formed by the wet **casting** method described in the specification, which necessarily requires drying") (emphasis added).

Plaintiffs argue that Defendants' construction renders the term "solid" superfluous. *See* Plaintiffs' Opening Position, *supra* at 24. Not so. Defendants' construction provides the plain meaning of the phase "solid molded," which is the same meaning as the term "molded" when in context of a "solid" "oral dosage form," as in the claims. However, Defendants' construction accounts for the plain and ordinary meaning of both the term "solid" and "molded" in the context of the claimed dosage form, i.e., a dosage form prepared by "placing a composition in a mold and then drying it." *See* Ex. 10 at 2 ("A mold is a hollow container you pour liquid into. When the liquid **becomes solid**, it takes the same shape as **the mold**." (emphasis added)).

### 4. Plaintiffs' construction should be rejected.

Plaintiffs' construction, i.e., "formed in a desired shape," should be rejected because it has no intrinsic support and entirely ignores how a POSA would have

understood "molded" in the field of pharmaceutical formulation. Plaintiffs rely on a single sentence in the specification to support their construction: "The composition can be contained in a mold during the freeze-drying process to produce a solid form in any desired shape," which is the only use in the specification of the word "shape." Ex. 1 ('724 patent), 10:23-25 (A013). But this sentence does not indicate that "molded" means "formed in a desired shape." The fact that a molded form can be in "a" or "any desired shape" does not *equate* a "molded" dosage form with a dosage form in "a desired shape." The rest of the specification also does not support Plaintiffs' construction; in fact, there is no discussion in the specification of any significance to the "shape" of the claimed dosage form. Ex. 13 (Park Decl.) ¶52 (A457-A458).

Plaintiffs' construction ignores the context of the '724 patent claims and the specification and, instead, adopts a layperson's understanding of the word "molded." As discussed above, the '724 patent is directed to pharmaceutical dosage forms and the claim terms must be construed as understood by a POSA in this field. Ex. 13 (Park Decl.) ¶21 (A444).

Plaintiffs cited extrinsic evidence is irrelevant and should be rejected. Plaintiffs cite extrinsic and irrelevant references that use the word "mold" to describe tablet dies. *See* Plaintiffs' Opening Position, *supra* at 14-15. But Plaintiffs fail to explain why these references are relevant, i.e., why a POSA would have referred to

them to understand the meaning of "molded" or "solid molded" in the claims of the '724 patent. None of Plaintiffs' extrinsic references use the term "molded" to refer to solid dosage forms produced in those dies. *See* Exs. 5-7 (A104-A207). Instead, each of Plaintiffs' references merely uses the noun "mold" to describe a component of a machine that can be used in certain manufacturing processes. *Id*. This distinction is relevant for multiple reasons.

First, as Dr. Park explains, these cherry-picked examples describing one part of a machine as a "mold" do not displace the POSA's consistent (and unrebutted) understanding that "molded . . . dosage forms" are those prepared using a specific process consistent with Defendants' construction. Ex. 13 (Park Decl.) ¶¶53-57 (A458-A459). The POSA's understanding is evidenced by prior art references that use the term "molded," including the '580 patent and Remington. *Id*. at ¶¶22-37 (A444-A451). Notably, Dr. Berkland offers no opinion supporting Plaintiffs' reliance on these references.

Second, Plaintiffs' citation to references describing making tablets using a "mold" refutes Plaintiffs' argument that a "molded" tablet is something other than a tablet that has been prepared ***using a mold***. Unless a "molded" tablet is a tablet prepared using a molding process, there is no logical connection between the "molds" discussed in Plaintiffs' references and the "solid molded" dosage forms of the claimed invention. *Cf*. Plaintiffs' Opening Position, *supra* at 14-15.

41

Further, Plaintiffs also cite general purpose dictionaries irrelevant to pharmaceutical formulations and which likewise fail to support their construction. As Dr. Park explains, a "solid molded" dosage form (or, in Plaintiffs' version, a "molded" solid dosage form) is a term of art in the field of formulation science. Ex. 13 (Park Decl.) ¶58 (A459-A460). Where a term is one of art in the relevant field, with a plain meaning to POSAs that differs from the meaning to a layperson, a general-purpose dictionary is not informative as to the scope of the claims. *Phillips*, 415 F.3d at 1322. Notably, Dr. Berkland offers no opinion supporting Plaintiffs' reliance on these dictionaries. As discussed above, a POSA would understand "molded" according to its ordinary meaning in the art, as reflected in references such as Remington, Ansel, and the U.S. Pharmacopeia. Plaintiffs fail to cite any authoritative reference or even address Remington's contrary disclosure even though it was incorporated by reference into the specification. Thus, the Court should disregard Plaintiffs' attempt to use common dictionaries. *Id*.

However, even if general-purpose dictionaries were relevant, they still fail to support Plaintiffs' proposed construction. For example, Plaintiffs rely on the ***third*** definition of "mold" in the Collins American Dictionary. *See* Plaintiffs' Opening Position, *supra* at 14; Ex. 10, 2 (A223). In contrast, the ***first*** definition supports ***Defendants'*** construction: "A mold is a hollow container you pour liquid into. When the liquid becomes solid, it takes the same shape as the mold." *Id*. Thus, even

according to Plaintiffs' own general-purpose dictionary, a molded dosage form should be construed as one prepared by placing a composition in a mold and then drying it. *Id*. Thus, the Court should adopt Defendants' construction and reject Plaintiffs' improperly broad construction.

### C. Plaintiffs' Reply Position

#### 1. Defendants' Proposed Construction Is Incorrect Because It Limits the Claimed Dosage Forms to Tablets that Are Dried In a Mold

Defendants' construction of "molded"/"solid molded" must be rejected because it limits the claimed "oral solid molded fast-dispersing dosage form[s]" to molded tablets. Defendants' Answering Position, *supra* at 25 ("Here, a POSA would have understood the solid 'molded' dosage forms of the '724 patent to refer to ***tablets***, and more specifically 'molded ***tablets***.'"); *see id.* at 34 ("[T]he ordinary meaning of a 'molded' ***tablet*** is one prepared by placing a composition in a mold and then drying it."). Defendants' proposed construction ("a solid form obtained by placing the composition in a mold and then drying the composition") describes one way to make a molded dosage form in the form of a tablet. But there are solid "molded" dosage forms that are not tablets, including capsules and lozenges, and there are many molded tablet dosage forms that can be made without drying the composition in a mold, including tablet triturates, granulated tablets, and directly compressed tablets. *See infra* § III.C.3; *see also* Ex. 2, Berkland Decl. ¶¶ 21-23, 34-

35 (A037-A042). The claims of the '724 patent extend to all of these dosage forms and limiting the claims to one specific type of molded tablet as Defendants urge is improper.

The specification flatly contradicts Defendants' position that "a POSA would have understood the solid 'molded' dosage forms of the '724 patent to refer to tablets, and more specifically 'molded tablets.'" Defendants' Answering Position, *supra* at 25. The specification does not limit the claimed dosage forms to tablets. For example, the specification states "[t]he pharmaceutical compositions of ***the present invention*** can be prepared in ***any suitable dosage form***" including, for example, tablets, capsules, granules, and microspheres. Ex. 1, '724 patent, 9:19-23 (A013) (emphasis added). The specification also does not limit the claimed dosage forms by how they are manufactured. For example, the specification confirms that "the pharmaceutical compositions of ***the present invention*** may be manufactured in conventional methods known in the art, ***for example***, by means of conventional . . . granulating . . . lyophilizing processes and the like." Ex. 1, '724 patent, 9:58-63 (A013) (emphasis added). It then provides an example of "one aspect" of the invention that is prepared "such as" described in the '580 patent, where a composition is placed in a mold and then freeze-dried (or "lyophilized"). *Id*. at 9:64-67 (A013). The patent identifies the purpose of the mold: "to produce a solid form

in any desired shape." *Id.* at 10:24-25 (A013).  Plaintiffs' proposed construction of

"molded" is consistent with the stated purpose of the mold in the specification.

The claims themselves confirm that "oral solid molded fast-dispersing dosage

form[s]" cannot be limited to tablets.  Independent claim 11 recites:

> **11**. A pharmaceutical composition comprising a pharma-
> ceutically acceptable carrier and a therapeutically effective
> amount of rimegepant, or a pharmaceutically acceptable salt
> thereof, wherein the pharmaceutical composition is in a
> form of an oral solid molded fast-dispersing dosage form.

*Id.* at claim 11 (A028).  Claim 14, which depends from claim 11, recites: "[t]he

pharmaceutical composition of claim 11 *in the form of a tablet*":

> **14**. The pharmaceutical composition of claim **11** in the
> form of a tablet.

*Id*. at claim 14 (A028) (emphasis added).  The well-established doctrine of claim

differentiation disfavors reading a limitation from a dependent claim into an

independent claim.  *See InterDigital Commc'ns, LLC v. Int'l Trade Comm'n*, 690

F.3d 1318, 1324 (Fed. Cir. 2012) (finding that the doctrine of claim differentiation

"provide[d] a powerful argument against" narrowly construing the term "code" in

an independent claim to mean "spreading code" where a dependent claim added the

"spreading code" limitation).  Indeed, "where the limitation that is sought to be 'read

into' an independent claim already appears in a dependent claim, the doctrine of

claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358

F.3d 898, 910 (Fed. Cir. 2004).  Therefore, the "oral solid molded fast-dispersing dosage form" of claim 11 must cover dosage forms other than tablets.  *See, e.g.*, *Applications in Internet Time, LLC v. Salesforce, Inc.*, No. 2024-1133, 2024 WL 4456271, *3 (Fed. Cir. Oct. 10, 2024) (nonprecedential) (finding that the district court erred in construing "automatically detecting" in an independent claim to require the use of "one or more intelligent agents" where a dependent claim expressly recited the use of one or more intelligent agents and claim differentiation weighed against incorporating that limitation into the independent claim); *Baxalta Inc. v. Genentech, Inc.*, 972 F.3d 1341, 1345-46 (Fed. Cir. 2020) (finding that the plain language of the dependent claims weighed heavily in favor of adopting plaintiff's broader construction).

### 2. Defendants' Construction Improperly Limits the Claims to a Preferred Embodiment and Reads a Process Limitation into Product Claims

Claim terms are generally given their plain and ordinary meaning to one of skill in the art unless a patentee: (i) sets out a definition and acts as its own lexicographer, or (ii) disavows the full scope of a claim either in the specification or during prosecution.  *See, e.g.*, *Exeltis USA, Inc. v. Lupin Ltd.*, C.A. No. 22-434-RGA, 2024 WL 688489, at *3-5 (D. Del. Feb. 20, 2024) (rejecting proposed constructions that would import limitations into the claims in the absence of lexicography or disavowal); *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1358-59 (Fed. Cir.

2016) (finding that the district court erred in construing "voice input" restrictively in the absence of lexicography or disavowal); *MasterObjects, Inc. v. Meta Platforms, Inc.*, No. 2023-1097, 2024 WL 630330, at *5-7 (Fed. Cir. Feb. 15, 2024) ("Absent lexicography or disavowal, we do not depart from the plain meaning of the claims." (citation omitted)). "A patentee acts as its own lexicographer only if it 'clearly set forth a definition of the disputed claim term' in the specification. Disavowal, meanwhile, requires the specification to be 'both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.'" *Exeltis,* 2024 WL 688489, at *3 (citation omitted).

There is no dispute that the patentee did not narrow the ordinary meaning of "molded" by explicitly redefining that term in the specification or by expressly disavowing claim scope. In the absence of any lexicography or express disavowal to support their construction, Defendants rely on case law purporting to stand for the proposition that the consistent use of a term in the specification can operate as an ***implicit*** disavowal of claim scope. Defendants' Answering Position, *supra* at 30-32; 36-39 (citing *Trustees of Columbia Univ.*, *Medicines Co.*, and *Indivior*). "While [] disavowal can occur either explicitly or implicitly, ***it must be clear and unmistakable***." *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016) (emphasis added). Defendants have not identified any clear and unmistakable disclaimer here, and Defendants' cases do not support limiting the

47

plain and ordinary meaning of "molded" to an exemplary embodiment as Defendants propose.

### a.    The Cases Defendants Rely on to Support Their Implicit Disavowal Theory Do Not Apply Here

None of the cases Defendants cite to support the central legal argument in their Answering Brief (i.e., that the consistent use of a term in the specification can implicitly limit claim scope) rely on consistent usage of a term ***alone*** to limit claim scope.  Each of Defendants' cases relies on additional factors to limit the claims, including statements distinguishing prior art during prosecution, explicit definitions in the specification, and specification disclaimer, none of which Defendants have alleged are present here.

In *Trustees of Columbia University v. Symantec Corp*., 811 F.3d 1359 (Fed. Cir. 2016) the issue was whether the claim term "probabilistic model of normal computer system usage" should be limited to computer models created using so-called "attack-free data" or whether the term could also include computer models generated with "attack data."  *Id.* at 1367-68.  The district court found that the computer model described in the patents at issue must be generated with "only attack-free data." *Id.*  On appeal, the patent owner argued that the district court erred by importing a negative limitation from the specification into the claims despite no clear and unmistakable disclaimer of claim scope.  *Id.* at 1367-68.  The Federal Circuit found no error in the district court's construction because, according to

"overwhelming evidence in the specification and the prosecution history," the "probabilistic model of normal computer system and usage" was built using only attack-free data. *Id.* at 1368. Nothing in the specification described any embodiment that used attack data to build the claimed probabilistic model. *Id.* And, importantly, during prosecution, the applicant distinguished prior art on the basis that the claimed invention was built using attack-free (or normal) data. *Id.*

Unlike in *Trustees of Columbia University*, where the intrinsic evidence pointed to one and only one way of achieving the claimed product, the intrinsic evidence here does not point to drying the composition in a mold as the only way to make the claimed "molded" dosage forms. Instead, the specification expressly contemplates that dosage forms of the present invention can be made by manufacturing processes that do ***not*** require drying a composition in a mold including, for example, granulation. Ex. 1, '724 patent, 9:58-63 (A013); Ex. 2, Berkland Decl. ¶¶ 20, 22, 23 (A036-A038). Defendants also have not identified anything in the file history of the '724 patent to suggest that the applicants distinguished prior art on the basis that the molded dosage forms of the claims require drying the composition in a mold.

Defendants' reliance on the prosecution history of the parent application to the '724 patent is irrelevant and does not support limiting the claims. *See* Defendants' Answering Position, *supra* at 29-30. As Defendants acknowledge, the

claims examined in the parent application were not directed to "molded" dosage forms. *Id.* at 29. Instead, parent application claim 22 recited compositions "in the form of an oral tablet." Ex. 14, Dec. 15, 2022 Response to Non-Final Office Action at 4-5 (A745-A746) (showing proposed new claim 22). The prosecution history of the parent application is therefore irrelevant to the meaning of "molded" because the claim language in the parent application and the '724 patent is different. *ResQNet.com, Inc. v. Lansa, Inc.*, 346 F.3d 1374, 1383 (Fed. Cir. 2003) ("Although a parent patent's prosecution history may inform the claim construction of its descendent, the [parent] patent's prosecution history is irrelevant to the meaning of [a] limitation [if] the two patents do not share the same claim language."). Moreover, parent application claim 22 was directed to an oral tablet containing specific weight percentages of rimegepant and four excipients. Ex. 14, Dec. 15, 2022 Response to Non-Final Office Action at 4-5 (A745-A746) (showing proposed new claim 22). The portion of the specification the applicants cited during prosecution of the parent application (*Id.* at 6 (A674) (citing p.6, ll.6-14 of the original specification as filed)) disclosed a tablet with the same composition as parent application claim 22 and thus provided support for the composition as claimed.

Defendants also rely on *Medicines Co. v. Mylan, Inc.*, 853 F.3d 1296 (Fed. Cir. 2017) to support their implicit disavowal argument. *See* Defendants' Answering Position, *supra* at 31, 36-38. The issue there was whether the claim term "wherein

the batches have a maximum impurity level of Asp[9]-bivalirudin that does not exceed about 0.6%" should be limited to batches produced by an "efficient mixing" compounding process, even though the claims did not expressly recite "efficient mixing." *Id.* at 1302-07. The Federal Circuit determined that the claimed batches must be produced by an "efficient mixing" compounding process because: (i) the specification defined the batches of the claims to be those produced by "a same compounding process" (*id.* at 1303); (ii) the specification and prosecution history demonstrated that the invention was a compounding process (*id.* at 1304); (iii) the Medicines Company admitted that it was "readily apparent" that the definition of "batches" referred to the compounding process described in the patents in suit (*id.*); and (iv) during prosecution, applicants unambiguously admitted that the claimed "process involves *efficiently mixing* the pH-adjusting solution and the dissolved bivalirudin solution, which is not performed in the Applicants' prior compounding process." *Id.* at 1305; *see also Indivior Inc. v. Dr. Reddy's Labs., S.A.*, 752 F. App'x 1024, 1033 (Fed. Cir. 2018) (discussing *Medicines Co.* and stating that "the prosecution history and the specification of the patents 'demonstrate that the invention disclosed by the . . . patents is a compounding process that achieves batch consistency,' which the specification taught could only be achieved using 'efficient mixing'"). The Federal Circuit expressly noted that it was not "impermissibly add[ing] a process limitation to a product claim that does not require a process"

because the specification of the patent defined batches in a way that "by itself injects a compounding process as a limitation in the asserted claims." *Medicines Co.*, 853 F.3d at 1304.

Here, unlike in *Medicines Co.*, the specification does not contain a definition of "molded" that injects a drying process limitation into the asserted claims. Rather, the specification explains that dosage forms of the present invention can be made by manufacturing processes that do not require drying a composition in a mold (e.g., granulation). Ex. 1, '724 patent 9:58-63 (A013); Ex. 2, Berkland Decl. ¶¶ 20, 22, 23 (A037-A039). Also unlike in *Medicines Co.*, Defendants here have not identified anything in the file history of the '724 patent to indicate that the applicants considered drying the composition in a mold to be an essential part of the claimed invention.

Lastly, Defendants rely on *Indivior Inc. v. Dr. Reddy's Labs., S.A.*, 752 F. App'x 1024 (Fed. Cir. 2018). *See* Defendants' Answering Position, *supra* at 31-32, 36-38. *Indivior* concerned specification disclaimer, which Defendants have not alleged applies here. In a first action, Indivior sued two ANDA filers for infringing several patents, including the '514 patent, which contained an explicit "drying" step in claims directed to the production of oral films for the treatment of opioid dependency. *Id.* at 1025-26. The specification of the '514 patent "expressly disclaimed and disparaged" one type of drying (i.e., conventional air drying from

52

the top) to produce the claimed films. *Id.* at 1027. The district court therefore construed the drying limitation to exclude that conventional drying method. *Id.* Following a bench trial, the court determined that the accused products did not infringe the asserted '514 patent claims. *Id.*

Faced with that trial loss, Indivior amended certain claims in a related application to replace the words "dried" and "drying" with "continuously" and "continuously cast." *Id.* at 1027-28. The amended claims ultimately issued in a later patent (the '305 patent), which shared a specification with the '514 patent from the earlier case. *Id*. at 1026. Indivior then asserted the '305 patent against another ANDA filer. *Id.* at 1028. In the context of a preliminary injunction motion, the district court found that the claims of the '305 patent lacked an express drying limitation and therefore did not exclude any particular drying method. *Id.*

On appeal, the Federal Circuit determined that the district court abused its discretion in granting the preliminary injunction. *Id.* at 1029. Over Indivior's objection that the claims of the '305 patent were not limited to any particular drying process because "dried/drying has no textual basis in the claims," the Federal Circuit determined that such a textual hook was not required because "the specification makes clear that the invention does not include films that were dried using conventional top air drying." *Id.* at 1031-32; *see also id.* at 1030 ("[T]he '305 patent is 'rife with remarks that disparage, and therefore, disclaim' solely using

conventional top air drying to form films."). The Federal Circuit also dispatched Indivior's argument that it was improper to read a process limitation into the claims of the '305 patent because the patent specification made clear that a drying process was an essential part of the claimed invention and specification disclaimer excluded conventional drying methods from the scope of the claims. *Id.* at 1033-34.

Here, unlike in *Indivior*, the specification of the '724 patent is far from "rife with remarks that disparage" processes for manufacturing dosage forms that do not require drying the composition in mold. Instead, the specification expressly contemplates that dosage forms of the present invention may be manufactured by processes that do not require such a drying step. Ex. 1, '724 patent, 9:58-63 (A013); Ex. 2, Berkland Decl. ¶¶ 20, 22, 23 (A037-A039). Defendants have not pointed to a single statement in the '724 patent specification that disparages or otherwise disavows compositions that are not dried in a mold. Nor have Defendants identified anything in the specification of the '724 patent that identifies drying the composition in a mold as an essential step in manufacturing a molded dosage form that justifies reading a process limitation into product claims. As Defendants' own cited references make clear, a POSA would not consider drying the composition in a mold to be an essential step in a process to make a molded dosage form. *See infra* § III.C.3; *see also* Ex. 2, Berkland Decl. ¶¶ 20-25 (A036-A040).

In sum, there is no lexicography or disavowal (express or implied) here that requires narrowing the plain and ordinary meaning of "molded" (or "solid molded") as Defendants propose.  Defendants' proposed construction should be rejected because it improperly limits "molded" to the exemplary tablet dosage forms freeze-dried in a mold and it impermissibly imports a process step (i.e., drying the composition in a mold) into the product claims at issue.  *See Liebel-Flarsheim Co.*, 358 F.3d at 913 ("[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited."); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1375 (Fed. Cir. 2007); *see also* Plaintiffs' Opening Position, *supra* § III.A.1.c.i-ii.

Defendants did not attempt to meaningfully distinguish the cases Plaintiffs cited in their opening brief to support their argument that Defendants' proposed construction improperly reads limitations from an exemplary embodiment into the claims.  *Compare* Plaintiffs' Opening Position, *supra* at 15-17 (citing *Liebel-Flarsheim* and *GE Lighting*), *with* Defendants' Answering Position, *supra* at 36-37. And Defendants do not even mention, let alone attempt to distinguish, Plaintiffs' cases supporting the argument that it is improper to import process limitations into product claims absent a clear indication that the process steps are an essential part of the claimed invention.  *Compare* Plaintiffs' Opening Position, *supra* at 17-19

(citing *Andersen*, *Vanguard*, *Vectura*, and *AstraZeneca*), *with* Defendants' Answering Position, *supra* at § III.B.

### b.  The Examples in the '724 Patent Do Not Support Defendants' Proposed Construction

Defendants attempt to rely on the Examples in the '724 patent to support their proposed construction.  *See* Defendants' Answering Position, *supra* at 27-30.  They urge the Court to "adopt a construction of 'solid molded' that does not encompass the dosage forms of Example 1, because those dosage forms are not described as 'solid molded' dosage forms as required by the claims."  Defendants' Answering Position, *supra* at 30.  Defendants rely on *Horizon Pharma, Inc. v. Dr. Reddy's Labs. Inc.*, 839 F. App'x 500 (Fed. Cir. 2021) to support excluding the Example 1 tablets from the scope of the claims.  Defendants' Answering Position, *supra* at 27-28.  The *Horizon* Court observed that the use of the terms "target" and "produce" at different points in the specification supported the conclusion that those words had separate meanings.  *Id.* at 504.  That is not the issue here.  *Horizon* does not stand for the proposition that an applicant who omits a term (i.e., "molded") when describing an exemplary embodiment clearly and unmistakably disclaims that embodiment from the scope of the claims.

Nothing in the specification of the '724 patent expressly (or implicitly) removes the Example 1 tablets from the scope of the "molded" claim term.  The Example 1 tablets were manufactured by granulation and molded into tablets using

a rotary tablet press.  Ex. 1, '724 patent, 13:50-14:36 (A015); *see* Ex. 2, Berkland Decl. ¶¶ 21, 22 (A037-A039).  The specification is clear that "granulating" is one of the methods by which "the pharmaceutical compositions of the present invention" may be manufactured.  Ex. 1, '724 patent, 9:58-63 (A013).  While they are "molded," the Example 1 tablets are reported to have a "[d]isintegration of 2:30 minutes" and, therefore, they are not fast-dispersing, which is a separate requirement of the claims.  Ex. 1, '724 patent, 14:25-26 (A015); *see also id.* at 10:1-6 (A013) (defining "fast-dispersing dosage form"); Ex. 2, Berkland Decl. ¶¶ 21, 22 (A037-A039).

The non-fast-dispersing tablets from Example 1 were tested in phase 3 clinical trials as reported in Examples 2 and 3.  These tablets were also tested in Example 5 against tablets that were manufactured by a freeze-drying (i.e., "lyophilization") process and are described as "fast-dispersing."  Ex. 1, '724 patent, 19:66-20:3 (A018).  The mere fact that the tablets in Examples 1-3 were tested in a comparative bioequivalence study against the tablets in Example 5 does not evidence a clear disavowal of claim scope.  *See, e.g.*, *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 798 (Fed. Cir. 2019) ("[C]omparing and contrasting the present technique to that of the prior art does not rise to the level of a clear disavowal of claim scope.").

The prosecution history confirms that the applicants distinguished the Example 1-3 tablets from the Example 5 tablet on the basis that the Example 5 tablet

was *fast-dispersing* and not on the basis that it was molded.  During prosecution, the applicants relied on the data in Table 5 of the '724 patent to overcome an obviousness rejection.  The data in Table 5 was generated from a bioequivalence study comparing the non-fast-dispersing (or "conventional") tablets of Examples 2 and 3 with the fast-dispersing tablets of Example 5.  Ex. 1, '724 patent 19:66-20:3 (A018).  The applicants argued that a POSA "would have had no reasonable expectation that administration of a *fast-dispersing* dosage form of an anti-migraine medicine would have resulted in faster absorption and more rapid onset of action than administration of the conventional tablet."  *See* Ex. 15, '724 patent file history, 3/24/2021 Amendment and Remarks at 9-10 (A771-A772).  Earlier attempts to incorporate other drugs for the treatment of migraine into fast-dispersing dosage forms resulted in slower absorption.  *Id.* at 7-8 (A769-A770).  The Examiner found the applicants' arguments persuasive and withdrew the obviousness rejection.  Ex. 15, '724 patent file history, 4/27/2021 Final Rejection at 5 (A779).  The prosecution history therefore confirms that the applicants distinguished the Example 1-3 tablets from the Example 5 tablets on the basis that the Example 5 tablets were fast-dispersing (which is not at issue here) and not on the basis that the Example 5 tablets were molded while the Example 1-3 tablets were not.

Defendants' argument that the Example 1 tablets must not be "molded" and therefore should be carved out of the meaning of that term has no basis in the intrinsic record or the law and should be rejected.

> **3.    Defendants' Extrinsic Evidence Confirms that Defendants' Construction Is Unduly Narrow Because It Excludes Oral Solid Molded Dosage Forms that Are Not Dried in a Mold**

At the outset, Defendants' reliance on Remington, Ansel, and the U.S. Pharmacopeia as authoritative references that "describe solid molded ***tablets*** as being prepared by placing a composition in a mold and then drying, which is entirely consistent with a POSA's understanding" (Defendants' Answering Position, *supra* at 35-36 (emphasis added)) is irrelevant because, with the exception of claim 14, the claims of the '724 patent are not limited to tablets. *See supra* § III.C.1. Defendants' expert declaration is similarly at odds with the claim language because it largely focuses on "the customary and ordinary meaning of '***molded tablets***'" to a POSA and is therefore not probative of how a POSA would understand the meaning of "molded" in the context of claims that are not limited to tablets. *See* Ex. 13, Park Decl., § VI.A (A444-A451); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 (Fed. Cir. 1996) ("[A]s we have recently re-emphasized, extrinsic evidence in general, and expert testimony in particular . . . may not be used to vary or contradict the claim language."); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005 ("[A] court should discount any expert testimony 'that is clearly at

odds with the claim construction mandated by the claims themselves . . . .'") (citation omitted).

Further, Defendants' extrinsic evidence provides numerous examples of oral solid molded dosage forms that are not dried in a mold and demonstrates that Defendants' construction is inappropriately narrow. For example, the same chapter of Remington that Defendants cite to support their proposed construction, titled "Oral Solid Dosage Forms," describes soft elastic capsules. Ex. 13-D, Remington, at 889-90 (A595-A596); *see also id*. at 885 (A591) (describing soft elastic capsules as "solid dosage forms"). According to Remington, soft elastic capsules can be manufactured by a "plate process" which uses "a set of ***molds***." Ex. 13-D at 890 (A596) (emphasis added). In the described method, a sheet of gelatin is laid over the lower plate of the mold, the dosage form is filled with a substance, and then a second sheet of gelatin is put in place followed by the top plate of the mold. *Id.* at 889-90 (A595-A596). The mold is then placed under a press, pressure is applied to form capsules, and the capsules are washed. *Id.* at 890 (A596). Drying the composition in a mold is not a required step in the method for producing oral solid molded soft elastic capsules as described in Remington.

Remington discusses "tablet triturates" as another example of an oral solid molded dosage form that is not dried in a mold. *See id.* at 882 (A588). For example, Remington describes a "hand-***molding***" process for making tablet triturates where

60

the composition is pressed into a mold, tablets are ejected from the mold, and the tablets are then "spread evenly in single layers on silk trays and dried in a clean, dust-free chamber with warm, circulating air." *Id*.  (emphasis added).

The USP chapter on Pharmaceutical Dosage Forms, also cited by Defendants, describes "molded lozenges" as an example of an oral solid molded dosage form that is not dried in a mold.  *See* Ex. 13-F at 774 (A653).  In describing the manufacture of molded lozenges, the USP states that "[i]ndividual dosage units ***of the desired shape*** are formed by filling the molten mass into ***molds***.  These lozenges are quickly cooled in the molds to trap the base in the glassy state.  Once formed, the lozenges are removed from the molds and packaged." *Id.* (emphasis added).  Not only is this description consistent with Plaintiffs' proposed construction of "molded" (i.e., "formed in a desired shape"), there is no mention of a drying step in the USP's method for producing oral solid molded lozenges.  *See also* Ex. 13-D at 891-92 (A597-A598) (describing a process for manufacturing lozenges involving kneading syrup and an active ingredient into a pliable mass, working the mass into a "pipe form" (i.e., mold) having the diameter desired for the candy piece, cutting the lozenges from the pipe form, and allowing them to cool).

Defendants' extrinsic evidence therefore confirms that their proposed construction is unduly narrow because it excludes oral solid molded dosage forms that are not dried in a mold from the scope of the claims.

61

### D.    Defendants' Sur-Reply Position

#### 1.    Plaintiffs' broad construction of "molded" ignores the specification's consistent use of the term.

The specification does not provide support for Plaintiffs' inappropriately broad construction of "molded." A "construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Phillips*, 415 F.3d at 1316 (quotation marks omitted). Plaintiffs ignore the consistent use of the words "mold" and "molded" in the specification to describe specific dosage forms, attempting to improperly broaden the construction of "molded" to capture the conventional tablets of Example 1. Defendants' Answering Position, *supra* § III.B.1.a.

The specification uses the word "molded" only in the specific context of dosage forms made by placing a composition in a mold and then drying. *Id*. This description is not merely a "preferred embodiment," as Plaintiffs contend, but rather a consistent use of the term "molded" to describe a specific composition made by a well-known process in the art of formulation. Notably, the specification uses different words to describe different processes and dosage forms. In describing the preparation of the conventional, compressed tablets of Example 1, the specification never uses the term "mold" or "molded," but instead describes using a "rotary tablet press." Ex. 1, 14:20 (A015). The applicant's decision to use the words "mold" and "molded" repeatedly throughout the specification to describe dosage forms made

using a mold and then drying, and not to use those words in the context of Example 1, indicates to a POSA that the compressed tablets of Example 1 are ***not molded*** and that the device used to prepare those tablets is ***not a mold***. *Cf.* Plaintiffs' Opening Position, *supra* § III.A.1.a. (suggesting the "rotary tablet press" of Example 1 is a mold, even though the specification calls it a "rotary tablet press," not a "mold.").

The applicants' choice to adopt the exact same sequence of adjectives that appear in the '580 patent ("oral solid molded fast-dispersing dosage form") is also instructive. The '580 patent exclusively teaches how to make "molded" dosage forms by placing a composition in a mold and then drying; Defendants' construction captures this well-understood concept in the art of formulations. Ex. 3 ('580 patent), 13:2-3 (A095). A POSA, reading the specification in light of the prior art, including the '580 patent, would therefore understand that the specification intended that the term "molded" refer only to dosage forms prepared by placing a composition in a mold and then drying it.

Precedent confirms that the specification's consistent and selective use of a term informs its construction. *Trustees of Columbia*, 811 F.3d at 1368; *Medicines*, 853 F.3d at 1304; *Horizon*, 839 F. App'x at 504. Plaintiffs strain to distinguish these cases, but they control. For example, in *Medicines*, the patentee sought a construction that encompassed any composition made by a method that achieved the claimed property, rather than just the process consistently described in the

63

specification. 853 F.3d at 1303-04. The Federal Circuit relied on the consistent disclosures in the specification and prosecution history of the process used to make the claimed composition to properly construe the claims as encompassing only the compounding process described. *Id*. Indeed, the prosecution history of the '724 patent draws a distinction between molded and conventional tablets. Defendants' Sur-Reply Position, *infra* § III.D.1.c. This Court should do likewise, recognizing that "molded" dosage forms were well-known in the art and consistently described in the specification ***only*** as dosage forms prepared by placing a composition in a mold and then drying it. Defendants' Answering Position, § III.B.3.

> **a.**    **General disclosures in the specification encompassing both claimed and unclaimed embodiments do not support Plaintiffs' construction.**

Plaintiffs cite two general disclosures in the '724 patent specification for the proposition that the "molded" dosage forms of the asserted claims include tablets prepared by processes other than molding, such as granulation and compression. However, Plaintiffs' clip-quoting of passages from the specification demonstrates the weakness of their position.

First, Plaintiffs argue that the specification does not limit the manufacturing methods that can be used to make the claimed invention because "the specification confirms that 'the pharmaceutical compositions of ***the present invention*** may be manufactured in conventional methods known in the art, ***for example***, by means of

conventional ... granulating ... lyophilizing processes and the like." Plaintiffs' Reply Position, § III.C.1 (quoting Ex. 1, ('724 patent) at 9:58-63 (A013) (emphasis Plaintiffs')). But the full sentence omitted by Plaintiffs' ellipses tells a different story, disclosing "conventional <u>mixing, dissolving</u>, granulating, <u>dragee-making, levigating, emulsifying, encapsulating, entrapping</u>, lyophilizing processes and the like." Ex. 1, ('724 patent) at 9:58-63 (A013) (emphasis added where Plaintiffs omitted content). While the claims are limited to ***fast-dispersing*** dosage forms, Plaintiffs omit processes including "dragee-making." Conventional dragee-making involves coating the dosage form with a hard sugar-containing coating resulting in a slow, not fast-dispersing dosage form. Likewise, "emulsifying" is typically used to make liquid oil-and-water-containing formulations, whereas the claims encompass only ***solid*** dosage forms. Thus, the manufacturing processes listed for "compositions of the present invention" plainly include both processes that can be used to make the claimed forms and those that cannot. Column 9's disclosure is thus broader than the scope of the claims, including both claimed and unclaimed embodiments. *See TIP*, 529 F.3d at 1373 (specification can include both claimed and unclaimed embodiments). Plaintiffs' reliance on incomplete disclosures of column 9 to inform the scope of the construction of "molded" to cover conventional tablets prepared by processes such as compacting is thus improper. Regardless, Defendants' construction does not ***preclude*** the use of conventional manufacturing methods like

65

lyophilization, so long as the composition is a "molded" dosage form, that is, that the preparation method also includes placing the composition in mold and then drying it.

Plaintiffs next argue that "the specification states that '[t]he pharmaceutical compositions of the present invention can be prepared in any suitable dosage form' including for example, tablets, capsules, granules, and microspheres." Plaintiffs' Reply Position, § III.C.1 (quoting Ex. 1, 9:21-24 (A013)). But again, Plaintiffs' quotation misleadingly omits dosage forms that are clearly outside the scope of the claims. The complete list includes "tablets, capsules, nasal sprays, powders, granules, ointments, solutions, suppositories, injections, inhalants, gels, microspheres, and aerosols." Ex. 1, 9:21-24 (A013) (emphasis added where Plaintiffs omitted content). "Nasal sprays," "ointments," "solutions," and "aerosols," are not "oral solid molded" dosage forms, because none are solids. It is undisputed that some dosage forms in column 9 are within the scope of the claims, but some are indisputably outside the scope of the claims. *See TIP*, 529 F.3d at 1373. Thus, Plaintiffs cannot rely on this broad listing of dosage forms to selectively broaden the asserted claims, which are limited to "oral solid molded fast-dispersing dosage forms." The Court should adopt Defendants' construction, which properly construes the terms "molded" and "solid molded" consistently with the specification's use of ***those terms***.

b.    **Despite Plaintiffs' attempts to distinguish Defendants' cases, they cannot avoid the plain meaning of "molded."**

Plaintiffs focus on irrelevant minutiae in seeking to distinguish Defendants' case law to distract from the fact that "molded" has a plain and ordinary meaning to a POSA: a dosage formed prepared by placing a composition in a mold and then drying it.  As a threshold matter, Plaintiffs argue that the constructions in *Trustees of Columbia, Medicines*, and *Indivior* were supported by both the specification and the prosecution history.  But Plaintiffs do not grapple with the Federal Circuit's reasoning in these cases, which indicate that consistent use of a term in the specification informs its construction.  *E.g.*, *Trustees*, 811 F.3d at 1368 ("The specification consistently describes an implementation" without attack data and "[n]othing in the specification describes any embodiment which uses attack data to build the model.").  In particular, Plaintiffs' argue that *Medicines*' holding should be confined to its facts, but as explained above, here, as in *Medicines*, the specification uses the definition of "molded" which was also well-understood in the art. *Supra* Defendants' Sur-Reply Position, § III.D.1.a; *cf.* Plaintiffs' Opening Position, § III.C.2.a.

That the prosecution history supported the constructions in Defendants' cited case law is no reason to reject a similar holding here.  Like those cases, the prosecution history of the '724 patent supports Defendants' construction.

Defendants' Answering Position, § III.B.1.a.  Accordingly, Plaintiffs' attempts to distinguish Defendants' cases fail.

Plaintiffs do not dispute that the applicant overcame a rejection by the Examiner relying on data "summariz[ing] pharmacokinetic statistics of Rimegepant *ODT* <u>versus</u> Rimegepant Conventional Tablet." *See* Ex. 15, ('724 patent file history, 3/24/2021 Amendment and Remarks ("'724 PH"), emphasis added), 9-10 (A771-A772).  Plaintiffs try to sidestep this issue by arguing that the distinction being drawn by the applicant was between "fast-dispersing" and "conventional," rather than between "molded" and "conventional."  Plaintiffs' argument, however, ignores the explicit definition of "ODT" in the specification of the '724 patent as an "oral solid *molded* fast-dispersing dosage form." Ex. 1, 19:66-20:1 (A018) (emphasis added). Thus, in arguing to the examiner that the "conventional tablets" of Example 1 were *not* ODTs, the applicant was necessarily arguing that they were not the molded dosage forms recited by the asserted claims.  *Id*.  Thus, the prosecution history supports Defendants' construction and demonstrates why the Court should reject Plaintiffs' improperly broad construction.

### c.    The doctrine of claim differentiation does not support Plaintiffs' construction.

Plaintiffs argue that adopting Defendants' construction of the claim term "molded" (or "solid molded") would give claims 11 and 14 of the '724 patent the same scope, because Plaintiffs insist that Defendants' construction of "molded" is

limited to tablets. Plaintiffs are wrong. Claim 14 dependent on claim 11 and specifies that the dosage form of claim 11 is "in the form of a tablet." Ex. 1, 40:27-28 (A028). As discussed above, Defendants' construction is not limited to tablets alone. For example, a "molded" dosage form can include pills in addition to tablets. Both the Remington and Ansel references distinguish "tablets," a predominant form of oral solid dosage form used today, from the now largely-abandoned oral solid dosage form generally prepared by molding, "pills," which unlike tablets "were made extemporaneously by the community pharmacist whose skill at pill-making became an art." Ex. 13-D (Remington), 891 (A597); Ex. 13-E (Ansel), 294 (A638); Ex. 13-F (U.S. Pharmacopeia), 776 (A655); Ex. 4 ("GB'022"), 1:14-16 (A097)). A POSA would have clearly recognized that the scope of claim 11 comprises oral solid molded fast-dispersing dosage forms generally, including at least both modern molded tablets (disclosed explicitly in the specification) and other molded dosage forms such as pills. Thus, claim 14, which is limited to tablets, is narrower in scope than claim 11 under Defendants' construction. The doctrine of claim differentiation accordingly does not support adopting Plaintiffs' overly-broad construction.

Even if Plaintiffs were correct that adopting Defendants' construction would generate redundancy between claims 11 and 14, the specification still compels adopting Defendants' well-supported construction. "Canons of claim construction, such as the doctrine of claim differentiation ... are not absolute." *Cave Consulting*

*Grp., LLC v. OptumInsight, Inc.*, 725 F. App'x 988, 994 (Fed. Cir. 2018). The *Cave* court observed that the specification of the patent-in-suit "repeatedly and consistently describe[d]" the invention as using certain methods and reversed the district court's construction, even though doing so generated superfluity between an independent claim and claims depending from it. *Id*.; *see also Intell. Ventures LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1326 (Fed. Cir. 2017) ("[T]he doctrine of claim differentiation ... does not serve to broaden claims beyond their meaning in light of the specification." (quotation marks omitted). The specification supports Defendants' construction, not Plaintiffs'. *See* Defendants' Answering Position, § III.B.4. Even if that construction generated redundancy between claims (it does not), the Court should nevertheless refuse to adopt Plaintiffs' unsupported and overly broad construction.

### d.    Disavowal is not relevant where the proposed construction is the plain and ordinary meaning.

Defendants' construction represents the plain and ordinary meaning of the term "molded" to a POSA in view of the '724 specification. The "clear and unmistakable disavowal" standard is therefore inappropriate. Plaintiffs suggest that, to prevail, Defendants must demonstrate that the applicants disavowed certain dosage forms, thereby narrowing the claim term "molded." Plaintiffs' Reply Position, § III.C.2. However, Plaintiffs' own authority confirms that the disavowal doctrine applies only where a party seeks a construction that would "depart from the

plain meaning of the claims." *MasterObjects, Inc. v. Meta Platforms, Inc.*, No. 2023-1097, 2024 WL 630330, at *5-4 (Fed. Cir. Feb. 15, 2024).  For the reasons given above, Defendants' construction does not depart from the plain meaning of the claim term "molded" but instead ***reflects*** the plain meaning of that term to a POSA in light of the specification and the POSA's knowledge of the field and relevant art.  Thus, Plaintiffs' lexicography and disavowal arguments are irrelevant here.

### e.    To the extent extrinsic evidence is relevant, it also supports Defendants' construction.

The extrinsic evidence supports Defendants' construction.  Authoritative treatises in the field demonstrate that a POSA would understand "molded" (or "solid molded") to mean "prepared by placing a composition in a mold and then drying" it and distinguish "molded" from "compressed" dosage forms.  Defendants' Answering Position, § III.B.2. Plaintiffs appear to have abandoned the extrinsic evidence cited in their opening brief.  *Compare* Plaintiffs' Reply Position, § III.C.3, *with* Plaintiffs' Opening Position, § III.A.1.b. Dr. Berkland likewise offered no response to Dr. Park's art-informed opinions.  Instead, Plaintiffs rely on the same authoritative prior art treatises submitted by Defendants, claiming they support Plaintiffs' construction.  But those references support Defendants' construction, not Plaintiffs'.

Contrary to Plaintiffs' argument, tablet triturates, as described in Remington, fall within the scope of Defendants' construction.  *Cf.* Plaintiffs' Reply Position,

§ III.C.3. Defendants' construction reflects a POSA's understanding that a "molded" or "solid molded" dosage form is one "prepared by placing a composition in a mold and then drying" it. Defendants' construction does not require drying the composition *in the mold*. Accordingly, Remington's description of the method of preparing "tablet triturates," which, as Plaintiffs concede, requires placing a composition in a mold and then drying it, falls within Defendants' construction. Ex. 13-D (Remington), 882 (A588). Remington thus taught that tablet triturates prepared by "hand-molding" are molded tablets because they are prepared by placing a composition in a mold and then drying it. *Id*.

Plaintiffs' arguments related to soft-elastic capsules and lozenges are red-herrings. *Cf.* Plaintiffs' Reply Position, § III.C.3. First, a POSA would not think that the USP's disclosure of "molded lozenges" would be relevant to the construction of the "oral solid molded *fast-dispersing* dosage form" claimed by the '724 patent. The USP explicitly teaches that "[l]ozenges are solid oral dosage forms that are designed to dissolve or disintegrate *slowly* in the mouth." Ex. 13-F (U.S. Pharmacopeia), 774 (A653) (emphasis added). Thus, a POSA would have understood that the process of making "molded lozenges" is irrelevant to the "fast-dispersing" dosage forms disclosed and claimed by the '724 patent.

Regardless, these passages cannot be read to support Plaintiffs' construction. Both Remington and USP describe a *process* of preparing dosage forms using a

"mold." Neither suggests that any dosage form "formed in a desired shape" is "molded." Furthermore, neither Remington nor the USP suggest that tablets prepared using a rotary tablet press, such as the compressed tablets of the '724 patent's Example 1, should be considered "molded," as Plaintiffs' construction requires.

The extrinsic evidence supports Defendants' construction and Defendants' construction should be adopted.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Megan E. Dellinger*

_____

OF COUNSEL:

Dimitrios T. Drivas
John P. Scheibeler
Kevin J. Georgek
Samantha J. Kokonis
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY  10020
(212) 819-8200

Jeremy A. Tigan (#5239)
Megan E. Dellinger (#5739)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
jtigan@morrisnichols.com
mdellinger@morrisnichols.com

*Attorneys for Plaintiffs Pfizer Inc.,*
*Pfizer Ireland Pharmaceuticals, and*
*Bristol-Myers Squibb Company*

MORRIS JAMES LLP

*/s/ Kenneth L. Dorsney*

OF COUNSEL:

Deepro R. Mukerjee
Lance A. Soderstrom
Christopher B. Prescott
KATTEN MUCHIN ROSENMAN LLP
50 Rockefeller Plaza
New York, NY  10020-1605
(212) 940-8800

Joseph M. Janusz
KATTEN MUCHIN ROSENMAN LLP
550 South Tryon Street, Suite 2900
Charlotte, NC  28202-4213
(704) 444-2000

Jillian M. Schurr
KATTEN MUCHIN ROSENMAN LLP
525 West Monroe Street
Chicago, IL  60661-3693
(312) 902-5200

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendants Apotex Inc.
and Apotex Corp.*

74

COZEN O'CONNOR

*/s/ Kaan Ekiner*

OF COUNSEL:

W. Blake Coblentz
Aaron S. Lukas
COZEN O'CONNOR
1200 19th Street, NW
Washington, DC  20036
(202) 912-4800

Keri L. Schaubert
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY  10007
(212) 509-9400

Kaan Ekiner (#5607)
1201 North Market Street, Suite 1001
Wilmington, DE  19801
(302) 295-2046
kekiner@cozen.com

*Attorneys for Defendants Aurobindo
Pharma Limited and Aurobindo
Pharma U.S.A., Inc.*

SMITH KATZENSTEIN JENKINS LLP

*/s/ Daniel A. Taylor*

OF COUNSEL:

Howard Wang
RIMÔN PC
100 Overlook Center, 2nd Floor
Princeton, NJ  08540
(973) 966-3200

Neal C. Belgam (#2721)
Daniel A. Taylor (#6934)
1000 West Street, Suite 1501
Wilmington, DE 19801
(302) 652-8400
nbelgam@skjlaw.com
dtaylor@skjlaw.com

*Attorneys for Defendant
Changzhou Pharmaceutical Factory*

COZEN O'CONNOR

*/s/ Kaan Ekiner*

OF COUNSEL:

W. Blake Coblentz
Aaron S. Lukas
COZEN O'CONNOR
1200 19th Street, NW
Washington, DC  20036
(202) 912-4800

Keri L. Schaubert
COZEN O'CONNOR
3 WTC
175 Greenwich Street, 55th Floor
New York, NY  10007
(212) 509-9400

Kaan Ekiner (#5607)
1201 North Market Street, Suite 1001
Wilmington, DE  19801
(302) 295-2046
kekiner@cozen.com

*Attorneys for Defendants MSN*
*Laboratories Private Ltd. and MSN*
*Pharmaceuticals Inc.*

RICHARDS, LAYTON & FINGER, P.A.

*/s/ Kelly E. Farnan*

_____

OF COUNSEL:

Christopher J. Sorenson
W. Reid Morris
MERCHANT & GOULD PC
150 South Fifth Street, Suite 2200
Minneapolis, MN  55402
(612) 332-5300

Andrew O. Larsen
MERCHANT & GOULD PC
500 Fifth Avenue, Suite 4100
New York, NY  10110
(212) 223-6520

Jason M. Wiener
MERCHANT & GOULD PC
191 Peachtree Road NE, Suite 3800
Atlanta, GA  30303
(703) 684-2500

Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
One Rodney Square
920 North King Street
Wilmington, DE  19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com

*Attorneys for Defendant
Natco Pharma Ltd.*

77

MORRIS JAMES LLP

*/s/ Kenneth L. Dorsney*

OF COUNSEL:

Stephen R. Auten
Jaimin H. Shah
TAFT STETTINIUS & HOLLISTER LLP
111 East Wacker Drive, Suite 2600
Chicago, IL 60601
(312) 527-4000

Aaron M. Johnson
TAFT STETTINIUS & HOLLISTER LLP
2200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 977-8400

Kenneth L. Dorsney (#3726)
Cortlan S. Hitch (#6720)
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801-1494
(302) 888-6800
kdorsney@morrisjames.com
chitch@morrisjames.com

*Attorneys for Defendant Rubicon
Research Private Ltd.*

78

SHAW KELLER LLP

*/s/ Nathan R. Hoeschen*

OF COUNSEL:

Elaine H. Blais
Daryl L. Wiesen
Emily L. Rapalino
Molly Grammel
GOODWIN PROCTER LLP
100 Northern Avenue
Boston, MA  02210
(617) 570-1000

Madeline R. Bordynoski
GOODWIN PROCTER LLP
1900 N. Street, N.W.
Washington, DC  20036-1612
(202) 346-4000

Gabriel Bruno Ferrante
Magdalin Peña Jimenez
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, NY  10018
(212) 813-8800


September 5, 2025

_____
Karen E. Keller (#4489)
Nathan R. Hoeschen (#6232)
Emily S. DiBenedetto (#6779)
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0700
kkeller@shawkeller.com
nhoeschen@shawkeller.com
edibenedetto@shawkeller.com

*Attorneys for Defendant Teva
Pharmaceuticals, Inc.*

79