# EXHIBIT 14

FILE HISTORY

16/767,134

INVENTORS:    Vladimir Coric

Robert Croop

TITLE:    RIMEGEPANT FOR CGRP RELATED DISORDERS

APPLICATION NO:    16/767,134

FILED:    27 MAY 2020

COMPILED:    13 JAN 2025

# Electronic Acknowledgement Receipt

| | |
|---|---|
| **EFS ID:** | 39544098 |
| **Application Number:** | 16767134 |
| **International Application Number:** | PCT/US2019/023940 |
| **Confirmation Number:** | 5353 |
| **Title of Invention:** | RIMEGEPANT FOR CGRP RELATED DISORDERS |
| **First Named Inventor/Applicant Name:** | Vladimir Coric |
| **Customer Number:** | 164621 |
| **Filer:** | Dmitry Zuev |
| **Filer Authorized By:** | |
| **Attorney Docket Number:** | 20058-US-PCT |
| **Receipt Date:** | 27-MAY-2020 |
| **Filing Date:** | |
| **Time Stamp:** | 06:39:24 |
| **Application Type:** | U.S. National Stage under 35 USC 371 |

## Payment information:

| | |
|---|---|
| Submitted with Payment | yes |
| Payment Type | DA |
| Payment was successfully received in RAM | $1760 |
| RAM confirmation Number | E20205Q741253777 |
| Deposit Account | 603113 |
| Authorized User | Dmitry Zuev |
| The Director of the USPTO is hereby authorized to charge indicated fees and credit any overpayment as follows: | |
|     37 CFR 1.17 (Patent application and reexamination processing fees) | |
|     37 CFR 1.19 (Document supply fees) | |

37 CFR 1.21 (Miscellaneous fees and charges)

37 CFR 1.492 (National application filing, search, and examination fees)

## File Listing:

| Document Number | Document Description | File Name | File Size(Bytes)/ Message Digest | Multi Part /.zip | Pages (if appl.) |
|---|---|---|---|---|---|
| 1 | | 20058USPCT_Application_as_Filed.pdf | 897541<br><br>aa972ecbe5f61a746aa260db2004d34f07b1bb83 | yes | 59 |

| | Multipart Description/PDF files in .zip description | | | | |
|---|---|---|---|---|---|
| | Document Description | | Start | | End |
| | Abstract | | 59 | | 59 |
| | Claims | | 56 | | 58 |
| | Specification | | 1 | | 55 |

**Warnings:**

The page size in the PDF is too large. The pages should be 8.5 x 11 or A4. If this PDF is submitted, the pages will be resized upon entry into the Image File Wrapper and may affect subsequent processing

**Information:**

| 2 | Drawings-only black and white line drawings | 20058USPCT_Figures_as_Filed.pdf | 731811<br><br>f1663c8a4fa7d497d9cc7dee3018c969005bd102 | no | 6 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 3 | Application Data Sheet | WebADS.pdf | 141835<br><br>34939c7926c51708d41855fd903f3a1a6e17540 | no | 8 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| 4 | Fee Worksheet (SB06) | fee-info.pdf | 38141<br><br>d542720c85707325c190c5bbe62ee9e846ec7c5e | no | 2 |
|---|---|---|---|---|---|

**Warnings:**

**Information:**

| | | | | | |
|---|---|---|---|---|---|
| | | **Total Files Size (in bytes):** | 1809328 | | |

This Acknowledgement Receipt evidences receipt on the noted date by the USPTO of the indicated documents, characterized by the applicant, and including page counts, where applicable. It serves as evidence of receipt similar to a Post Card, as described in MPEP 503.

**New Applications Under 35 U.S.C. 111**
If a new application is being filed and the application includes the necessary components for a filing date (see 37 CFR 1.53(b)-(d) and MPEP 506), a Filing Receipt (37 CFR 1.54) will be issued in due course and the date shown on this Acknowledgement Receipt will establish the filing date of the application.
**National Stage of an International Application under 35 U.S.C. 371**
If a timely submission to enter the national stage of an international application is compliant with the conditions of 35 U.S.C. 371 and other applicable requirements a Form PCT/DO/EO/903 indicating acceptance of the application as a national stage submission under 35 U.S.C. 371 will be issued in addition to the Filing Receipt, in due course.
**New International Application Filed with the USPTO as a Receiving Office**
If a new international application is being filed and the international application includes the necessary components for an international filing date (see PCT Article 11 and MPEP 1810), a Notification of the International Application Number and of the International Filing Date (Form PCT/RO/105) will be issued in due course, subject to prescriptions concerning national security, and the date shown on this Acknowledgement Receipt will establish the international filing date of the application.

20058-US-PCT

## RIMEGEPANT FOR CGRP RELATED DISORDERS

### CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a national stage application under 35 U.S.C. § 371 of International Application No. PCT/US2019/023940, filed March 25, 2019, which claims priority to U.S. Provisional Application No. 62/647,794 filed March 25, 2018, U.S. Provisional Application No. 62/664,761 filed April 30, 2018, U.S. Provisional Application No. 62/774,285 filed December 2, 2018, U.S. Provisional Application No. 62/777,180 filed December 9, 2018, and U.S. Provisional Application No. 62/777,625 filed December 10, 2018, and all the benefits accruing therefrom under 35 U.S.C. §119, the disclosure of each of which applications is herein incorporated by reference in its entirety.

### FIELD OF THE INVENTION

The present invention relates to the use of rimegepant and salts thereof for treating CGRP-related disorders such as migraine.

### BACKGROUND OF THE INVENTION

Migraine is a chronic and debilitating disorder characterized by recurrent attacks lasting four to 72 hours with multiple symptoms, including typically one-sided, pulsating headaches of moderate to severe pain intensity that are associated with nausea or vomiting, and/or sensitivity to sound (phonophobia) and sensitivity to light (photophobia). Migraines are often preceded by transient neurological warning symptoms, known as auras, which typically involve visual disturbances such as flashing lights, but may also involve numbness or tingling in parts of the body. Migraine is both widespread and disabling. The Migraine Research Foundation ranks migraine as the world's third most prevalent illness, and the Global Burden of Disease Study 2015 rates migraine as the seventh highest specific cause of disability worldwide. According to the Migraine Research Foundation, in the United States, approximately 36 million individuals suffer from migraine attacks. While most sufferers experience migraine attacks once or twice per month, more than 4 million people have chronic migraine, defined as experiencing at least 15 headache days per month, of which at least eight are migraine, for more than three months. Others have episodic migraine, which is characterized by experiencing less than 15 migraine days per month. People with episodic migraine may progress to chronic migraine over time. Migraine attacks can last four hours or up to

1

20058-US-PCT

three days.  More than 90% of individuals suffering from migraine attacks are unable to work or function normally during a migraine attack, with many experiencing comorbid conditions such as depression, anxiety and insomnia.  Also, those suffering from migraine often have accompanying nausea and have an aversion to consuming food or liquids

5     during an attack.

CGRP (calcitonin gene-related peptide) is a 37 amino acid neuropeptide, which belongs to a family of peptides that includes calcitonin, adrenomedullin and amylin.  In humans, two forms of CGRP (a-CGRP and 13-CGRP) exist and have similar activities.  They vary by three amino acids and exhibit differential distribution.  At least two CGRP

10    receptor subtypes may also account for differential  activities.  The CGRP receptor is located within pain-signaling pathways, intracranial arteries and mast cells and its activation is thought to play a causal role in migraine pathophysiology.  For example, research and clinical studies have shown: serum levels of CGRP are elevated during migraine attacks, infusion of intravenous CGRP produces persistent pain in migraine

15    sufferers and non-migraine sufferers, and treatment with anti-migraine drugs normalizes CGRP activity.

Possible CGRP involvement in  migraine  has  been  the  basis  for  the development  and clinical testing of a number of compounds, including for example, olcegepant (Boehringer Ingelheim, Ridgefield, CT), telcagepant (Merck Sharp & Dohme

20    Corp., Kenilworth, NJ ), ubrogepant (Allergan plc, Dublin, Ireland ), rimegepant (Biohaven Pharmaceutical Holding Company Ltd., New Haven, CT), galcanezumab (Eli Lilly and Company, Indianapolis, IN), fremanezumab (Teva Pharmaceutical Industries, Petah Tikva, Israel), eptinezumab (Alder Biopharmaceuticals, Inc., Bothell, WA), and erenumab (Amgen Inc., Thousand Oaks, CA).  Another compound recently studies for treatment of

25    migraine is lasmiditan (Eli Lilly and Company, Indianapolis, IN).

Currently, clinicians use a number of pharmacologic agents for the acute treatment of migraine.  A study published by the American Headache Society in 2015 concluded that the medications deemed effective for the acute treatment of migraine fell into the following classes: triptans, ergotamine derivatives, non-steroidal anti-

30    inflammatory drugs ("NSAIDs"), opioids and combination medications.  The current standard of care for the acute treatment of migraine is prescription of triptans, which are serotonin 5-HT $_{1B/1D}$ receptor agonists.  Triptans have been developed and approved for the acute treatment of migraine over the past two decades.  The initial introduction of triptans represented a shift toward drugs more selectively targeting the suspected

2

20058-US-PCT

pathophysiology of migraine. While triptans account for almost 80% of anti-migraine therapies prescribed at office visits by healthcare providers, issues such as an incomplete effect or headache recurrence remain important clinical limitations. In fact, only about 30% of patients from clinical trials are pain free at two hours after taking triptans. In
5    addition, triptans are contraindicated in patients with cardiovascular disease, cerebrovascular disease, or significant risk factors for either because of potential systemic and cerebrovascular vasoconstriction from the 5-HT$_{1B}$-mediated effects. Also, according to a January 2017 study published in the journal *Headache*, an estimated 2.6 million migraine sufferers in the United States have a cardiovascular event, condition or
10   procedure that limits the potential of triptans as a treatment option.

Accordingly, there remains a significant unmet medical need for the treatment of migraine that may provide enhanced patient benefits compared to existing therapies. In addition, CGRP receptor antagonists may be useful pharmacological agents for disorders that involve other CGRP disorders. In addition to migraine, such disorders
15   may include cluster headache (Doods (2001) *Curr. Opin. Invest. Drugs* 2, 1261-1268; Edvinsson *et al.* (1994) *Cephalalgia* 14, 320-327); chronic tension type headache (Ashina *et al.* (2000) *Neurology* 14, 1335-1340); pain (Yu *et al.* (1998) *Eur. J Pharmacol.* 347, 275-282); chronic pain (Hulsebosch *et al.* (2000) *Pain* 86, 163-175); neurogenic inflammation and inflammatory pain (Holzer (1988) *Neuroscience* 24,
20   739-768; Delay-Goyet *et al.* (1992) *Acta Physiol. Scanda.* 146, 537-538; Salmon *et al.* (2001) *Nature Neurosci.* 4, 357-358); eye pain (May *et al.* (2002) *Cephalalgia* 22, 195-196), tooth pain (Awawdeh *et al.* (2002) *Int. Endocrin. J* 35, 30-36), non-insulin dependent diabetes mellitus (Molina *et al.* (1990) *Diabetes* 39, 260- 265); vascular disorders; inflammation (Zhang *et al.* (2001) *Pain* 89,265); arthritis, bronchial
25   hyperreactivity, asthma, (Foster *et al.* (1992) *Ann. NY Acad. Sci.* 657, 397-404; Schini *et al.* (1994) *Am. J Physiol.* 267, H2483-H2490; Zheng *et al.* (1993) *J Viral.* 67, 5786-5791); shock, sepsis (Beer *et al.* (2002) *Crit. Care Med.* 30, 1794-1798); opiate withdrawal syndrome (Salmon *et al.* (2001) *Nature Neurosci.* 4, 357-358); morphine tolerance (Menard *et al.* (1996) *J Neurosci.* 16, 2342-2351); hot flashes in men and
30   women (Chen *et al.* (1993) *Lancet* 342, 49; Spetz *et al.* (2001) *J Urology* 166, 1720-1723); allergic dermatitis (Wallengren (2000) *Contact Dermatitis* 43, 137-143); psoriasis; encephalitis, brain trauma, ischaemia, stroke, epilepsy, and neurodegenerative diseases (Rohrenbeck *et al.* (1999) *Neurobiol. Dis.* 6, 15-34); skin diseases (Geppetti and Holzer, Eds., Neurogenic Inflammation, 1996, CRC Press, Boca

3

20058-US-PCT

Raton, FL), neurogenic cutaneous redness, skin rosaceousness and erythema; tinnitus (Herzog *et al.* (2002) *J Membr. Biol.* 189,225); obesity (Walker *et al.* (2010) *Endocrinology* 151, 4257-4269); inflammatory bowel disease, irritable bowel syndrome, (Hoffman *et al.* (2002) *Scand. J Gastroenterol.* 37, 414-422) and cystitis.

5

## SUMMARY OF THE INVENTION

The present invention is directed, among other things, to the treatment of CGRP related disorders, e.g., migraine, with rimegepant and salts thereof.  By virtue of the present invention, it may now be possible to provide more effective GCRP related treatments to patients.  Patients suffering from migraine may experience an improved response in one or more areas including, for example, fewer migraine headaches, improvements in pain freedom or freedom from most bothersome symptoms.

10

In one aspect of the invention, there is provided a method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide decrease in the number of migraines per month for said patient of at least 20%.

15

In one aspect of the invention, the decrease in the number of migraines per month for said patient of at least 30%.  In one aspect of the invention, the decrease in the number of migraines per month for said patient of at least 40%.

20

In one aspect of the invention, there is provided a method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide Pain Freedom of the pharmaceutical composition of at about 30% greater than placebo.

25

In one aspect of the invention, the Pain Freedom is at least about 50% greater than placebo. In one aspect of the invention, the Pain Freedom of the pharmaceutical composition is from about 30-75% greater than placebo. In one aspect of the invention, the Pain Freedom is from about 35-65% greater than placebo.

30

In one aspect of the invention, there is provided a method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide Freedom from MBS of the pharmaceutical composition of at about 30% greater than placebo.

4

20058-US-PCT

In one aspect of the invention, the Freedom from MBS is at least about 40% greater than placebo. In one aspect of the invention, the Freedom from MBS is from about 30-50% greater than placebo. In one aspect of the invention, the Freedom from MBS is from about 35-65% greater than placebo.

5    In one aspect of the invention, the method provides an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL).  In one aspect of the invention, the method provides an $AUC_{0-t}$ of from about 85-115% of 5000 (hr*ng/mL).  In one aspect of the invention, the method provides an $AUC_{0-t}$ of from about 90-105% of 5000 (hr*ng/mL).

In one aspect of the invention, the method provides a $C_{max}$ of from about 80-10    125% of 835 (ng/mL).  In one aspect of the invention, the method provides a $C_{max}$ of from about 85-120% of 835 (ng/mL).  In one aspect of the invention, the method provides a $C_{max}$ of from about 95-115% of 835 (ng/mL).

In one aspect of the invention, the pharmaceutical composition is administered by oral, sublingual or buccal administration.

15    In one aspect of the invention, the pharmaceutical composition comprises from about 10 to 600 mg of rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the pharmaceutical composition comprises from about 25 to 300 mg of rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the pharmaceutical composition comprises from about 25 to 150 mg of 20    rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the pharmaceutical composition comprises from about 50 to 100 mg of rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the pharmaceutical composition comprises from about 70 to 80 mg of rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the 25    pharmaceutical composition comprises about 75 mg of rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the pharmaceutical composition comprises about 150 mg of rimegepant or a pharmaceutically acceptable salt thereof.  In one aspect of the invention, the pharmaceutical composition comprises about 37.5 mg of rimegepant or a pharmaceutically acceptable salt thereof.

30    In one aspect of the invention, the rimegepant is in the form of a hemisulfate sesquihydrate salt.

In one aspect of the invention, there is provided a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically

5

20058-US-PCT

acceptable salt thereof, in order to provide an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL).

In one aspect of the invention, there is provided a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide a $C_{max}$ of from about 80-125% of 835 (ng/mL).

In one aspect of the invention, the pharmaceutical composition is provided in the form of a tablet. In one aspect of the invention, the pharmaceutical composition comprises from about 50-60 wt% rimegepant hemisulfate sesquihydrate, about 30-35 wt% microcrystalline cellulose, about 2-7 wt% hydroxypropyl cellulose, about 3-7 wt% croscarmellose sodium, and about 0.1-1.0 wt% magnesium stearate. In one aspect of the invention, the pharmaceutical composition comprises about 57.1 wt% rimegepant hemisulfate sesquihydrate, about 33.4 wt% microcrystalline cellulose, about 4.0 wt% hydroxypropyl cellulose, about 5.0 wt% croscarmellose sodium, and about 0.5 wt% magnesium stearate.

In one aspect of the invention, the pharmaceutical composition is provided in the form of an oral solid molded fast-dispersing dosage form. In one aspect of the invention, the pharmaceutical composition comprises from about 70-80 wt% rimegepant hemisulfate sesquihydrate, about 10-20 wt% fish gelatin, about 10-20 wt% of a filler, and 0.1-5.0 wt% of a flavorant. In one aspect of the invention, the filler is mannitol.

In one aspect of the invention, there is provided a method of treating a condition associated with aberrant levels of CGRP in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL).

In one aspect of the invention, there is provided a method of treating a condition associated with aberrant levels of CGRP in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide a $C_{max}$ of from about 80-125% of 835 (ng/mL). In one aspect of the invention, the disorder is selected from: migraine and cluster headache; chronic tension type headache; chronic pain; neurogenic inflammation and inflammatory pain; eye pain; tooth pain; non-insulin dependent diabetes mellitus; vascular disorders; inflammation; arthritis; bronchial hyperreactivity; asthma; shock; sepsis; opiate withdrawal syndrome; morphine tolerance; hot flashes in men and women; allergic dermatitis; psoriasis; encephalitis,

6

20058-US-PCT

brain trauma, ischaemia, stroke, epilepsy, and neurodegenerative diseases; skin diseases; neurogenic cutaneous redness, skin rosaceousness and erythema; tinnitus; obesity; inflammatory bowel disease; irritable bowel syndrome; and cystitis.

In one aspect of the invention, there is provided a kit for treating a condition associated with aberrant levels of CGRP in a patient, the kit comprising:

(a)    a pharmaceutical composition comprising a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof;

(b)    instructions for administering the pharmaceutical composition;

wherein the therapeutically effective amount provides an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL).


BRIEF DESCRIPTION OF THE DRAWINGS

Figure 1 shows the probability of pain freedom versus time in a clinical study entitled BHV3000-301: Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03235479).

Figure 2 shows the probability of pain freedom versus time in a clinical study entitled BHV3000-302 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03237845).

Figure 3 shows the time to pain relief up to 8 hours pose dose in a clinical study entitled BHV3000-301: Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03235479).

Figure 4 shows the time to pain relief up to 8 hours pose dose in a clinical study entitled BHV3000-302 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03237845).

Figure 5 shows a Kaplan-Meier pain relief curve through 2 hours after a single dose of rimegepant 75 mg Zydis ODT in a clinical study entitled BHV3000-303 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) Orally Discintegrating Tablet (ODT) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03461757).

7

20058-US-PCT

Figure 6 shows a the pain free freedom from 2 to 8 hours after a single dose of rimegepant 75 mg Zydis ODT in a clinical study entitled BHV3000-303 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) Orally Discintegrating Tablet (ODT) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03461757).

DETAILED DESCRIPTION OF THE INVENTION

The following detailed description is provided to aid those skilled in the art in practicing the present invention. Those of ordinary skill in the art may make modifications and variations in the embodiments described herein without departing from the spirit or scope of the present disclosure. Unless otherwise defined, all technical and scientific terms used herein have the same meaning as commonly understood by one of ordinary skill in the art to which this disclosure belongs. The terminology used in the description is for describing particular embodiments only and is not intended to be limiting.

As used in this application, except as otherwise expressly provided herein, each of the following terms shall have the meaning set forth below. Additional definitions are set forth throughout the application. In instances where a term is not specifically defined herein, that term is given an art-recognized meaning by those of ordinary skill applying that term in context to its use in describing the present invention.

The articles "a" and "an" refer to one or to more than one (i.e., to at least one) of the grammatical object of the article unless the context clearly indicates otherwise. By way of example, "an element" means one element or more than one element.

The term "about" refers to a value or composition that is within an acceptable error range for the particular value or composition as determined by one of ordinary skill in the art, which will depend in part on how the value or composition is measured or determined, i.e., the limitations of the measurement system. For example, "about" can mean within 1 or more than 1 standard deviation per the practice in the art. Alternatively, "about" can mean a range of up to 1%, 5%, 10% or 20% (i.e., ±10% or ±20%) depending on the context of the application.  For example, about 3 mg can include any number between 2.7 mg and 3.3 mg (for 10%) or between 2.4 mg and 3.6 mg (for 20%). Furthermore, particularly with respect to biological systems or processes, the terms can mean up to an order of magnitude or up to 5-fold of a value. When particular values or compositions are provided in the application and claims, unless otherwise

8

20058-US-PCT

stated, the meaning of "about" should be assumed to be within an acceptable error range for that particular value or composition.

The term "administering" refers to the physical introduction of a composition comprising a therapeutic agent to a subject, using any of the various methods and
5    delivery systems known to those skilled in the art.  Administering can also be performed, for example, once, a plurality of times, and/or over one or more extended periods and can be a therapeutically effective dose or a subtherapeutic dose.

The term "AUC" (area under the curve) refers to a total amount of drug absorbed or exposed to a subject.  Generally, AUC may be obtained from mathematical method in
10   a plot of drug concentration in the subject over time until the concentration is negligible. The term "AUC" could also refer to partial AUC at specified time intervals.

The term "Cmax" refers to a maximum concentration of a drug in blood, serum, a specified compartment or test area of a subject between administration of a first dose and administration of a second dose.   The term Cmax could also refer to dose normalized
15   ratios, if specified.

The term "dosing interval," refers to the amount of time that elapses between multiple doses of a formulation disclosed herein being administered to a subject. Dosing interval can thus be indicated as ranges.

The term "dosing frequency" refers to the frequency of administering doses of a
20   formulation disclosed herein in a given time. Dosing frequency can be indicated as the number of doses per a given time, e.g., once a week or once in two weeks.

The terms "in combination with" and "in conjunction with" refer to administration of one treatment modality in addition to another treatment modality. As such, "in combination with" or "in conjunction with" refers to administration of one
25   treatment modality before, during, or after administration of the other treatment modality to the subject.

The term "pharmaceutically acceptable salt" refers to a salt form of one or more of the compounds described herein which are typically presented to increase the solubility of the compound in the gastric or gastroenteric juices of the patient's
30   gastrointestinal tract in order to promote dissolution and the bioavailability of the compounds.  Pharmaceutically acceptable salts include those derived from pharmaceutically acceptable inorganic or organic bases and acids, where applicable. Suitable salts include, for example, those derived from alkali metals such as potassium

9

20058-US-PCT

and sodium, alkaline earth metals such as calcium, magnesium and ammonium salts, among numerous other acids and bases well known in the pharmaceutical art.

The terms "subject" and "patient" refer any human or nonhuman animal. The term "nonhuman animal" includes, but is not limited to, vertebrates such as nonhuman primates, sheep, dogs, and rodents such as mice, rats and guinea pigs. In some embodiments, the subject is a human. The terms, "subject" and "patient" are used interchangeably herein.

The terms "effective amount", "therapeutically effective amount", "therapeutically effective dosage" and "therapeutically effective dose" of an agent (also sometimes referred to herein as a "drug") refers to any amount of the agent that, when used alone or in combination with another agent, protects a subject against the onset of a disease or promotes disease regression evidenced by a decrease in severity of disease symptoms, an increase in frequency and duration of disease symptom-free periods, or relief from impairment or disability due to the disease affliction.  The therapeutically effective amount of an agent can be evaluated using a variety of methods known to the skilled practitioner, such as in human subjects during clinical trials, in animal model systems predictive of efficacy in humans, or by assaying the activity of the agent in in vitro assays.

The term "Tmax" refers to a time or period after administration of a drug when the maximum concentration (Cmax) is reached in blood, serum, a specified compartment or test area of a subject.

The term "treatment" refers to any treatment of a condition or disease in a subject and may include: (i) preventing the disease or condition from occurring in the subject which may be predisposed to the disease but has not yet been diagnosed as having it; (ii) inhibiting the disease or condition, i.e., arresting its development; relieving the disease or condition, i.e., causing regression of the condition; or (iii) ameliorating or relieving the conditions caused by the disease, i.e., symptoms of the disease.  Treatment could be used in combination with other standard therapies or alone.  Treatment or "therapy" of a subject also includes any type of intervention or process performed on, or the administration of an agent to, the subject with the objective of reversing, alleviating, ameliorating, inhibiting, slowing down or preventing the onset, progression, development, severity or recurrence of a symptom, complication or condition, or biochemical indicia associated with a disease.

10

20058-US-PCT

With respect to headache, "treatment" is an approach for obtaining beneficial or desired results with a subject. For purposes of this invention, beneficial or desired clinical results include, but are not limited to, one or more of the following: improvement in any aspect of a headache including lessening severity, alleviation of pain intensity, and other associated symptoms, reducing frequency of recurrence, increasing the quality of life of those suffering from the headache, decreasing dose of other medications required to treat the headache and reducing the number of headache days per month. For migraine, other associated symptoms include, but are not limited to, nausea, vomiting, and sensitivity to light, sound, and/or movement. For cluster headache, other associated symptoms include, but are not limited to swelling under or around the eyes, excessive tears, red eye, Rhinorrhea or nasal congestion, and red flushed face.

For purposes of this disclosure, reference is made to the publication by the U.S. Food and Drug Administration (FDA), Guidance for Industry, "Migraine: Developing Drugs for Acute Treatment", February 2018, available from https://www.fda.gov/downloads/drugs/guidances/ucm419465.pdf. Terms used in the Examples, such as, for example, most bothersome symptoms (MBS) and Pain Freedom, are described in the FDA Guidance.

The starting materials useful for making the pharmaceutical compositions of the present invention are readily commercially available or can be prepared by those skilled in the art.

Rimegepant has the chemical formula, $C_{28}H_{28}F_2N_6O_3$ and the IUPAC name [(5S,6S,9R)-5-amino-6-(2,3-difluorophenyl)-6,7,8,9-tetrahydro-5H-cyclohepta[b]pyridin-9-yl] 4-(2-oxo-3H-imidazo[4,5-b]pyridin-1-yl)piperidine-1-carboxylate. Rimegepant is also referred to herein as BHV-3000.

The structure of rimegepant is:

11

A679

20058-US-PCT



Rimegepant is described, for example in WO 2011/046997 published April 21, 2011.

In a preferred aspect of the invention, rimegepant is present in the form of a

5    hemisulfate sesquihydrate salt.  This preferred salt form is described in WO 2013/130402 published September 6, 2013.

The chemical formula of the salt form is $C_{28}H_{28}F_2N_6O_3 \bullet 0.5\ H_2SO_4 \bullet 1.5\ H_2O$ and the structure is as follows:



$0.5\ H_2SO_4$
$1.5\ H_2O$

10    The pharmaceutical compositions of the present invention can be prepared in any suitable dosage form including, for example, such as tablets, capsules, nasal sprays, powders, granules, ointments, solutions, suppositories, injections, inhalants, gels, microspheres, and aerosols.

The pharmaceutical compositions of the present invention comprising rimegepant

15    typically also include other pharmaceutically acceptable carriers (also referred to as excipients) such as, for example, binders, lubricants, diluents, coatings, disintegrants, barrier layer components, glidants, coloring agents, solubility enhancers, gelling agents, fillers,

12

A680

20058-US-PCT

proteins, co-factors, emulsifiers, solubilizing agents, suspending agents, flavorants, preservatives and mixtures thereof.  The choice of excipients depends on the desired characteristics of the compositions and on the nature of other pharmacologically active compounds in the formulation.  Suitable excipients are known to those skilled in the art (see
5      Handbook of Pharmaceutical Excipients, fifth edition, 2005 edited by Rowe et al., McGraw Hill).

        Examples of pharmaceutically acceptable carriers that may be used in preparing the pharmaceutical compositions of the present invention may include, but are not limited to, fillers such as sugars, including lactose, sucrose, mannitol, or sorbitol; cellulose preparations
10     such as maize starch, wheat starch, rice starch, potato starch, gelatin, gum tragacanth, methyl cellulose, hydroxypropyl methyl-cellulose, sodium carboxymethylcellulose, polyvinyl-pyrrolidone (PVP), talc, calcium sulphate, vegetable oils, synthetic oils, polyols, alginic acid, phosphate buffered solutions, emulsifiers, isotonic saline, pyrogen-free water and combinations thereof..  If desired, disintegrating agents may be combined as well, and
15     exemplary disintegrating agents may be, but not limited to, cross-linked polyvinyl pyrrolidone, agar, or alginic acid or a salt thereof such as sodium alginate.  In an aspect of the invention, the flavoring agent is selected from mint, peppermint, berries, cherries, menthol and sodium chloride flavoring agents, and combinations thereof.  In an aspect of the invention, the sweetener is selected from sugar, sucralose, aspartame, acesulfame,
20     neotame, and combinations thereof.

        In general, the pharmaceutical compositions of the present invention may be manufactured in conventional methods known in the art, for example, by means of conventional mixing, dissolving, granulating, dragee-making, levigating, emulsifying, encapsulating, entrapping, lyophilizing processes and the like.
25     In one aspect of the invention the pharmaceutical compositions are prepared in oral solid molded fast-dispersing dosage form, such as described in US Pat. No. 9,192,580, issued November 24, 2015.

        The phrase "fast-dispersing dosage form" refers to compositions which disintegrate or disperse within 1 to 60 seconds, preferably 1 to 30 seconds, more preferably 1 to 10
30     seconds and particularly 2 to 8 seconds, after being placed in contact with a fluid. The fluid is preferably that found in the oral cavity, i.e., saliva, as with oral administration.

        In a preferred embodiment, the compositions of the invention are solid fast-dispersing dosage forms comprising a solid network of the active ingredient, rimegepant, and a water-soluble or water-dispersible carrier containing fish gelatin.

13

20058-US-PCT

Accordingly, the carrier is inert towards the active ingredient. The network is obtained by subliming solvent from a composition in the solid state, the composition comprising the active ingredient and a solution of the carrier in the solvent. The dosage forms according to the invention can be prepared according to the process disclosed in Gregory et al., U.K.

5    Patent No. 1,548,022 using fish gelatin as the carrier. Accordingly, an initial composition (or admixture) comprising the active ingredient and a solution of the fish gelatin carrier in a solvent is prepared followed by sublimation. The sublimation is preferably carried out by freeze drying the composition. The composition can be contained in a mold during the freeze-drying process to produce a solid form in any desired shape. The mold can be cooled

10   using liquid nitrogen or solid carbon dioxide in a preliminary step prior to the deposition of the composition therein. After freezing the mold and composition, they are next subjected to reduced pressure and, if desired, controlled application of heat to aid in sublimation of solvent. The reduced pressure applied in the process can be below about 4 mm Hg, preferably below about 0.3 mm Hg. The freeze dried compositions can then be removed

15   from the mold if desired or stored therein until later use.

When the process is used with active ingredients and fish gelatin as the carrier, a solid fast-dispersing dosage form is produced having the advantages associated with the use of fish gelatin described herein. Generally, fish gelatin is categorized as being from cold water and warm water fish sources and as being of the gelling or non-gelling variety. The

20   non-gelling variety of fish gelatin, in comparison to  gelling fish gelatin and bovine gelatin, contains lower proline and hydroxyproline amino acid content, which are known to be associated with cross-linking properties and gelling ability. Non-gelling fish gelatin can remain at solution concentrations of up to about 40% as well as in temperatures as low as 20° C. In one aspect of the invention, the fish gelatin used in accordance with the invention

25   is preferably obtained from cold water fish sources and is the non-gelling type of fish gelatin. More preferably, in one aspect of the invention, the non-hydrolyzed form of non-gelling fish gelatin is used. In an alternative embodiment, spray-dried non-hydrolyzed non-gelling fish gelatin can be used. Fish gelatins suitable for use in the invention are commercially available.

30   The compositions according to the invention can also contain, in addition to the active ingredient arid fish gelatin carrier, other matrix forming agents and secondary components. Matrix forming agents suitable for use in the present invention include materials derived from animal or vegetable proteins, such as other gelatins, dextrins and soy, wheat and psyllium seed proteins; gums such as acacia, guar, agar, and xanthan;

14

20058-US-PCT

polysaccharides; alginates; carboxymethylcelluloses; carrageenans; dextrans; pectins; synthetic polymers such as polyvinylpyrrolidone; and polypeptide/protein or polysaccharide complexes such as gelatin-acacia complexes.

5     Other materials which may also be incorporated into the fast-dissolving compositions of the present invention include sugars such as mannitol, dextrose, lactose, galactose, and trehalose; cyclic sugars such as cyclodextrin; inorganic salts such as sodium phosphate, sodium chloride and aluminum silicates; and amino acids having from 2 to 12 carbon atoms such as glycine, L-alanine, L-aspartic acid, L-glutamic acid, L- hydroxyproline, L-isoleucine, L-leucine and L-phenylalanine.  One or more matrix forming agents may be

10    incorporated into the solution or suspension prior to solidification (freezing).  The matrix forming agent may be present in addition to a surfactant or to the exclusion of a surfactant. In addition to forming the matrix, the matrix forming agent may aid in maintaining the dispersion of any active ingredient within the solution of suspension.  This is especially helpful in the case of active agents that are not sufficiently soluble in water and must,

15    therefore, be suspended rather than dissolved.  Secondary components such as preservatives, antioxidants,  surfactants, viscosity enhancers, coloring agents, flavoring agents, pH modifiers, sweeteners or taste-masking agents may also be incorporated into the fast-dissolving compositions.  Suitable coloring agents include red, black and yellow iron oxides and FD & C dyes such as FD&C Blue No. 2 and FD&C Red No. 40 available from Ellis &

20    Everard. Suitable flavoring agents include mint, raspberry, licorice, orange, lemon, grapefruit, caramel, vanilla, cherry and grape flavors and combinations of these. Suitable pH modifiers include the edible acids and bases, such as citric acid, tartaric acid, phosphoric acid, hydrochloric acid, maleic acid and sodium hydroxide. Suitable sweeteners include, for example, sucralose, aspartame, acesulfame K and thaumatin. Suitable taste-masking agents

25    include, for example, sodium bicarbonate, ion exchange resins, cyclodextrin inclusion compounds, adsorbates or microencapsulated actives.

Typical routes of administering the pharmaceutical compositions of the invention include, without limitation, oral, topical, transdermal, inhalation, parenteral, sublingual, buccal, rectal, vaginal, and intranasal. The term parenteral as used herein includes

30    subcutaneous injections, intravenous, intramuscular, intrasternal injection or infusion techniques. Pharmaceutical compositions according to certain embodiments of the present invention are formulated so as to allow the active ingredients contained therein to be bioavailable upon administration of the composition to a patient.  Compositions that will be administered to a subject or patient may take the form of one or more dosage units.  Actual

15

20058-US-PCT

methods of preparing such dosage forms are known, or will be apparent, to those skilled in this art; for example, see *Remington: The Science and Practice of Pharmacy,* 20th Edition (Philadelphia College of Pharmacy and Science, 2000).

5    Solid compositions are normally formulated in dosage units providing from about 1 to about 1000 mg of the active ingredient per dose. Some examples of solid dosage units are 0.1 mg, 1 mg, 10 mg, 37.5 mg, 75 mg, 100 mg, 150 mg, 300 mg, 500 mg, 600 mg and 1000 mg. Typical dose ranges in accordance with the present invention include from about 10-600 mg, 25-300 mg, 25-150 mg, 50-100 mg, 60-90 mg, and 70-80 mg. Liquid compositions are generally in a unit dosage range of 1-100 mg/mL. Some examples of liquid

10    dosage units are 0.1 mg/mL, 1 mg/mL, 10 mg/mL, 25 mg/mL, 50 mg/mL, and 100 mg/mL.

In some embodiments, a method may comprise administering to a subject one or more additional agent(s) simultaneously or sequentially with the rimegepant. In some embodiments, an additional agent may be an anti-headache medication such as an example anti-headache medication (e.g., 5-HT1 agonists, triptans, ergot alkaloids, opiates, adrenergic

15    antagonists, NSAIDs or antibodies) known in the art. In some embodiments, a therapeutic effect may be greater as compared to use of rimegepant or one or more additional agent(s) alone. Accordingly, a synergistic effect between rimegepant and the one or more additional agents may be achieved. In some embodiments, the one or more additional agent(s) may be taken by a subject prophylactically.

20    In addition to migraine, other CGRP related disorders that may be treated by the pharmaceutical compositions and methods of the present invention include, for example, cluster headache; chronic tension type headache; chronic pain; neurogenic inflammation and inflammatory pain; eye pain; tooth pain; non-insulin dependent diabetes mellitus; vascular disorders; inflammation; arthritis; bronchial hyperreactivity; asthma; shock; sepsis;

25    opiate withdrawal syndrome; morphine tolerance; hot flashes in men and women; allergic dermatitis; psoriasis; encephalitis, brain trauma, ischaemia, stroke, epilepsy, and neurodegenerative diseases; skin diseases; neurogenic cutaneous redness, skin rosaceousness and erythema; tinnitus; obesity; inflammatory bowel disease; irritable bowel syndrome; and cystitis.

30    In one aspect, the invention also provides kits for use in the instant methods. Kits can include one or more containers comprising a pharmaceutical composition described herein and instructions for use in accordance with any of the methods described herein. Generally, these instructions comprise a description of administration of the pharmaceutical composition to treat, ameliorate or prevent headache (such as migraine), or other CRGP

16

A684

20058-US-PCT

disorder, according to any of the methods described herein. The kit may, for example, comprise a description of selecting an individual suitable for treatment based on identifying whether that individual has headache or whether the individual is at risk of having headache.  The instructions are typically provided in the form of a package insert, or label, in
5    accordance with the requirements of the regulatory having authority over the jurisdiction where the pharmaceutical composition is to be provided to patients.

In accordance with the present invention, administration of the pharmaceutical compositions comprising rimegepant to a subject may promote a reduction in severity (which can include reducing need for and/or amount of (e.g., exposure to) other drugs
10   and/or therapies generally used for this condition, including, for example, ergotamine, dihydroergotamine, or triptans for migraine), duration, and/or frequency (including, for example, delaying or increasing time to next episodic attack in an individual).

In addition, administration of the pharmaceutical compositions comprising rimegepant to a subject may promote a lessening or improvement of one or more symptoms
15   of headache, or a reduction in the duration of a symptom, as compared to not administering a treatment.

In addition, administration of the pharmaceutical compositions comprising rimegepant to a subject may promote a reduction in the frequency of headache attacks in an individual (as compared to the level before treatment) in a certain time period, e.g., per
20   month.  For example, the frequency of attacks may be reduced by at least about any of 10%, 20%, 30%, 40%, 50%, 60%, or 70% in the individual as compared to the level before treatment.

In addition, administration of the pharmaceutical compositions comprising rimegepant to a subject may promote a delay in the development of headache, i.e., to defer,
25   hinder, slow, retard, stabilize, and/or postpone progression of the disease. This delay can be of varying lengths of time, depending on the history of the disease and/or individuals being treated.

In addition, administration of the pharmaceutical compositions comprising rimegepant to a subject may delay the development or progression of a headache, i.e.,
30   delay of the initial manifestations and/or ensuing progression of the disorder. Development of headache can be detectable and assessed using standard clinical techniques as well known in the art. However, development also refers to progression that may be undetectable.

17

20058-US-PCT

EXAMPLES

The following examples illustrate the invention and are not intended to limit the scope of the invention.

5                                        EXAMPLE 1

**Tablet Manufacture** – A batch is prepared to manufacture tablets containing a dose of 75 mg of rimegepant as follows.  The composition of the batch is set forth below in Table 1. Tablets are made from the batch as indicated.

Table 1

| Ingredient | Percent per Tablet | Amount per Tablet, (mg) | Amount per 100,000 Tablet Batch (g) |
|---|---|---|---|
| **Intra-granular** | | | |
| Rimegepant (as hemisulfate sesquihydrate equivalent to 75mg as base) | 57.11 | 85.67 | 8575.5 |
| Microcrystalline cellulose, NF | 13.39 | 20.09 | 2,011.0 |
| Hydroxypropyl Cellulose), USP/NF (Klucel EXF PHARM) | 4.00 | 6.00 | 600.6 |
| Croscarmellose Sodium NF | 2.50 | 3.75 | 375.4 |
| Purified Water USP | q.s. | N/A | 0[1] |
| Intragranular Dispensed Solids | | | 11562 |
| **Extra-granular** | | | |
| Microcrystalline cellulose NF | 20.00 | 30.00 | 3,003.0 |
| Croscarmellose Sodium NF | 2.50 | 3.75 | 375.4 |
| Magnesium Stearate NF | 0.50 | 0.75 | 75.08 |
| **Total Core Tablet** | **100.0** | **150** | **15015** |

10    [1] Purified Water is removed in-process.  An excess amount is dispensed.  The portion consumed is documented.  Intragranular Dispensed Solids does not include water.

   1.  The rimegepant hemisulfate sesquihydrate and all excipients are weighed.
   2.  Pass the rimegepant hemisulfate sesquihydrate, microcrystalline cellulose (intragranular portion), hydroxypropyl cellulose, and croscarmellose sodium
15        (intragranular portion) through a 20-mesh screen.
   3.  Load the sieved mixture from 2 into a suitable granulator equipped with an appropriate size bowl & dry mix for 10 minutes.  Set impeller speed to low & turn chopper off.
   4.  While mixing, equip the granulator with a spray tip and add purified water until
20        endpoint is reached.
   5.  Mix wet mass for 30 seconds with impeller set to low and chopper set to low.
   6.  Discharge the wet mass into expansion chamber of fluid bed dryer. Dry to target LOD of <2%.

18

20058-US-PCT

7. Mill the dried granules using the Comil with an appropriate screen (0.075R) and spacer (0.050).  Perform bulk and tapped density & particle size distribution analyses.  Record results.  Calculate Carr Index & Carr Index mean from two samples.
8. Calculate the fractional yield.  Recalculate the extragranular quantities.
9. Pass the microcrystalline cellulose and croscarmellose through a 20-mesh screen.
10. Combine the milled granulation with the recalculated microcrystalline cellulose (extragranular portion), croscarmellose sodium (extragranular portion) in a 2-cubic foot tote & blend for 150 revolutions.
11. Pass the magnesium stearate through 30-mesh screen.
12. Add screened magnesium stearate to the 2 cubic foot tote contents & blend for 75 revolutions.
13. Collect blend uniformity samples per plan.
14. Perform bulk & tapped density and particle size analyses & calculate Carr Index.
15. Discharge into a suitable container and weigh.
16. Set up 716-station rotary tablet press with 7mm round concave plain tooling.  Adjust number of stations as needed.
17. Adjust the press to achieve the following specifications for the tablets: Friability of ≤ 0.3% loss; Hardness of 10-14 kP; Thickness of 3.60-4.10 mm; and Disintegration of ≥ 2:30 minutes.
18. Conduct in-process testing as follows:
    - Tablet friability and disintegration at beginning, middle and end of run
    - Tablet hardness, tablet thickness, individual tablet weights, average tablet weights, and appearance at 15 minute intervals
19. Pass the tablets through a de-duster and metal detector.
20. Package tablets in double polyethylene bags in a suitable container.


EXAMPLE 2

<u>Clinical Trial</u> – BHV3000-301: Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03235479).

A phase 3 clinical study was conducted with 1490 participants, as follows.

**Study Description**

The purpose of this study was to compare the efficacy of BHV-3000 (rimegepant) versus placebo in subjects with Acute Migraines

| Condition or disease | Intervention/treatment |
|---|---|
| Migraine | Drug: BHV-3000 |
| Acute Migraine | Drug: Placebo Oral Tablet |
| Phonophobia | |
| Photophobia | |

**Study Design**

19

A687

20058-US-PCT

|  |  |
|---|---|
| Study Type : | Interventional  (Clinical Trial) |
| Actual Enrollment  : | 1490 participants |
| Allocation: | Randomized |
| Intervention Model: | Parallel Assignment |
| Intervention Model Description: | Double-blind to Sponsor, Investigator and Subject Randomized Controlled Trial |
| Masking: | Triple (Participant, Care Provider, Investigator) |
| Masking Description: | Double-blind to Sponsor, Investigator and Subject |
| Primary Purpose: | Treatment |
| Official Title: | BHV3000-301: Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine |

**Arms and Interventions**

| Arm | Intervention/treatment |
|---|---|
| Experimental: BHV-3000 | Drug: BHV-3000 75 mg tablet QD |
| Placebo Comparator: Placebo | Drug: Placebo Oral Tablet equivalent of 75 mg tablet QD |

5    **Outcome Measures**

Primary Outcome Measures  :

1.  Pain freedom of rimegepant (75 mg tablet) compared with placebo in the acute treatment of migraine will be measured using the number of evaluable subjects that
10       report no pain at 2 hours post-dose. [ Time Frame: Two hours post dose ]

     Pain will be measured on a 4 point Likert scale (0=none, 1=mild, 2=moderate, 3=severe)

2.  Freedom from the most bothersome symptom (MBS) of rimegepant (75 mg tablet) compared with placebo will be measured using the number of evaluable subjects
15       that report the absence of their MBS at 2 hours post-dose. [ Time Frame: Two hours post dose ]

     The MBS (nausea, phonophobia or photophobia) will measured using a binary scale (0=absent, 1=present).

20

A688

20058-US-PCT

Secondary Outcome Measures :

1. To measure the difference between rimegepant (75 mg tablet) compared to placebo from 2 to 24 hours, using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 2 hours -24 hours post-dose ]

5

   Sustained Pain Freedom as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

2. The difference between rimegepant (75 mg tablet) compared to placebo by tabulating the absence of photophobia at 2 hours post-dose in the subset of subjects that reported the presence of photophobia at headache baseline. [ Time Frame: 2 hours post-dose ]

10

   Photophobia

3. To evaluate rimegepant (75 mg tablet) compared to placebo by tabulating the number of subjects that report the absence of phonophobia at 2 hours post-dose in the subset of subjects that reported the presence of phonophobia at headache baseline. [ Time Frame: 2 hours post-dose ]

15

   Phonophobia

4. To measure the difference between rimegepant (75 mg tablet) compared to placebo on Pain Relief, at 2 hours post-dose, for those that report a pain level of moderate or severe at baseline and then report a pain level of none or mild. [ Time Frame: 2 hours post-dose ]

20

   Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

5. Freedom from Nausea by tabulating the number of subjects that report the absence of nausea at 2 hours post-dose in the subset of subjects that reported the presence of nausea at headache baseline. [ Time Frame: 2 hours post-dose ]

25

   Freedom from Nausea

6. The difference between rimegepant (75 mg tablet) compared to placebo on the probability of requiring rescue medication using the number of subjects that take rescue medication within 24 after administration of study medication (BHV3000 or placebo). [ Time Frame: up to 24 hours post-dose ]

30

   Requiring Rescue Medication

7. To measure the difference between rimegepant (75 mg tablet) compared to placebo on sustained pain freedom, from 2 to 48 hours, using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 2 hours - 24 hours post-dose ]

35

   Sustained Pain Freedom

21

A689

20058-US-PCT

8. Rimegepant (75 mg tablet) compared to placebo on sustained pain relief, from 2 to 24 hours by using the number of subjects that do not use any rescue medications, and do not experience any moderate or severe headache pain through that time. [ Time Frame: 2 hours- 24 hours post-dose ]

5   Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

9. To measure the difference between rimegepant (75 mg tablet) compared to placebo on sustained pain relief from 2 to 48 hours, using the number of subjects that do not use any rescue medications and do not experience moderate to severe headache 10   pain. [ Time Frame: 2 hours - 48 hours post-dose ]

   Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

10. To measure the difference between rimegepant (75 mg tablet) relative to placebo on the proportion of subjects able to function normally, at 2 hours, using the 15   number of subjects that self-report as "normal" on the functional disability scale. [ Time Frame: 2 hours post-dose ]

   Functional Disability Score

11. To measure the difference between rimegepant (75 mg tablet) compared to placebo on pain relapse using the number of subjects that are pain free at 2 hours post-dose 20   and then have a headache of any severity within 48 hours of study medication. [ Time Frame: 2 hours to 48 hours post-dose ]

   Pain relapse as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

   Further details concerning the clinical study including eligibility criteria, contacts and 25   locations and more information can be found at www.clinicaltrials.gov for ClinicalTrials.gov Identifier: NCT03235479.


EXAMPLE 3

**Clinical Trial** – BHV3000-302 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, 30   Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03237845)

   A phase 3 clinical study was conducted with 1503 participants, as follows.

**Study Description**

35   Brief Summary:
The purpose of this study is to compare the efficacy of BHV-3000 (rimegepant) versus placebo in subjects with Acute Migraines

22

A690

20058-US-PCT

| Condition or disease | Intervention/treatment |
|---|---|
| Migraine | Drug: BHV-3000 |
| Acute Migraine | Drug: Placebo Oral Tablet |
| Phonophobia | |
| Photophobia | |

**Study Design**

|  |  |
|---|---|
| Study Type : | Interventional  (Clinical Trial) |
| Actual Enrollment : | 1503 participants |
| Allocation: | Randomized |
| Intervention Model: | Parallel Assignment |
| Intervention Model Description: | Double-blind to Sponsor, Investigator and Subject |
| Masking: | Triple (Participant, Care Provider, Investigator) |
| Masking Description: | Double-blind to Sponsor, Investigator and Subject |
| Primary Purpose: | Treatment |
| Official Title: | BHV3000-302 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) for the Acute Treatment of Migraine |
| Actual Study Start Date : | July 26, 2017 |
| Primary Completion Date : | January 25, 2018 |
| Study Completion Date : | January 31, 2018 |

5

**Arms and Interventions**

| Arm | Intervention/treatment |
|---|---|
| Experimental: BHV-3000 rimegepant 75 mg tablet QD | Drug: Rimegepant active |
| Placebo Comparator: Placebo Matching 75mg placebo tablet QD | Drug: Placebo placebo |

23

A691

20058-US-PCT

**Outcome Measures**

Primary Outcome Measures :

5      1.   Pain Freedom of rimegepant (75 mg tablet) compared with placebo in the acute treatment of migraine will be measured using the number of evaluable subjects that report no pain at 2 hours post-dose. [ Time Frame: Two hours post dose ]

Pain will be measured on a 4 point Likert scale (0=none, 1=mild, 2=moderate, 3=severe)

10     2.   Freedom from the most bothersome symptom (MBS) of rimegepant (75 mg tablet) compared with placebo will be measured using the number of evaluable subjects that report the absence of their MBS at 2 hours post-dose. [ Time Frame: Two hours post dose ]

15      The MBS (nausea, phonophobia or photophobia) will measured using a binary scale (0=absent, 1=present).

Secondary Outcome Measures :

    1.   Rimegepant (75 mg tablet) compared to placebo from 2 to 24 hours, using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 2 hours -24 hours post-dose ]

20      Sustained Pain Freedom as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

    2.   Rimegepant (75 mg tablet) compared to placebo by tabulating the number of subjects that report the absence of photophobia at 2 hours post-dose in the subset of subjects that reported the presence of photophobia at headache baseline.

25      [ Time Frame: 2 hours post-dose ]

Freedom from Photophobia

    3.   Rimegepant (75 mg tablet) compared to placebo by tabulating the number of subjects that report the absence of phonophobia at 2 hours post-dose in the subset of subjects that reported the presence of phonophobia at headache baseline.

30      [ Time Frame: 2 hours post-dose ]

Freedom from Phonophobia

    4.   To measure rimegepant (75 mg tablet) compared to placebo on Pain Relief, at 2 hours post-dose, that report a pain level of moderate or severe at baseline and then report a pain level of none or mild. [ Time Frame: 2 hours post-dose ]

35      Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

24

20058-US-PCT

5. Freedom from Nausea will by tabulating the number of subjects that report the absence of nausea at 2 hours post-dose in the subset of subjects that reported the presence of nausea at headache baseline. [ Time Frame: 2 hours post-dose ]

Freedom from Nausea

5      6. To measure rimegepant (75 mg tablet) compared to placebo on the probability of requiring rescue medication will be assessed using the number of subjects that take rescue medication within 24 after administration of study medication (BHV3000 or placebo). [ Time Frame: up to 24 hours post-dose ]

Requiring Rescue Medication

10     7. Rimegepant (75 mg tablet) compared to placebo on sustained pain freedom, from 2 to 48 hours, will be measured using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 2 hours - 48 hours post-dose ]

15     Sustained Pain Freedom as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

8. Rimegepant (75 mg tablet) compared to placebo on sustained pain relief, from 2 to 24 hours by using the number of subjects that do not use any rescue medications, and do not experience any moderate or severe headache pain through that time. [ Time Frame: 2 hours- 24 hours post-dose ]

20     Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

9. Rimegepant (75 mg tablet) compared to placebo on sustained pain relief from 2 to 48 hours, using the number of subjects that do not use any rescue medications and do not experience moderate to severe headache pain. [ Time Frame: 2 hours - 48 hours post-dose ]

25     Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

10. Rimegepant (75 mg tablet) relative to placebo on the proportion of subjects able to function normally, at 2 hours, using the number of subjects that self-report as "normal" on the functional disability scale. [ Time Frame: 2 hours post-dose ]

30     Functional Disability Score

11. Rimegepant (75 mg tablet) compared to placebo on pain relapse will be measured using the number of subjects that are pain free at 2 hours post-dose and then have a headache of any severity within 48 hours of study medication. [ Time Frame: 2 hours to 48 hours post-dose ]

35     Pain relapse as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

25

20058-US-PCT

Further details concerning the clinical study including eligibility criteria, contacts and locations and more information can be found at www.clinicaltrials.gov for ClinicalTrials.gov Identifier: NCT03237845.

5 EXAMPLE 4

**Results from Clinical Trials** - The study results from the clinical studies described in Example 2 and Example 3 are set forth in Figure 1, Figure 2 and Table 2, Table 3 and Table 4.

Table 2

| Co-Primary Endpoints Met in Both Phase 3 Trials | | | |
|---|---|---|---|
| **Study 302** 2 hour Endpoint | Rimegepant (n=537) | Placebo (n=535) | Adjusted p-value |
| Pain Freedom | 19.6% | 12.0% | < 0.001 |
| Freedom from MBS[1] | 37.6% | 25.2% | < 0.0001 |

| **Study 301** 2 hour Endpoint | Rimegepant (n=543) | Placebo (n=541) | Adjusted p-value |
|---|---|---|---|
| Pain Freedom | 19.2% | 14.2% | < 0.03 |
| Freedom from MBS[1] | 36.6% | 27.7% | < 0.002 |

10 [1]Most Bothersome Symptom including Photophobia, Phonophobia or Nausea.

Table 3

26

20058-US-PCT



5

Table 4

| Pooled Liver Function Test (LFT) Profile: Rimegepant was Similar to Placebo in Both Studies | | |
|---|---|---|

Complete Dataset of LFT Results from Study 301 and Study 302

| ALT | Rimegepant (n=1089) | Placebo (n=1092) |
|---|---|---|
| >1XN | 22 (2.0%) | 24 (2.2%) |
| >3x ULN | 1 (0.1%) | 1 (0.1%) |
| >5x ULN | 0 | 0 |
| >10x ULN | 0 | 0 |
| >20x ULN | 0 | 0 |

| AST | Rimegepant (n=1089) | Placebo (n=1092) |
|---|---|---|
| >1XN | 12 (1.1%) | 16 (1.5%) |
| >3x ULN | 1 (0.1%) | 0 |
| >5x ULN | 0 | 0 |
| >10x ULN | 0 | 0 |
| >20x ULN | 0 | 0 |

*No bilirubin elevations > 2xULN across both Studies 301 and 302
* ALL CASES RESOLVED

10

EXAMPLE 5

27

A695

20058-US-PCT

**Bioequivalence** – The bioequivalence of an oral solid molded fast-dispersing dosage form made with fish gelatin as described herein ("ODT") at a dose of 75 mg of rimegepant was compared to the 75 mg tablets used in the studies described in Examples 2 and 3.

The synopsis of the experiment is set forth below.

5    Primary objective:

To compare the rate and extent of absorption of rimegepant ODT administered sublingually versus rimegepant tablet administered as 1 x 75 mg in healthy volunteers under fasting conditions.

Secondary objective:

10    To assess the safety, tolerability, and PK of rimegepant tablet and ODT.

Exploratory objective:

To compare the rate and extent of absorption of rimegepant ODT administered on top of the tongue versus rimegepant tablet administered as 1 x 75 mg in healthy volunteers under fasting conditions.

15    Study Design

This will be a single center, Phase 1, open-label, randomized study designed to be conducted as follows:

Part I: 4-period, 2-sequence, fully-replicated crossover bioequivalence study.

Part II: 2-period, 2-sequence, crossover relative bioavailability study. Part II may be

20    conducted prior to Part I.

This study is intended for filing under Food and Drug Administration (FDA), European Medicines Agency (EMA), and Health Product and Food Branch (HPFB) regulations.

Each part of the study is intended to dose in one group; if, for any reason, either of the study parts is dosed in more than one group, all groups will be dosed at the same clinical

25    site and the same protocol requirements and procedures will be followed within each group.


Sample Size

A total of approximately 60 healthy adult male or female volunteers will be dosed. Approximately 36 subjects will be included in the Part I bioequivalence portion of the study.

30    Based on preliminary data from previous studies, the intra-subject coefficient of variation should be approximately 30% for both AUC and $C_{max}$. Thus, with this expected coefficient of variation and an expected ratio of AUC and $C_{max}$ within 0.91 and 1.10, the study should have a power of at least 80% to show bioequivalence with 30 subjects in a 4-period fully replicated design. In order of the study.

28

20058-US-PCT

Approximately 24 subjects will be included in the Part II relative bioavailability portion of the study.

<u>Confinements and Washouts</u>

Part I

5    Subjects will be confined from at least 10 hours before drug administration of Period 1 until after the 72-hour post-dose blood draw of Period 4, i.e., until morning of Day **22**.

There will be a washout period of **5** days or more between doses; subjects will remain confined in the clinic throughout the washout periods. Participation of each subject in this study should last approximately **3** weeks.

10    Part II

Subjects will be confined from at least 10 hours before drug administration of Period 1 until after the 72-hour post-dose blood draw of Period 2, i.e., until morning of Day 8.

There will be a washout period of 4 days or more between doses; subjects will remain confined in the clinic throughout the washout periods. Participation of each subject

15    in this study should last approximately 1.5 weeks.

<u>Randomization and Blinding</u>

Subjects will be administered each treatment according to the 4-period, 2-sequence (CBCB or BCBC) and to the 2-period, 2-sequence (CA or AC), block randomization scheme produced by inVentiv for Part I and Part II, respectively. The randomization code will not be

20    available to the Bioanalytical Division of inVentiv until the clinical and analytical phases of the study have been completed.

This study will be open-label due to the objective nature of the data.

<u>Study Medication</u>

Part I

25    Each subject will receive each of the 2 following treatments twice:

Treatment *C* (Test)**:** 1 x 75 mg rimegepant **sublingual** ODT to be held **under** the tongue until fully dissolved then swallowed without water, administered under fasting conditions

Treatment B (Reference)**:** 1 x 75 mg rimegepant tablet swallowed with water,

30    administered under fasting conditions

Part II

Each subject will receive each of the 2 following treatments once:

29

20058-US-PCT

Treatment C (Test)**:** 1 x 75 mg rimegepant sublingual ODT to be held under the tongue until fully dissolved then swallowed without water, administered under fasting conditions

Treatment A (Reference): 1 x 75 mg rimegepant ODT to be held on top of the tongue
5    until fully dissolved then swallowed without water, administered under fasting conditions

Part I

Treatment C

One rimegepant ODT will be placed under each subject's tongue by the clinical staff and subject will be instructed not to swallow saliva until the ODT is completely dissolved.
10   The subject will be instructed to give a hand sign once the ODT is completely dissolved and swallowed. A hand and mouth check will be performed to ensure consumption of the medication.

Time of dosing will be set to the time the ODT is placed under the tongue. No water will be allowed from 1 hour before dosing and until 1 hour post-dose. The complete dosing
15   procedure must be completed within 2 minutes. If the ODT is not completely dissolved within 2 minutes, the subject will be asked to swallow with saliva and this will be documented. The start and end time of complete dosing will be recorded.

Treatment B

One rimegepant tablet will be administered to each subject with 240 mL of water
20   and a hand and mouth check will be performed to ensure consumption of the medication.

Part II

Treatment C

One rimegepant ODT will be placed under each subject's tongue by the clinical staff and subject will be instructed not to swallow saliva until the ODT is completely dissolved.
25   The subject will be instructed to give a hand sign once the ODT is completely dissolved and swallowed. A hand and mouth check will be performed to ensure consumption of the medication.

Time of dosing will be set to the time the ODT is placed under the tongue. No water will be allowed from 1 hour before dosing and until 1 hour post-dose. The complete dosing
30   procedure must be completed within 2 minutes. If the ODT is not completely dissolved within 2 minutes, the subject will be asked to swallow with saliva and this will be documented. The start and end time of complete dosing will be recorded.

Treatment A

30

20058-US-PCT

One rimegepant ODT will be placed on top of each subject's tongue by the clinical staff and subject will be instructed not to swallow saliva until the ODT is completely dissolved. The subject will be instructed to give a hand sign once the ODT is completely dissolved and swallowed. A hand and mouth check will be performed to ensure

5    consumption of the medication.

Time of dosing will be set to the time the ODT is placed on the tongue. No water will be allowed from 1 hour before and until 1 hour post-dose. The complete dosing procedure must be completed within 2 minutes. If the ODT is not completely dissolved within 2 minutes, the subject will be asked to swallow with saliva and this will be documented. The

10    start and end time of complete dosing will be recorded.

Sample Collection and Processing

In each period, a total of 17 blood samples will be drawn from each subject for pharmacokinetic analyses. Blood samples will be collected prior to drug administration and 0.083, 0.167, 0.333, 0.5, 0.667, 0.833, 1, 1.5, 2, 2.5, 5, 8, 12, 24, 48, and 72 hours post-dose

15    (3 mL for each sampling time). The time tolerance window for blood sample collection will be ±29 seconds for all post-dose samples collected during the confinement period. Sample collections done outside the pre-defined time windows will not be considered as protocol deviations since actual post-dose sampling times will be used for pharmacokinetic and statistical analyses. Unless otherwise specified or for subject safety, when blood draws and

20    other procedures coincide, blood draws will have precedence. A dead-volume intravenous catheter will be used for blood collection to avoid multiple skin punctures, when appropriate. Otherwise, blood samples will be collected by direct venipuncture.

The total volume of blood including that collected for eligibility, genotyping, and safety purposes should not exceed 308 mL for Part I and 185 mL for Part II.

25    Plasma samples will be collected and processed.

Pharmacokinetic and Statistical Analyses

PK analysis will be performed using Phoenix® WinNonlin®, which is validated for bioequivalence/bioavailability studies. Inferential statistical analyses will be performed using SAS® according to FDA, EMA, and HPFB guidelines.

30    Bioanalysis of all samples should be completed prior to the initiation of the pharmacokinetic and statistical analyses.

Pharmacokinetics

The following PK parameters will be calculated by standard non-compartmental methods for rimegepant:

31

20058-US-PCT

- $AUC_{0-t}$: area under the concentration-time curve from time zero to the last non-zero concentration

- $AUC_{0-inf}$: area under the concentration-time curve from time zero to infinity (extrapolated)

5
- $C_{max}$: maximum observed concentration

- Residual area: calculated as $100*(1- AUC_{0-t} / AUC_{0-inf})$

- $T_{max}$: time of observed $C_{max}$

- $T_{\frac{1}{2}\ el}$: elimination half-life

- $K_{el}$: elimination rate constant

10    Additional PK analysis may be performed.

Safety Population

The safety population is defined as all subjects who received at least one dose of the study medication.

Pharmacokinetic Population

15    For Part I, the pharmacokinetic population will include all subjects completing at least 2 periods, including Treatment **C** and Treatment B, and for whom the pharmacokinetic profile can be adequately characterized.

For Part II, the pharmacokinetic population will include all subjects completing the study and for whom the pharmacokinetic profile can be adequately characterized.

20    Any subject with pre-dose concentrations will be presented in the concentrations and PK tables but excluded from descriptive statistics and inferential analyses (for the concerned period in Part I) if the pre-dose concentration is greater than 5% of the $C_{max}$ value measured for that subject.

Data from subjects who experienced emesis during the sampling interval and who 25    were not withdrawn may be evaluated after completion of the PK analysis. Any subject who experienced emesis within 2 times median $T_{max}$ of rimegepant will be excluded from the statistical analysis (i.e., descriptive statistics and inferential analyses). Similarly, subjects withdrawn due to AEs or vomiting episodes will be presented in data listings but excluded from the statistical analysis tables (for the concerned period in Part I).

30    Statistical Analyses

A Statistical Analysis Plan (SAP) will be prepared after completion of the final protocol and finalized prior to database lock.

32

20058-US-PCT

Demographic parameters will be summarized descriptively. Treatment-emergent adverse events (TEAEs) will be summarized descriptively by treatment for all subjects who were dosed (safety population). No inferential statistical analysis of safety data is planned.

5         Individual and mean plasma concentration versus time curves will be presented for both linear and semi-log scales. Descriptive statistics (arithmetic and geometric means, standard deviation [SD], coefficient of variation [CV%], minimum [Min], maximum [Max], and median) of the plasma concentrations and the PK parameters will be presented.

The results of the bioequivalence experiment are set forth in Table 5, Table 6 and Table 7.

10

33

A701

20058-US-PCT

**Table 5 - Summary Descriptive Statistics of BHV3000 for Pharmacokinetic Parameters by Treatment and Administration – Part I**

| Analyte | Admin | Treatment | Sequence | AUC0_15 min (hr*ng/mL) | AUC0_30 min (hr*ng/mL) | AUC0_1h (hr*ng/mL) | AUC0_2h (hr*ng/mL) | AUClast (hr*ng/mL) | AUCinf (hr*ng/mL) | Residual area (%) | $C_{max}$ (ng/mL) | $T_{max}$ (hr) | $T_{\frac{1}{2}}$ (hr) | $K_{el}$ (1/hr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BHV3000 | 1 | Rimegepant ODT (Test) | N | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 |
| | | | Mean | 3.23 | 48.41 | 336.36 | 1049.14 | 4073.13 | 4986.49 | 0.20 | 954.02 | 1.47 | 7.84 | 0.0921 |
| | | | SD | 5.35 | 54.43 | 251.82 | 560.98 | 1429.96 | 1420.42 | 0.18 | 519.43 | 0.64 | 1.56 | 0.0190 |
| | | | CV% | 157.92 | 111.96 | 79.41 | 47.75 | 28.74 | 28.47 | 43.45 | 53.34 | 43.33 | 12.93 | 20.6976 |
| | | | Min | 0.60 | 0.90 | 1.28 | 381.45 | 2707.35 | 2717.72 | 0.09 | 292.92 | 0.47 | 5.75 | 0.0664 |
| | | | Median | 0.95 | 25.52 | 260.49 | 1041.73 | 4539.82 | 4547.69 | 0.32 | 916.06 | 1.50 | 8.21 | 0.0853 |
| | | | Max | 24.49 | 179.44 | 961.23 | 2171.04 | 8132.82 | 8347.14 | 1.06 | 1885.94 | 2.50 | 16.44 | 0.1265 |
| | | | Geometric Mean | NC | NC | 181.18 | 927.52 | 4778.39 | 4787.65 | 0.25 | 849.54 | 1.24 | 7.68 | 0.0892 |
| BHV3000 | 2 | Rimegepant ODT (Test) | N | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| | | | Mean | 3.27 | 51.95 | 320.86 | 1030.22 | 5330.16 | 5354.69 | 0.31 | 915.87 | 1.54 | 8.49 | 0.0855 |
| | | | SD | 4.44 | 53.91 | 242.59 | 523.43 | 1512.53 | 1524.80 | 0.16 | 308.35 | 0.70 | 1.93 | 0.0189 |
| | | | CV% | 131.97 | 106.44 | 75.54 | 52.69 | 28.35 | 28.22 | 52.24 | 33.67 | 46.10 | 22.94 | 22.0490 |
| | | | Min | 0.60 | 0.90 | 3.59 | 368.79 | 2844.92 | 2826.82 | 0.12 | 377.93 | 0.47 | 5.73 | 0.0540 |
| | | | Median | 1.28 | 29.25 | 256.77 | 1082.94 | 5408.23 | 5421.88 | 0.25 | 920.29 | 1.50 | 8.54 | 0.0812 |
| | | | Max | 18.93 | 196.33 | 753.90 | 2026.77 | 8865.17 | 8866.97 | 0.64 | 1525.91 | 2.50 | 12.84 | 0.1210 |
| | | | Geometric Mean | 0.98 | 20.27 | 167.12 | 947.52 | 5125.96 | 5143.78 | 0.27 | 861.46 | 1.36 | 8.30 | 0.0814 |
| BHV3000 | 1 | Rimegepant Tablet (Reference) | N | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 | 34 |
| | | | Mean | 0.68 | 19.67 | 222.43 | 924.82 | 5201.88 | 5217.35 | 0.32 | 907.26 | 2.04 | 7.95 | 0.0915 |
| | | | SD | 0.88 | 19.65 | 186.90 | 534.84 | 1532.87 | 1532.78 | 0.26 | 366.37 | 1.24 | 1.72 | 0.0190 |
| | | | CV% | 128.78 | 100.57 | 82.63 | 58.45 | 29.45 | 29.37 | 57.73 | 40.37 | 60.85 | 21.74 | 21.6454 |
| | | | Min | 0.60 | 0.90 | 4.19 | 75.32 | 2635.48 | 2649.68 | 0.09 | 338.78 | 0.47 | 5.51 | 0.0593 |
| | | | Median | 0.45 | 14.81 | 194.49 | 906.91 | 4838.68 | 4865.29 | 0.22 | 910.77 | 2.00 | 8.06 | 0.0860 |
| | | | Max | 3.91 | 93.96 | 868.73 | 1957.51 | 9551.84 | 9565.90 | 0.98 | 2004.95 | 5.00 | 11.53 | 0.1257 |
| | | | Geometric Mean | NC | 9.51 | 136.80 | 743.54 | 4992.92 | 5006.58 | 0.24 | 841.03 | 1.75 | 7.79 | 0.0889 |
| BHV3000 | 2 | Rimegepant Tablet (Reference) | N | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 | 33 |
| | | | Mean | 2.13 | 25.37 | 239.64 | 960.99 | 5403.72 | 5500.22 | 0.29 | 834.10 | 2.65 | 9.49 | 0.0883 |
| | | | SD | 3.74 | 30.78 | 181.90 | 459.51 | 1670.60 | 3674.31 | 0.15 | 289.43 | 0.88 | 3.95 | 0.0364 |
| | | | CV% | 174.96 | 121.33 | 65.71 | 48.32 | 30.41 | 30.39 | 50.78 | 34.72 | 68.30 | 17.29 | 39.4072 |
| | | | Min | 0.60 | 0.19 | 3.44 | 84.31 | 2916.60 | 2936.35 | 0.12 | 386.15 | 0.47 | 5.89 | 0.0024 |
| | | | Median | 0.51 | 11.41 | 206.97 | 889.26 | 5272.46 | 5295.49 | 0.28 | 798.82 | 1.50 | 8.40 | 0.0817 |
| | | | Max | 4.89 | 123.36 | 732.46 | 2003.09 | 8619.52 | 8864.26 | 0.71 | 1671.55 | 5.00 | 11.29 | 0.1176 |
| | | | Geometric Mean | NC | 11.38 | 136.64 | 811.29 | 5258.65 | 5274.64 | 9.26 | 786.69 | 1.64 | 8.46 | 0.0819 |

34

20058-US-PCT

**Table 6 - Summary Descriptive Statistics of BHV3000 for Pharmacokinetic Parameters by Treatment – Part I**

| Analyte | Treatment | | AUC0_15 min (hr*ng/mL) | AUC0_30 min (hr*ng/mL) | AUC0_1 h (hr*ng/mL) | AUC0_2 h (hr*ng/mL) | AUClast (hr*ng/mL) | AUCinf (hr*ng/mL) | Residual area (%) | Cmax (ng/mL) | Tmax (hr) | T½ (hr) | Kel (1/hr) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BHV3000 | Rimegepant Sublingual ODT (Test) | N | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| | | Mean | 3.35 | 50.26 | 338.55 | 1059.82 | 5133.41 | 5167.94 | 0.30 | 909.86 | 3.59 | 8.26 | 0.0879 |
| | | SD | 4.85 | 54.47 | 245.35 | 512.86 | 1471.15 | 1472.53 | 0.17 | 521.69 | 0.66 | 1.74 | 0.0393 |
| | | CV% | 144.27 | 108.38 | 77.02 | 49.32 | 28.57 | 28.49 | 57.53 | 34.26 | 44.07 | 21.67 | 21.957 |
| | | Min | 0.00 | 0.00 | 1.28 | 365.79 | 2344.91 | 2356.32 | 0.09 | 282.92 | 0.67 | 5.73 | 0.0540 |
| | | Median | 1.26 | 29.36 | 267.11 | 1082.04 | 4956.26 | 4963.67 | 0.24 | 929.80 | 3.50 | 8.39 | 0.0827 |
| | | Max | 24.49 | 250.33 | 931.21 | 2171.04 | 8895.17 | 8966.97 | 1.66 | 1855.84 | 3.50 | 12.84 | 0.1210 |
| | | Geometric Mean | NC | NC | 188.85 | 887.32 | 4943.80 | 4968.58 | 0.26 | 855.49 | 3.36 | 8.07 | 0.0859 |
| BHV3000 | Rimegepant Tablet (Reference) | N | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| | | Mean | 9.90 | 22.58 | 245.85 | 937.67 | 5345.62 | 5360.09 | 0.29 | 871.35 | 3.94 | 8.28 | 0.0872 |
| | | SD | 1.38 | 25.81 | 182.68 | 484.74 | 1606.41 | 1608.21 | 0.15 | 330.28 | 3.08 | 1.64 | 0.0383 |
| | | CV% | 153.46 | 114.29 | 74.31 | 51.70 | 30.05 | 30.00 | 53.91 | 37.92 | 55.60 | 19.78 | 21.2592 |
| | | Min | 0.00 | 0.05 | 4.39 | 75.32 | 2693.48 | 2647.68 | 0.09 | 338.78 | 0.67 | 5.51 | 0.0695 |
| | | Median | 9.34 | 14.98 | 218.33 | 899.25 | 5095.43 | 5104.27 | 0.23 | 851.33 | 2.90 | 8.40 | 0.0825 |
| | | Max | 6.89 | 122.36 | 732.48 | 2008.09 | 9819.52 | 9864.26 | 0.86 | 2204.05 | 5.00 | 11.50 | 0.1257 |
| | | Geometric Mean | NC | 18.39 | 161.18 | 756.17 | 5121.92 | 5136.57 | 0.25 | 813.81 | 3.69 | 8.12 | 0.0854 |

5

35

20058-US-PCT

Table 7 - Ratios, 90% Geometric Confidence Intervals, $CV_{WR}$ (FDA Methodology)

| PK Parameter | Ratio[1] (%) | 90% Lower C.I.[2] (%) | 90% Upper C.I.[2] (%) | 95% Upper Confidence Bounds[3] (%) | $CV_{WR}$ (%) |
|---|---|---|---|---|---|
| Ln(AUC$_{0-t}$) | 96.79 | 92.63 | 101.15 | - | 15.70 |
| Ln(AUC$_{0-inf}$) | 96.81 | 92.66 | 101.14 | - | 15.68 |
| Ln(C$_{max}$) | 104.65 | 97.04 | 112.84 | - | 23.74 |

[1] Calculated using least-squares means according to the formula: $e^{(DIFFERENCE)}$ X 100.

5      [2] 90% Geometric Confidence Interval using ln-transformed data.

[3] Reference Scaled ABE approach.

20058-US-PCT

EXAMPLE 6

**Efficacy of Rimegepant** – Results and analysis from the Clinical Trial – BHV3000-301 described in Example 2.

**Objectives**

To compare the efficacy, safety, and tolerability of rimegepant 75 mg oral tablet with placebo in the acute treatment of migraine in adults.

**Methods**

In a double-blind, randomized, placebo-controlled, multicenter study (Study 301, NCT03235479) adults ≥18 years of age with at least a 1-year history of ICHD 3-beta migraine were eligible to participate. Following a 3- to 28-day screening period, subjects were randomized to receive rimegepant 75 mg or matching placebo and instructed to treat a single migraine attack with 1 dose of the blinded study drug (rimegepant or placebo) when headache pain reached moderate or severe intensity. The coprimary endpoints were pain freedom at 2 hours postdose and freedom from the most bothersome symptom (MBS) at 2 hours postdose. Safety assessments included adverse events (AEs), ECGs, vital signs, physical measurements, and routine laboratory tests, including assessment of liver function. Unless stated otherwise, values presented are mean±SD.

**Results**

In total, 1162 subjects were randomized to receive rimegepant (n=582) or placebo (n=580), and 1084 were evaluated for efficacy (rimegepant n=543, placebo n=541). Subjects had a mean age of 41.6±12.2 years, 85.5% were female, and by history had 4.7±1.8 attacks per month. At 2 hours postdose, rimegepant treated patients had higher pain-free rates than placebo treated patients (19.2% vs 14.2%, *P*=.0298), were more likely to be free of the MBS (36.6% vs 27.7%, *P*=.0016); and had higher rates of pain relief (56.0% vs 45.7%, *P*=.0006). A single dose of rimegepant, without the use of rescue medication, demonstrated superiority versus placebo for sustained pain freedom and pain relief from 2 through 48 hours postdose (*P*=.013 and *P*=.0003, respectively). On a measure of functional disability, a greater proportion of rimegepant-treated patients achieved normal function at 2 hours (*P*<.0001).

The safety and tolerability profiles of rimegepant were similar to placebo. The most common AEs were nausea (.9%, 5/546 vs 1.1%, 6/549) and dizziness (.7%, 4/546 vs .4%, 2/549). Serum ALT or AST levels greater than the upper limit of normal (ULN) were seen in 2.0% (11/546) and 3.6% (20/549) of subjects treated with rimegepant and placebo, respectively. One subject in the rimegepant group (.2%)

37

20058-US-PCT

and 1 subject in the placebo group (.2%) had a transaminase level >3 times ULN, and no subject in either group had a level >5 times ULN. No bilirubin elevations >2 times ULN were observed. Serious AEs (SAEs) were observed in .4% (n=2) of subjects in the rimegepant group and .2% (n=1) in the placebo group. No SAE was determined to be related to the study drug. Both subjects with SAEs in the rimegepant group had not been dosed before onset of the SAEs.

**Conclusions**

Significant and durable clinical effects were seen with a single dose of rimegepant across multiple outcome measures, including pain freedom, freedom from MBS, pain relief, and recovery of normal function. Rimegepant 75 mg oral tablet demonstrated favorable tolerability and safety, including a liver safety profile similar to placebo. These clinically meaningful results complement the benefits seen in an identical Phase 3 study (Study 302) and a previous Phase 2b study. Rimegepant may ultimately offer patients a novel approach for the acute treatment of migraine.

| Endpoints | Rimegepant 75 mg | Placebo | P-value[a] |
|---|---|---|---|
| Coprimary | | | |
| Pain-free at 2 hours | 19.2% [104/543] | 14.2% [77/541] | .0298 |
| Free from MBS at 2 hours | 36.6% [199/543] | 27.7% [150/541] | .0016 |
| Selected secondary | | | |
| Photophobia-free at 2 hours | 34.9% [164/470] | 24.8% [120/483] | .0005 |
| Phonophobia-free at 2 hours | 38.6% [133/345] | 30.9% [113/366] | .0299 |
| Pain relief at 2 hours | 56.0% [304/543] | 45.7% [247/541] | .0006 |
| Nausea-free at 2 hours | 46.9% [149/318] | 41.6% [134/322] | .1815 |

38

A706

20058-US-PCT

| | | | |
|---|---|---|---|
| Sustained pain relief, 2-24 hours | 38.9% [211/543] | 27.9% [151/541] | .0001 |

MBS, most bothersome symptom

[a]Endpoints were tested hierarchically in the order shown at $P=.05$

Results from Example 6 are also shown in Figure 3.

EXAMPLE 7

**Efficacy of Rimegepant** – Results and analysis from the Clinical Trial – BHV3000-302 described in Example 3.

**Objectives**

To compare the efficacy, safety, and tolerability of rimegepant 75 mg oral tablet with placebo in the acute treatment of migraine in adults.

**Methods**

In a double-blind, randomized, placebo-controlled, multicenter study (Study 302, NCT03237845) adults ≥18 years of age with at least a 1-year history of ICHD 3-beta migraine were eligible to participate. Following a 3- to 28-day screening period, subjects were randomized to receive rimegepant 75 mg or matching placebo and instructed to treat a single migraine attack with 1 dose of the blinded study drug (rimegepant or placebo) when headache pain reached moderate or severe intensity. The coprimary endpoints were pain freedom at 2 hours postdose and freedom from the most bothersome symptom (MBS) at 2 hours postdose. Safety assessments included adverse events (AEs), ECGs, vital signs, physical measurements, and routine laboratory tests, including assessment of liver function. Unless stated otherwise, values presented are mean±SD.

**Results**

In total, 1186 subjects were randomized to receive rimegepant (n=594) or placebo (n=592), and 1072 were evaluated for efficacy (rimegepant n=537, placebo n=535). Subjects had a mean age of 40.6±12.0 years, 88.7% were female, and by history had 4.6±1.8 attacks per month. At 2 hours postdose, rimegepant treated patients had higher pain free rates than placebo treated patients (19.6% vs 12.0%, $P=.0006$), were more likely to be free of the MBS (37.6% vs 25.2%, $P<.0001$); and had higher rates of pain relief (58.1% vs 42.8%, $P<.0001$). A single dose of rimegepant, without the use of rescue

39

20058-US-PCT

medication, demonstrated superiority versus placebo for sustained pain freedom and pain relief from 2 through 48 hours postdose ($P$=.0181 and $P$<.0001, respectively). On a measure of functional disability, a greater proportion of rimegepant-treated patients achieved normal function at 2 hours ($P$<.0001).

The safety and tolerability profiles of rimegepant were similar to placebo. The most common AEs were nausea (1.8%, 10/543 vs 1.1%, 6/543) and urinary tract infection (1.5%, 8/543 vs 1.1%, 6/543). Serum ALT or AST levels greater than the upper limit of normal (ULN) were seen in 2.4% (13/543) and 2.2% (12/543) of subjects treated with rimegepant and placebo, respectively. No subject in either treatment group had a transaminase level greater than 3 times ULN, and no bilirubin elevations greater than 2 times ULN were observed. Serious AEs (SAEs) were observed in 1 subject in the rimegepant group (back pain) and 2 subjects in the placebo group. No SAEs were determined to be related to the study drug.

**Conclusions**

Significant and durable clinical effects were seen with a single dose of rimegepant across multiple outcome measures, including pain freedom, freedom from MBS, pain relief, and recovery of normal function. Rimegepant 75 mg oral tablet demonstrated favorable tolerability and safety, including a liver safety profile similar to placebo. These clinically meaningful results complement the benefits seen in Study 301. Rimegepant may ultimately offer patients a novel approach for the acute treatment of migraine.

| Endpoints | Rimegepant 75 mg | Placebo | P-value[a] |
|---|---|---|---|
| Coprimary | | | |
| Pain-free at 2 hours | 19.6% [105/537] | 12.0% [64/535] | .0006 |
| Free from MBS at 2 hours | 37.6% [202/537] | 25.2% [135/535] | <.0001 |
| Selected secondary | | | |
| Photophobia-free at 2 hours | 37.4% [183/489] | 22.3% [106/477] | <.0001 |

40

A708

20058-US-PCT

| | | | |
|---|---|---|---|
| Phonophobia-free at 2 hours | 36.7% [133/362] | 26.8% [100/374] | .0039 |
| Pain relief at 2 hours | 58.1% [312/537] | 42.8% [229/535] | <.0001 |
| Nausea-free at 2 hours | 48.1% [171/355] | 43.3% [145/336] | .2084 |
| Sustained pain relief, 2-24 hours | 42.6% [229/537] | 26.5% [142/535] | <.0001 |

MBS, most bothersome symptom

[a]Endpoints were tested hierarchically in the order shown at $P$=.05

Results from Example 7 are also shown in Figure 4.

EXAMPLE 8

**Clinical Trial** – BHV3000-303 : Phase 3: Double-Blind, Randomized, Placebo-Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) Orally Discintegrating Tablet (ODT) for the Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT03461757)

A phase 3 clinical study was conducted with 1812 participants, as follows.

**Study Description**

**Brief Summary:**

The purpose of this study is to compare the efficacy of BHV-3000 (rimegepant ODT) versus placebo in subjects with Acute Migraines.

| Condition or disease | Intervention/treatment | Phase |
|---|---|---|
| Migraine | Drug: RimegepantDrug: Placebo | Phase 3 |

41

20058-US-PCT

**Study Design**

| | |
|---|---|
| Study Type : | Interventional  (Clinical Trial) |
| Actual Enrollment : | 1812 participants |
| Allocation: | Randomized |
| Intervention Model: | Parallel Assignment |
| Masking: | Triple (Participant, Care Provider, Investigator) |
| Primary Purpose: | Treatment |
| Official Title: | BHV3000-303: Phase 3, Double-Blind, Randomized, Placebo Controlled, Safety and Efficacy Trial of BHV-3000 (Rimegepant) Orally Disintegrating Tablet (ODT) for the Acute Treatment of Migraine |
| Actual Study Start Date : | February 27, 2018 |
| Actual Primary Completion Date : | October 8, 2018 |
| Actual Study Completion Date : | October 15, 2018 |

**Arms and Interventions**

| Arm | Intervention/treatment |
|---|---|
| Experimental: Arm 1: BHV-3000 (Active) | Drug: Rimegepant<br>BHV-3000 (rimegepant) 75 mg (ODT) |
| Placebo Comparator: Arm 2: Placebo Comparator Drug | Drug: Placebo<br>75mg matching placebo ODT |

**Outcome Measures**

**Primary Outcome Measures:**

42

A710

20058-US-PCT

1.      Pain freedom of rimegepant compared with placebo in the acute treatment of migraine will be measured using the number of evaluable subjects that report no pain at 2 hours post-dose.

[ Time Frame: Two hours post dose ]

Pain will be measured on a 4 point Likert scale (0=none, 1=mild, 2=moderate, 3=severe)


2.      Freedom from the most bothersome symptom (MBS) of rimegepant compared with placebo will be measured using the number of evaluable subjects that report the absence of their MBS at 2 hours post-dose. [ Time Frame: Two hours post dose ]

The MBS (nausea, phonophobia or photophobia) will measured using a binary scale (0=absent, 1=present).


**Secondary Outcome Measures :**

1.      To measure rimegepant compared to placebo on Pain Relief, at 2 hours post-dose, that report a pain level of moderate or severe at baseline and then report a pain level of none or mild.

[ Time Frame: 2 hours post-dose ]

Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

2.      Functional disability scale [ Time Frame: 2 hour post-dose ]

Subjects self-report "normal" on the functional disability scale

3.      Rimegepant compared to placebo on sustained pain relief, from 2 to 24 hours by using the number of subjects that do not use any rescue medications, and do not experience any moderate or severe headache pain through that time. [ Time Frame: 2 hours- 24 hours post-dose ]

Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

4.      Sustained freedom from most bothersome symptom from 2 to 24 hours , assessed by using the number of subjects that do not experience their most bothersome symptom through below time period.

[ Time Frame: 2 to 24 hours post-dose ]

Most bothersome symptom

5.      To measure rimegepant compared to placebo on the probability of requiring rescue medication will be assessed using the number of subjects that take rescue medication within 24 after administration of study medication (BHV3000 or placebo). [ Time Frame: up to 24 hours post-dose ]

Requiring Rescue Medication

6.      Sustained ability to function at a normal level as measured by the Functional disability scale

[ Time Frame: 2 to 24 hours post-dose ]

43

20058-US-PCT

Subjects self-report "normal" on the functional disability scale

7.      Rimegepant compared to placebo on sustained pain relief from 2 to 48 hours, using the number of subjects that do not use any rescue medications and do not experience moderate to severe headache pain. [ Time Frame: 2 hours - 48 hours post-dose ]

Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

8.      Rimegepant compared to placebo on pain freedom from most bothersome symptom from 2- 48 hours post dose. [ Time Frame: 2 to 48 hours post dose ]

Most bothersome symptom

9.      Sustained ability to function at a normal level as measured by the Functional disability scale [ Time Frame: 2 to 48 hours post dose ]

Subjects self-report "normal" on the functional disability scale

10.     Rimegepant compared to placebo by tabulating the number of subjects that report the absence of photophobia at 2 hours post-dose in the subset of subjects that reported the presence of photophobia at headache baseline [ Time Frame: 2 hours post-dose ]

Freedom from Photophobia

11.     Functional disability scale [ Time Frame: 90 minutes post dose ]

Subjects self-report "normal" on the functional disability scale

12.     Rimegepant compared to placebo on sustained pain relief at 90 minutes, using the number of subjects that do not use any rescue medications and do not experience moderate to severe headache pain. [ Time Frame: 90 minutes post dose ]

Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

13.     Rimegepant compared to placebo from 2 to 24 hours, using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 2 hours -24 hours post-dose ]

Sustained Pain Freedom as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

14.     Sustained freedom from most bothersome symptom at 90 minutes, assessed by using the number of subjects that do not experience their most bothersome symptom through below time period. [ Time Frame: 90 minutes post-dose ]

Most bothersome symptom

15.     Rimegepant compared to placebo on sustained pain freedom 90 minutes post dose, will be measured using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 90 minutes post-dose ]

44

20058-US-PCT

Sustained Pain Freedom as measured by a 4 point numeric rating scale

16.    Rimegepant compared to placebo by tabulating the number of subjects that report the absence of phonophobia at 2 hours post-dose in the subset of subjects that reported the presence of phonophobia at headache baseline [ Time Frame: 2 hours post-dose ]

Freedom from Phonophobia

17.    Rimegepant compared to placebo on sustained pain freedom, from 2 to 48 hours, will be measured using the number of subjects that do not experience any headache pain through the time period of interest. [ Time Frame: 2 hours - 48 hours post-dose ]

Sustained Pain Freedom as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

18.    To measure rimegepant compared to placebo on Pain Relief, at 60 minutes post-dose, that report a pain level of moderate or severe at baseline and then report a pain level of none or mild. [ Time Frame: 60 minutes post dose ]

Sustained Pain Relief as measured by a 4 point numeric rating scale (None, Mild, Moderate, Severe)

19.    Functional disability scale [ Time Frame: 60 minutes post dose ]

Subjects self-report "normal" on the functional disability scale

20.    Freedom from Nausea will by tabulating the number of subjects that report the absence of nausea at 2 hours post-dose in the subset of subjects that reported the presence of nausea at headache baseline. [ Time Frame: 2 hours post-dose ]

Freedom from Nausea

21.    To assess the number of subjects that are pain free at 2 hours post-dose and then have a headache of any severity (response of 1, 2 or 3 on the 4-point scale within 48 hours after administrations of study medication, rimegepant or placebo. [ Time Frame: 2 hours - 48 hours post-dose ]

Pain relapse


Further details concerning the clinical study including eligibility criteria, contacts and locations and more information can be found at www.clinicaltrials.gov for ClinicalTrials.gov Identifier: NCT03461757.

45

A713

20058-US-PCT

EXAMPLE 9

Results from the clinical trial described in Example 8 are summarized as follows.

Study 303 met its co-primary registrational endpoints of pain freedom and freedom from most bothersome symptom (MBS) at 2 hours using a single dose (Table 8). Importantly, patients treated with the rimegepant Zydis ODT formulation in accordance with the present invention began to numerically separate from placebo on pain relief as early as 15 minutes and demonstrated statistical significance by 60 minutes (p < 0.0001) (see Figure 5). Figure 5 shows the percentage of patients experiencing pain relief between 0 and 2 hours after dosing for patients who took a single dose of rimegepant Zydis ODT 75 mg or placebo. Data are Kaplan-Meier exploratory estimates with pain relief defined as patients who have either mild-pain or no-pain during the specified interval. Subjects were censored who took rescue medication or were lost to follow-up during the specified interval. Additionally, a significantly greater percentage of patients treated with rimegepant Zydis ODT returned to normal functioning within 60 minutes as compared to placebo (p < 0.002). Lasting clinical benefit was observed through 48 hours on pain relief (p < 0.001), pain freedom (p < 0.001), most bothersome symptom (p < 0.001), functional disability (p < 0.003) and multiple other secondary endpoints after a single dose of rimegepant as compared to placebo. The vast majority of patients treated with rimegepant Zydis ODT (85%) did not use any rescue medications.

**Table 8: Study 303**

**Pain Freedom & Freedom from Most Bothersome Symptom**

| 2 Hour Endpoint | Rimegepant (N=669) | Placebo (N=682) | Difference | Adjusted p-value |
|---|---|---|---|---|
| Pain Freedom | 21.2% | 10.9% | 10.3% | < 0.0001 |
| Freedom from MBS[1] | 35.1% | 26.8% | 8.3% | 0.0009 |

In Study 303, rimegepant Zydis ODT statistically differentiated from placebo on the two co-primary endpoints as well as the first 21 consecutive secondary outcome measures were prespecified in hierarchical testing (p-values < 0.05). These secondary outcomes and additional exploratory outcome measures from this study are anticipated to be presented at upcoming scientific meetings in 2019.

46

A714

20058-US-PCT

The safety and tolerability of rimegepant in Study 303 was consistent with the profile previously observed in Study 301 (Example 2) and 302 (Example 3).  Table 9 shows the pooled safety data across all three trials. No single adverse event (AE) occurred in the rimegepant group with an incidence higher than 1.6% and overall rates of AEs were similar to placebo.  With regard to liver function tests, one patient treated with placebo and one patient treated with rimegepant showed LFTs > 3x ULN in Study 303. Pooled liver function test results across the three pivotal trials (n=3,556) performed to date showed that rimegepant was similar to placebo with regard to aminotransferase (ALT or AST) levels above the upper limit of normal (ULN) and no patients experienced elevations in bilirubin > 2x ULN (Table 10).

**Table 9: Pooled Adverse Event (AE) Safety Data:**

**Complete Dataset of AEs from Studies 301, 302 and 303 of**

**Patients Reporting an AE within 48 Hours Post-Dose ≥ 1% Incidence**

| Adverse Event | Rimegepant (n=1,771) | Placebo (n=1,785) |
|---|---|---|
| ≥ 1 On-Study AE* | 252 (14.2%) | 209 (13.2%) |
| Nausea | 26 (1.5%) | 15 (0.8%) |
| UTI | 21 (1.2%) | 12 (0.7%) |
| SAEs** | 3 (0.2%) | 3 (0.2%) |

*No other individual AEs ≥ 1%, in rimegepant treated subjects, than listed in table. Includes all AEs without attribution to drug relatedness.

**No drug-related Serious Adverse Events (SAEs). 2 of the subjects with SAE in rimegepant group and 1 in placebo group had not been dosed before onset of SAE.

47

A715

20058-US-PCT

**Table 10: Pooled Liver Function Test (LFT) Profile:**

| ALT or AST | Complete Dataset of LFT Results from Studies 301, 302, and 303* | |
|---|---|---|
| | Rimegepant (n=1,771) | Placebo (n=1,785) |
| > ULN[1] | 48 (2.7%) | 52 (2.9%) |
| > 3x ULN | 2 (0.1%) | 2 (0.1%) |
| > 5x ULN | 1 (0.06%)[2] | 0 |
| > 10x ULN | 0 | 0 |
| > 20x ULN | 0 | 0 |

[1]Upper limit of normal; ALT alanine aminotransferase; AST aspartate aminotransferase

[2]AST elevation, Not Drug-Related as deemed by the investigator: subject newly initiated weight-lifting with laboratory results consistent with muscle injury

*AST/ALT Categories are not mutually exclusive; No bilirubin elevations > 2x ULN across Studies 301, 302 and 303

Further results from the clinical trial described in Example 8 (Study 303) are shown in Tables 11, 12 and Figure 6.

Table 11

| ORDER | Primary Endpoints | Rimegepant | Placebo | P-value |
|---|---|---|---|---|
| Primary, 1 | Pain @ 2hrs | 21.2% | 10.9% | <0.0001 |
| Primary, 2 | MBS @ 2hrs | 35.1% | 26.8% | 0.0009 |
| SECONDARY ORDER | Secondary Endpoints | BHV | PBO | P-value |

48

20058-US-PCT

| | | | | |
|---|---|---|---|---|
| 1 | Pain Relief @ 2 hours | 59.3% | 43.3% | <0.0001 |
| 2 | Functional Disability at 2 hours | 38.1% | 25.8% | <0.0001 |
| 3 | SP Relief 2 to 24 hours | 47.8% | 27.7% | <0.0001 |
| 4 | MBS 2 to 24 | 27.1% | 17.7% | <0.0001 |
| 5 | Prob of Rescue Meds in 24 hours | 14.2% | 29.2% | <0.0001 |
| 6 | Functional Disability 2 to 24 | 29.6% | 16.9% | <0.0001 |
| 7 | SP Relief 2 to 48 hours | 42.2% | 25.2% | <0.0001 |
| 8 | MBS 2 to 48 | 23.2% | 16.4% | 0.0018 |
| 9 | Functional Disability 2 to 48 | 26.0% | 15.4% | <0.0001 |
| 10 | Photophobia @ 2 hours | 33.4% | 24.5% | 0.0007 |
| 11 | Functional Disabilty @ 90 minutes | 30.2% | 21.3% | 0.0002 |
| 12 | Pain Relief @ 90 minutes | 49.6% | 37.2% | <0.0001 |
| 13 | SP Freedom 2 to 24 hours | 15.7% | 5.6% | <0.0001 |
| 14 | MBS Freedom at 90 minutes | 27.4% | 21.5% | 0.0128 |
| 15 | Pain Freedom @ 90 minutes | 15.1% | 7.3% | <0.0001 |
| 16 | Phonophobia @ 2hours | 41.7% | 30.2% | 0.0003 |
| 17 | SP Freedom 2 to 48 hours | 13.5% | 5.4% | <0.0001 |

49

A717

20058-US-PCT

| 18 | Pain Relief at 60 minutes | 36.8% | 31.2% | 0.0314 |
| 19 | Functional Disability at 60 minutes | 22.3% | 15.8% | 0.0025 |
| 20 | Nausea @ 2 hours | 51.0% | 45.2% | 0.0898 |
| 21 | Pain Relpase 2 to 48 | 36.6% | 50.0% | 0.0577 |

Table 12

**RIMEGEPANT (BHV-3000) PHASE 3 – STUDY 303**
**Sustained Pain Relief[1] from 2, 3, & 4 to 24 or 48 hours**

|  | Sustained Pain Relief | Rimegepant | Placebo | p-value |
|---|---|---|---|---|
|  |  | n=669 | n=682 |  |
|  | 2 to 24 hrs | 47.8% | 27.7% | <0.0001 |
| 24 hr | 3 to 24 hrs | 56.4% | 33.1% | <0.0001 |
|  | 4 to 24 hrs | 61.7% | 36.8% | <0.0001 |
|  | 2 to 48 hrs | 42.2% | 25.2% | <0.0001 |
| 48 hr | 3 to 48 hrs | 49.9% | 29.8% | <0.0001 |
|  | 4 to 48 hrs | 54.7% | 33.0% | <0.0001 |

1.   Sustained Pain Relief is defined as patients who have either mild pain or no pain pain during the specified interval, with no use of rescue medication. Analyses of 2-24, 6-24, 2-48, and 4-48 hours are exploratory

50

A718

20058-US-PCT

EXAMPLE 10

**Clinical Trial** – BHV3000-201: Open Label Safety Study in Acute Treatment of Migraine (ClinicalTrials.gov Identifier: NCT 03266588)

A phase 2/3 clinical study is conducted with about 2000 participants, as follows.

**Study Description**

**Brief Summary:**

The purpose of this study is to evaluate safety and tolerability of BHV3000 (rimegepant).

| Condition or disease | Intervention/treatment | Phase |
|---|---|---|
| Migraine | Drug: Rimegepant | Phase 2Phase 3 |

**Study Design**

| | |
|---|---|
| Study Type : | Interventional  (Clinical Trial) |
| Estimated Enrollment : | 2000 participants |
| Intervention Model: | Single Group Assignment |
| Masking: | None (Open Label) |
| Primary Purpose: | Treatment |
| Official Title: | A Multicenter, Open Label Long-Term Safety Study of BHV3000 in the Acute Treatment of Migraine |
| Actual Study Start Date : | August 30, 2017 |
| Estimated Primary Completion Date : | July 2019 |
| Estimated Study Completion Date : | July 2019 |

**Arms and Interventions**

| Arm | Intervention/treatment |
|---|---|
| Experimental: Rimegepant | Drug: Rimegepant<br>75 mg oral tablet<br>Other Name: BHV3000 |

**Outcome Measures**

51

A719

20058-US-PCT

**Primary Outcome Measures:**

1.      To assess the safety and tolerability of rimegepant (BHV-3000) by measuring the frequency and severity of adverse events and discontinuations due to adverse events [ Time Frame: 52 weeks ] Number of subjects with treatment-emergent adverse events as assessed through laboratory tests, ECGs, physical exam findings (safety and tolerability)

**Secondary Outcome Measures**:

1.      ALT or AST > 3x ULN with total bilirubin >2x ULN [ Time Frame: 52 weeks ] elevated liver function tests

2.      hepatic related adverse events and hepatic related adverse events that lead to discontinuation [ Time Frame: 52 weeks ] adverse events related to liver

Further details concerning the clinical study including eligibility criteria, contacts and locations and more information can be found at www.clinicaltrials.gov for ClinicalTrials.gov Identifier: NCT03266588.

EXAMPLE 11

Results from the clinical trial described in Example 10 are summarized as follows.

Study BHV3000-201 demonstrated initial positive results.  The interim analysis (database cutoff of November 21, 2018) demonstrated that the safety and tolerability of long-term dosing of rimegepant in patients with migraine is consistent with the profile observed in phase 1- 3 studies to date. Patients were allowed to treat migraine attacks of all severities (mild to severe) up to once daily for a full year. The initial results for hepatic safety and tolerability of rimegepant 75 mg in study participants is based upon review of both adverse events and regularly scheduled liver function tests.  Interim hepatic data were reviewed by an external and independent panel of liver experts. There were no liver cases assessed as probably related to study drug and there were no Hy's Law cases identified. The panel concluded that there was no liver safety signal detected to date, including a subset of patients with near-daily dosing (≥ 15 doses/month). In the aggregate, it was noted that compared to migraine trials

52

A720

20058-US-PCT

with drugs other than rimegepant, there was a very low incidence of overall elevations of liver function test abnormalities in rimegepant treated patients (1.0% incidence of serum ALT or AST > 3x ULN). Subjects will continue to participate in Study 201 with additional data analyses to be submitted in the NDA and required 120-day safety updates.

In addition to the interim safety analysis, data from subjects was assessed to determine reductions in the number of headache days per month. The data presented in Table demonstrate that patients experienced fewer headache days per month while taking rimegepant during their treatment phase versus their observation phase of the study. For example, of 1731 subjects, 683 (39.5%) had a reduction in headache days per month of at least 20%, 602 (34.8%) had a reduction in headache days per month of at least 25%, 523 (30.2%) had a reduction in headache days per month of at least 30%, 442 (25.5%) had a reduction in headache days per month of at least 35%, 362 (20.9%) had a reduction in headache days per month of at least 40%, 287 (16.6%) had a reduction in headache days per month of at least 45%, 226 (13.1%) had a reduction in headache days per month of at least 50%. This result was surprising and unexpected and indicates that rimegepant may function as a preventative treatment for migraine as well as an acute treatment. Reductions in the mean number of headache days per month was observed beginning as early as the first month and continued in subsequent months of therapy.

Accordingly, in accordance with the present invention, it may be possible to treat patients that suffer from migraine headaches by administering rimegepant to the patient at a dosage, e.g., 75 mg, and at a frequency, e.g., once per month, twice per month, three times per month, four times per month, five or more times per month, ten or more times per month, fifteen or more times per month, effective to reduce the number of headaches per month, e.g., a 20% or greater reduction in the number.

53

20058-US-PCT

TABLE 13

BHV-3000-201 - Percent Decrease in Migraines per Month

| | Enrollment Group (2-8) | Enrollment Group (9-14) | Enrollment Group (4-14) | Overall |
|---|---|---|---|---|
| Overall Percent Decrease | | | | |
| n | 1004 | 458 | 269 | 1731 |
| >= 20.0% decrease | 353 (35.2) | 171 (37.3) | 159 (59.1) | 683 (39.5) |
| >= 25.0% decrease | 308 (30.7) | 150 (32.8) | 144 (53.5) | 602 (34.8) |
| >= 30.0% decrease | 268 (26.7) | 125 (27.3) | 130 (48.3) | 523 (30.2) |
| >= 35.0% decrease | 224 (22.3) | 101 (22.1) | 117 (43.5) | 442 (25.5) |
| >= 40.0% decrease | 181 (18.0) | 81 (17.7) | 100 (37.2) | 362 (20.9) |
| >= 45.0% decrease | 144 (14.3) | 60 (13.1) | 83 (30.9) | 287 (16.6) |
| >= 50.0% decrease | 113 (11.3) | 46 (10.0) | 67 (24.9) | 226 (13.1) |

54

A722

20058-US-PCT

Throughout this application, various publications are referenced by author name and date, or by patent number or patent publication number. The disclosures of these publications are hereby incorporated in their entireties by reference into this application in order to more fully describe the state of the art as known to those skilled therein as of the date of the invention described and claimed herein. However, the citation of a reference herein should not be construed as an acknowledgement that such reference is prior art to the present invention.

Those skilled in the art will recognize, or be able to ascertain using no more than routine experimentation, numerous equivalents to the specific procedures described herein.  Such equivalents are considered to be within the scope of this invention and are covered by the following claims.  For example, pharmaceutically acceptable salts other than those specifically disclosed in the description and Examples herein can be employed.  Furthermore, it is intended that specific items within lists of items, or subset groups of items within larger groups of items, can be combined with other specific items, subset groups of items or larger groups of items whether or not there is a specific disclosure herein identifying such a combination.

55

A723

20058-US-PCT

CLAIMS

What is claimed is:

1.      A method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide decrease in the number of migraines per month for said patient of at least 20%.

2.      The method of claim 1 wherein the decrease in the number of migraines per month for said patient of at least 30%.

3.      The method of claim 2 wherein the decrease in the number of migraines per month for said patient of at least 40%.

4.      A method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide Pain Freedom of the pharmaceutical composition of at about 30% greater than placebo.

5.      The method of claim 1 wherein the Pain Freedom of the pharmaceutical composition is at least about 50% greater than placebo.

6.      The method of claim 4 wherein the Pain Freedom of the pharmaceutical composition is from about 30-75% greater than placebo.

7.      The method of claim 6 wherein the Pain Freedom of the pharmaceutical composition is from about 35-65% greater than placebo.

8.      A method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide Freedom from MBS of the pharmaceutical composition of at about 30% greater than placebo.

56

A724

20058-US-PCT

9.      The method of claim 8 wherein the Freedom from MBS of the pharmaceutical composition is at least about 40% greater than placebo.

10.     The method of claim 8 wherein the Freedom from MBS of the pharmaceutical composition is from about 30-50% greater than placebo.

11.     The method of claim 4 which provides an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL).

12.     The method of claim 4 which provides a $C_{max}$ of from about 80-125% of 835 (ng/mL).

13.     A pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL).

14.     The pharmaceutical composition of claim 13 which comprises about 75 mg of rimegepant or a pharmaceutically acceptable salt thereof.

15.     The pharmaceutical composition of claim 13 wherein the rimegepant is in the form of a hemisulfate sesquihydrate salt.

16.     The pharmaceutical composition of claim 13 in the form of a tablet.

17.     The pharmaceutical composition of claim 16 comprising from about 50-60 wt% rimegepant hemisulfate sesquihydrate, about 30-35 wt% microcrystalline cellulose, about 2-7 wt% hydroxypropyl cellulose, about 3-7 wt% croscarmellose sodium, and about 0.1-1.0 wt% magnesium stearate.

18.     The pharmaceutical composition of claim 17 comprising about 57.1 wt% rimegepant hemisulfate sesquihydrate, about 33.4 wt% microcrystalline cellulose, about 4.0 wt% hydroxypropyl cellulose, about 5.0 wt% croscarmellose sodium, and about 0.5 wt% magnesium stearate.

57

A725

20058-US-PCT

19.     The pharmaceutical composition of claim 13 in the form of an oral solid molded fast-dispersing dosage form.

20.     The pharmaceutical composition of claim 19 comprising from about 70-80 wt% rimegepant hemisulfate sesquihydrate, about 10-20 wt% fish gelatin, about 10-20 wt% of a filler, and 0.1-5.0 wt% of a flavorant.

21.     The pharmaceutical composition of claim 20 wherein the filler is mannitol.

58

A726

20058-US-PCT

ABSTRACT OF THE DISCLOSURE

Disclosed are methods of treating CGRP related disorders, e.g., migraine, by administering to a patient in need thereof rimegepant or a pharmaceutically acceptable salt thereof.  Pharmaceutical compositions comprising rimegepant and kits including the pharmaceutical compositions and instructions are also disclosed.

59



**Figure 1**



**Figure 2**

## Study 301: Time to Pain Relief up to 8 Hours Postdose



Data are Kaplan-Meier estimates of pain relief; subjects were censored (not included) who took rescue medication or were lost to follow-up during the specified interval

**Figure 3**

## Study 302: Time to Pain Relief up to 8 Hours Postdose





Data are Kaplan-Meier estimates of pain relief; subjects were censored (not included) who took rescue medication or were lost to follow-up during the specified interval

**Figure 4**

Study 303, Kaplan-Meier Pain Relief Curve Through 2 Hours after Single Dose of Rimegepant 75 Mg Zydis ODT



Figure 5



**Figure 6**

PTO/AIA/14
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

The application data sheet is part of the provisional or nonprovisional application for which it is being submitted. The following form contains the bibliographic data arranged in a format specified by the United States Patent and Trademark Office as outlined in 37 CFR 1.76.
This document may be completed electronically and submitted to the Office in electronic format using the Electronic Filing System (EFS) or the document may be printed and included in a paper filed application.

## Secrecy Order 37 CFR 5.2:

☐ Portions or all of the application associated with this Application Data Sheet may fall under a Secrecy Order pursuant to 37 CFR 5.2  (Paper filers only. Applications that fall under Secrecy Order may not be filed electronically.)

## Inventor Information:

**Inventor    1**

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| Dr. | Vladimir | | Coric | |

| Residence Information (Select One) | ⦿ US Residency | ◯ Non US Residency | ◯ Active US Military Service |
|---|---|---|---|

| City | Madison | State/Province | CT | Country of Residence i | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | Biohaven Pharmaceutical Holding Company Ltd. |
|---|---|
| Address 2 | 215 Church Street |

| City | New Haven | State/Province | CT |
|---|---|---|---|
| Postal Code | 06510 | Country i | US |

**Inventor    2**

**Legal Name**

| Prefix | Given Name | Middle Name | Family Name | Suffix |
|---|---|---|---|---|
| Dr. | Robert | | Croop | |

| Residence Information (Select One) | ⦿ US Residency | ◯ Non US Residency | ◯ Active US Military Service |
|---|---|---|---|

| City | Newton Square | State/Province | PA | Country of Residence i | US |
|---|---|---|---|---|---|

**Mailing Address of Inventor:**

| Address 1 | Biohaven Pharmaceutical Holding Company Ltd. |
|---|---|
| Address 2 | 215 Church Street |

| City | New Haven | State/Province | CT |
|---|---|---|---|
| Postal Code | 06510 | Country i | US |

| All Inventors Must Be Listed - Additional Inventor Information blocks may be generated within this form by selecting the **Add** button. | Add |
|---|---|

## Correspondence Information:

WEB ADS 1.0

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

**Enter either Customer Number or complete the Correspondence Information section below.**
**For further information see 37 CFR 1.33(a).**

☐ An Address is being provided for the correspondence Information of this application.

| Customer Number | 164621 |
|---|---|
| Email Address | patents@biohavenpharma.com | Add Email | Remove Email |

## Application Information:

| Title of the Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS | | |
|---|---|---|---|
| Attorney Docket Number | 20058-US-PCT | | |
| Application Type | Nonprovisional | | |
| Subject Matter | Utility | | |
| Total Number of Drawing Sheets (if any) | 6 | Suggested Figure for Publication (if any) | 1 |

### Filing By Reference:

Only complete this section when filing an application by reference under 35 U.S.C. 111(c) and 37 CFR 1.57(a). Do not complete this section if application papers including a specification and any drawings are being filed. Any domestic benefit or foreign priority information must be provided in the appropriate section(s) below (i.e., "Domestic Benefit/National Stage Information" and "Foreign Priority Information").

For the purposes of a filing date under 37 CFR 1.53(b), the description and any drawings of the present application are replaced by this reference to the previously filed application, subject to conditions and requirements of 37 CFR 1.57(a).

| Application number of the previously filed application | Filing date (YYYY-MM-DD) | Intellectual Property Authority or Country |
|---|---|---|
| | | |

### Publication Information:

☐ Request Early Publication (Fee required at time of Request 37 CFR 1.219)

☐ **Request Not to Publish.** I hereby request that the attached application not be published under 35 U.S.C. 122(b) and certify that the invention disclosed in the attached application **has not and will not** be the subject of an application filed in another country, or under a multilateral international agreement, that requires publication at eighteen months after filing.

## Representative Information:

Representative information should be provided for all practitioners having a power of attorney in the application. Providing this information in the Application Data Sheet does not constitute a power of attorney in the application (see 37 CFR 1.32).
Either enter Customer Number or complete the Representative Name section below. If both sections are completed the customer Number will be used for the Representative Information during processing.

| Please Select One: | ◉ Customer Number | ☐ US Patent Practitioner | ☐ Limited Recognition (37 CFR 11.9) |
|---|---|---|---|
| Customer Number | 164621 | | |

WEB ADS 1.0

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Application Data Sheet 37 CFR 1.76 | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix | Remove |
|---|---|---|---|---|---|
| | | | | | |

| Registration Number | |
|---|---|

| Prefix | Given Name | Middle Name | Family Name | Suffix | Remove |
|---|---|---|---|---|---|
| | | | | | |

| Registration Number | |
|---|---|

Additional Representative Information blocks may be generated within this form by selecting the **Add** button.

## Domestic Benefit/National Stage Information:

This section allows for the applicant to either claim benefit under 35 U.S.C. 119(e), 120, 121, 365(c), or 386(c) or indicate National Stage entry from a PCT application. Providing benefit claim information in the Application Data Sheet constitutes the specific reference required by 35 U.S.C. 119(e) or 120, and 37 CFR 1.78.

When referring to the current application, please leave the "Application Number" field blank.

| Prior Application Status | Pending | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| | a 371 of international | PCT/US2019/023940 | 2019-03-25 |

| Prior Application Status | Expired | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| PCT/US2019/023940 | Claims benefit of provisional | 62/647,794 | 2018-03-25 |

| Prior Application Status | Expired | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| PCT/US2019/023940 | Claims benefit of provisional | 62/664,761 | 2018-04-30 |

| Prior Application Status | Expired | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| PCT/US2019/023940 | Claims benefit of provisional | 62/774,285 | 2018-12-02 |

| Prior Application Status | Expired | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| PCT/US2019/023940 | Claims benefit of provisional | 62/777,180 | 2018-12-09 |

WEB ADS 1.0

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

| Prior Application Status | Expired | | Remove |
|---|---|---|---|
| Application Number | Continuity Type | Prior Application Number | Filing or 371(c) Date (YYYY-MM-DD) |
| PCT/US2019/023940 | Claims benefit of provisional | 62/777,625 | 2018-12-10 |

Additional Domestic Benefit/National Stage Data may be generated within this form by selecting the **Add** button.

## Foreign Priority Information:

This section allows for the applicant to claim priority to a foreign application. Providing this information in the application data sheet constitutes the claim for priority as required by 35 U.S.C. 119(b) and 37 CFR 1.55. When priority is claimed to a foreign application that is eligible for retrieval under the priority document exchange program (PDX) the information will be used by the Office to automatically attempt retrieval pursuant to 37 CFR 1.55(i)(1) and (2). Under the PDX program, applicant bears the ultimate responsibility for ensuring that a copy of the foreign application is received by the Office from the participating foreign intellectual property office, or a certified copy of the foreign priority application is filed, within the time period specified in 37 CFR 1.55(g)(1).

| Application Number | Country | Filing Date (YYYY-MM-DD) | Access Code (if applicable) |
|---|---|---|---|
| | | | |

Additional Foreign Priority Data may be generated within this form by selecting the **Add** button.

## Statement under 37 CFR 1.55 or 1.78 for AIA (First Inventor to File) Transition Applications

☐ This application (1) claims priority to or the benefit of an application filed before March 16, 2013 and (2) also contains, or contained at any time, a claim to a claimed invention that has an effective filing date on or after March 16, 2013.
NOTE: By providing this statement under 37 CFR 1.55 or 1.78, this application, with a filing date on or after March 16, 2013, will be examined under the first inventor to file provisions of the AIA.

WEB ADS 1.0

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

## Authorization or Opt-Out of Authorization to Permit Access:

When this Application Data Sheet is properly signed and filed with the application, applicant has provided written authority to permit a participating foreign intellectual property (IP) office access to the instant application-as-filed (see paragraph A in subsection 1 below) and the European Patent Office (EPO) access to any search results from the instant application (see paragraph B in subsection 1 below).

Should applicant choose not to provide an authorization identified in subsection 1 below, applicant **must opt-out** of the authorization by checking the corresponding box A or B or both in subsection 2 below.

**NOTE**: This section of the Application Data Sheet is **ONLY** reviewed and processed with the **INITIAL** filing of an application. After the initial filing of an application, an Application Data Sheet cannot be used to provide or rescind authorization for access by a foreign IP office(s). Instead, Form PTO/SB/39 or PTO/SB/69 must be used as appropriate.

**1. Authorization to Permit Access by a Foreign Intellectual Property Office(s)**

**A. Priority Document Exchange (PDX)** - Unless box A in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the European Patent Office (EPO), the Japan Patent Office (JPO), the Korean Intellectual Property Office (KIPO), the State Intellectual Property Office of the People's Republic of China (SIPO), the World Intellectual Property Organization (WIPO), and any other foreign intellectual property office participating with the USPTO in a bilateral or multilateral priority document exchange agreement in which a foreign application claiming priority to the instant patent application is filed, access to: (1) the instant patent application-as-filed and its related bibliographic data, (2) any foreign or domestic application to which priority or benefit is claimed by the instant application and its related bibliographic data, and (3) the date of filing of this Authorization. See 37 CFR 1.14(h)(1).

**B. Search Results from U.S. Application to EPO** - Unless box B in subsection 2 (opt-out of authorization) is checked, the undersigned hereby **grants the USPTO authority** to provide the EPO access to the bibliographic data and search results from the instant patent application when a European patent application claiming priority to the instant patent application is filed. See 37 CFR 1.14(h)(2).

The applicant is reminded that the EPO's Rule 141(1) EPC (European Patent Convention) requires applicants to submit a copy of search results from the instant application without delay in a European patent application that claims priority to the instant application.

**2. Opt-Out of Authorizations to Permit Access by a Foreign Intellectual Property Office(s)**

☐　A. Applicant **DOES NOT** authorize the USPTO to permit a participating foreign IP office access to the instant application-as-filed. If this box is checked, the USPTO will not be providing a participating foreign IP office with any documents and information identified in subsection 1A above.

☐　B. Applicant **DOES NOT** authorize the USPTO to transmit to the EPO any search results from the instant patent application. If this box is checked, the USPTO will not be providing the EPO with search results from the instant application.

**NOTE:** Once the application has published or is otherwise publicly available, the USPTO may provide access to the application in accordance with 37 CFR 1.14.

WEB ADS 1.0

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

## Applicant Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Applicant    1**

If the applicant is the inventor (or the remaining joint inventor or inventors under 37 CFR 1.45), this section should not be completed. The information to be provided in this section is the name and address of the legal representative who is the applicant under 37 CFR 1.43; or the name and address of the assignee, person to whom the inventor is under an obligation to assign the invention, or person who otherwise shows sufficient proprietary interest in the matter who is the applicant under 37 CFR 1.46. If the applicant is an applicant under 37 CFR 1.46 (assignee, person to whom the inventor is obligated to assign, or person who otherwise shows sufficient proprietary interest) together with one or more joint inventors, then the joint inventor or inventors who are also the applicant should be identified in this section.

Clear

| ⦿ Assignee | ◯ Legal Representative under 35 U.S.C. 117 | ◯ Joint Inventor |
|---|---|---|
| ◯ Person to whom the inventor is obligated to assign. | ◯ Person who shows sufficient proprietary interest | |

If applicant is the legal representative, indicate the authority to file the patent application, the inventor is:

Name of the Deceased or Legally Incapacitated Inventor:

If the Applicant is an Organization check here. ☒

| Organization Name | Biohaven Pharmaceutical Holding Company Ltd. |
|---|---|

**Mailing Address Information For Applicant:**

| **Address 1** | Biohaven Pharmaceutical Holding Company Ltd. | | |
|---|---|---|---|
| Address 2 | 215 Church Street | | |
| **City** | New Haven | **State/Province** | CT |
| **Country**[i] | US | Postal Code | 06510 |
| Phone Number | 203-675-8647 | Fax Number | 203-244-4239 |
| Email Address | patents@biohavenpharma.com | | |

Additional Applicant Data may be generated within this form by selecting the Add button.

WEB ADS 1.0

A739

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 20058-US-PCT |
|---|---|---|
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
|---|---|

## Assignee Information including Non-Applicant Assignee Information:

Providing assignment information in this section does not substitute for compliance with any requirement of part 3 of Title 37 of CFR to have an assignment recorded by the Office.

**Assignee          1**

Complete this section if assignee information, including non-applicant assignee information, is desired to be included on the patent application publication. An assignee-applicant identified in the "Applicant Information" section will appear on the patent application publication as an applicant. For an assignee-applicant, complete this section only if identification as an assignee is also desired on the patent application publication.

If the Assignee or Non-Applicant Assignee is an Organization check here. ☐

| Prefix | **Given Name** | Middle Name | **Family Name** | Suffix |
|---|---|---|---|---|
| | | | | |

**Mailing Address Information For Assignee including Non-Applicant Assignee:**

| **Address 1** | |
|---|---|
| Address 2 | |

| **City** | | **State/Province** | |
|---|---|---|---|
| **Country  i** | | Postal Code | |
| Phone Number | | Fax Number | |
| Email Address | | | |

Additional Assignee or Non-Applicant Assignee Data may be generated within this form by selecting the Add button.

WEB ADS 1.0

A740

PTO/AIA/14 (08-15)
Approved for use through 04/30/2017. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| **Application Data Sheet 37 CFR 1.76** | Attorney Docket Number | 20058-US-PCT |
| | Application Number | |

| Title of Invention | RIMEGEPANT FOR CGRP RELATED DISORDERS |
| --- | --- |

## Signature:

NOTE: This Application Data Sheet must be signed in accordance with 37 CFR 1.33(b). **However, if this Application Data Sheet is submitted with the <u>INITIAL</u> filing of the application <u>and</u> either box A or B is <u>not</u> checked in subsection 2 of the "Authorization or Opt-Out of Authorization to Permit Access" section, then this form must also be signed in accordance with 37 CFR 1.14(c).**

   This Application Data Sheet **must** be signed by a patent practitioner if one or more of the applicants is a **juristic   entity** (e. g., corporation or association). If the applicant is two or more joint inventors, this form must be signed by a patent practitioner, **all** joint inventors who are the applicant, or one or more joint inventor-applicants who have been given power of attorney (e.g., see USPTO Form PTO/AIA/81) on behalf of **all** joint inventor-applicants.

   See 37 CFR 1.4(d) for the manner of making signatures and certifications.

| Signature | /Dmitry Zuev/ | | | Date  (YYYY-MM-DD) | |
| --- | --- | --- | --- | --- | --- |
| First Name | Dmitry | Last Name | Zuev, Ph.D. | Registration Number | 59774 |
| Additional Signature may be generated within this form by selecting the Add button. | | | | | |

WEB ADS 1.0

PATENT
Serial No: 16/767,134
Docket No: PC040550A
Patent Center

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

APPLICANT:    CORIC et al.          GROUP ART UNIT:     1625

SERIAL NO.:   16/767,134           CONFIRMATION NO.:   5353

FILED:         May 27, 2020         EXAMINER:   TIMOTHY R ROZOF

TITLE:         RIMEGEPANT FOR CGRP RELATED DISORDERS

## RESPONSE TO NON-FINAL OFFICE ACTION

MS Amendment
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Commissioner:

This paper is responsive to the Non-Final Office Action for the above-identified patent application, mailed from the U.S. Patent and Trademark Office (USPTO) on September 29, 2022, providing for a three (3) month period for response to and through December 29, 2022.

**Amendments to the Claims** being on page **2** of this paper.

**Remarks** begin on page **6** of this paper.

1

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

<u>**AMENDMENTS TO THE CLAIMS**</u>

This listing of claims will replace all prior versions, and listings, of claims in the application.

<u>*Listing of Claims*</u>:

1.    (Withdrawn-Currently Amended) A method of treating migraine in a patient in need thereof, comprising administering to the patient ~~a pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant~~ the pharmaceutical composition of Claim 13, ~~or a pharmaceutically acceptable salt thereof,~~ in order to provide decrease in the number of migraines per month for said patient of at least 20%.

2.    (Withdrawn) The method of claim 1 wherein the decrease in the number of migraines per month for said patient of at least 30%.

3.    (Withdrawn) The method of claim 2 wherein the decrease in the number of migraines per month for said patient of at least 40%.

4.    (Withdrawn-Currently Amended) A method of treating migraine in a patient in need thereof, comprising administering to the patient a pharmaceutical composition comprising the pharmaceutical composition of claim 13 ~~a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof,~~ in order to provide Pain Freedom of the pharmaceutical composition of at about 30% greater than placebo.

5.    (Withdrawn) The method of claim 1 wherein the Pain Freedom of the pharmaceutical composition is at least about 50% greater than placebo.

6.    (Withdrawn) The method of claim 4 wherein the Pain Freedom of the pharmaceutical composition is from about 30-75% greater than placebo.

2

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

7.      (Withdrawn) The method of claim 6 wherein the Pain Freedom of the pharmaceutical composition is from about 35-65% greater than placebo.

8.      (Withdrawn-Currently Amended) A method of treating migraine in a patient in need thereof, comprising administering to the patient ~~the pharmaceutical composition of claim 13~~a ~~pharmaceutical composition comprising a pharmaceutically acceptable carrier and a~~ ~~therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof~~, in order to provide Freedom from MBS of the pharmaceutical composition of at about 30% greater than placebo.

9.      (Withdrawn) The method of claim 8 wherein the Freedom from MBS of the pharmaceutical composition is at least about 40% greater than placebo.

10.     (Withdrawn) The method of claim 8 wherein the Freedom from MBS of the pharmaceutical composition is from about 30-50% greater than placebo.

11.     (Cancelled)

12.     (Withdrawn) The method of claim 4 which provides a $C_{max}$ of from about 80-125% of 835 (ng/mL).

13.     (Currently Amended) A pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL)~~,~~
        ~~wherein the pharmaceutical composition is in the form of an oral tablet and wherein the~~ ~~oral tablet comprises~~
                ~~50-60 wt% of Rimegepant hemisulfate sesquihydrate;~~
                ~~30-35 wt% of microcrystalline cellulose;~~

3

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

~~2-7 wt% of hydroxypropyl cellulose;~~

~~3-7 wt% of croscarmellose sodium; and~~

~~0.1-1 wt% of magnesium stearate;~~

~~wherein the weight percentages are based on the total weight of the pharmaceutical~~

~~composition.~~

14.    (Previously Presented) The pharmaceutical composition of claim 13 which comprises about 75 mg of rimegepant or a pharmaceutically acceptable salt thereof.

15.    (Cancelled)

16.    (Cancelled)

17.    (Cancelled)

18.    (Currently Amended) The pharmaceutical composition of claim ~~17~~ 13 comprising about 57.1 wt% rimegepant hemisulfate sesquihydrate, about 33.4 wt% microcrystalline cellulose, about 4.0 wt% hydroxypropyl cellulose, about 5.0 wt% croscarmellose sodium, and about 0.5 wt% magnesium stearate.

19.    (Cancelled)

20.    (Cancelled)

21.    (Cancelled)

22.    (New) A pharmaceutical composition comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof;

4

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

wherein the pharmaceutical composition is in the form of an oral tablet and wherein the oral tablet comprises

50-60 wt% of Rimegepant hemisulfate sesquihydrate;

30-35 wt% of microcrystalline cellulose;

2-7 wt% of hydroxypropyl cellulose;

3-7 wt% of croscarmellose sodium; and

0.1-1 wt% of magnesium stearate;

wherein the weight percentages are based on the total weight of the pharmaceutical composition.

5

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

## REMARKS

Claims 1-21 are pending in the present application. Claims 1-12 are previously withdrawn, claims 1, 4, 8, 13, and 18 have been amended, claim 22 has been added, and claims 11, 15-17, and 19-21 have been cancelled, leaving claims 13, 14, 18, and 22 for consideration upon entry of the present Amended. No new matter has been added by amendment.

Claims 1, 4, 8, and 18 have been amended to update their claim dependencies.

Claim 13 has been amended to further define the composition. Support for this amendment can be found in claims 16 and 17 as originally filed.

Claim 22 has been added to further define the composition. Support for this new claim can be found in claims 13, 16, and 16 as originally filed as well as on Page 6, lines 6-14 of the application as originally filed.

Reconsideration and allowance of the claims are respectfully requested in view of the above amendments and the following remarks.

Elections/Restrictions

The Applicants thank the Examiner for acknowledging the election and note that the withdrawn claims 1-12 are correctly reflected in the Office Action Summary. The Applicants note that the statement on Page 2 of the Office Action dated September 29, 2022 (hereinafter "OA 09/22") incorrectly refers to Claims 13/24 being withdrawn.

Claim Rejections Under 35 U.S.C. § 102(a)

Claims 13-21 stand rejected under 35 U.S.C. § 102(a) as allegedly anticipated by U.S. Patent Application 2013/0225636 (hereinafter "Roberts"). The Applicants respectfully traverse this rejection for at least the following reasons.

OA 09/22 alleges that Roberts deprives Claim 13-21 of their novelty in that Roberts allegedly discloses the composition of former Claim 17. The Applicants respectfully disagree and submit that Roberts fails to disclose or suggest a composition comprising only 30-35 wt% of microcrystalline cellulose. Instead, Roberts merely discloses capsules for the administration to dogs that were prepared based on 42 wt.% of a microcrystalline cellulose, which is clearly outside of the claimed amount. (Roberts, Paragraph [0154]). Claim 13 is novel over Roberts.

6

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

In order to advance prosecution, the Applicants further respectfully submit that just as Claim 13 is novel over Roberts, it is also non-obvious. Roberts discloses that their composition including their 42 wt.% of a microcrystalline cellulose is for a capsule for the administration to dogs. Clearly, it is not possible to infer anything from an in vivo study in dogs to assess the impact of the formulation on migraine prevention in humans. Moreover, even when the compositions of Roberts were administered to humans (see Paragraphs [0150-0152]), no value of $AUC_{0-t}$ is given and the AUC inf value is much higher than the values obtained by the composition of the present disclosure. It is respectfully submitted that a skilled person starting from Roberts and seeking to alleviate symptoms from migraine would not have arrived at the composition of Claim 13.

Accordingly, as Roberts fails to motivate one of skill in the art to the presently claimed oral tablet including 50-60 wt% of Rimegepant hemisulfate sesquihydrate and only 30-35 wt% of microcrystalline cellulose in order to provide an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/mL), Claim 13 is also non-obvious over Roberts.

Reconsideration and withdrawal of this rejection are respectfully requested

**CONCLUSION**

Applicant would like to thank the Examiner for careful consideration of the present case. If a telephone conversation would help to clarify any issues, or help expedite prosecution of this case, Applicant invites the Examiner to contact the undersigned at (860) 271-5731.

7

A748

PATENT
Application No.: 16/767,134
Docket No.: PC040550A

No additional fees are believed to be due at the time of the filing of this response.  Should the Commissioner determine that any fee(s) are due or that any credit for overpayment is required, the Commissioner is hereby authorized to charge any additional fee(s) and/or credit any overpayments to Deposit Account No. 16-1445.

Respectfully submitted,

By: /Jessica Zimberlin Eastman/
Jessica Zimberlin Eastman, Ph.D.
Date:  December 15, 2022              Agent for Applicants
Reg. No.: 70,430

Pfizer Inc.
235 East 42nd Street
New York, NY 10017
(860) 271-5731
PfizerPatentDocket@pfizer.com
*via: Patent Center*

8



# UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/767,134 | 05/27/2020 | Vladimir Coric | 20058-US-PCT | 5353 |

164621      7590      02/22/2023

Pfizer Inc.
Attn: Legal Patent Department, Chief IP Counsel
235 East 42nd Street
Biohaven
New York, NY 10017

| EXAMINER |
|---|
| ROZOF, TIMOTHY R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1625 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 02/22/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PfizerPatentDocketing@pfizer.com

PTOL-90A (Rev. 04/07)

| *Office Action Summary* | Application No. 16/767,134 | Applicant(s) Coric et al. | |
|---|---|---|---|
| | Examiner TIMOTHY R ROZOF | Art Unit 1625 | AIA (FITF) Status Yes |

**-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address --**

**Period for Reply**

A SHORTENED STATUTORY PERIOD FOR REPLY IS SET TO EXPIRE <u>3</u> MONTHS FROM THE MAILING DATE OF THIS COMMUNICATION.
- Extensions of time may be available under the provisions of 37 CFR 1.136(a). In no event, however, may a reply be timely filed after SIX (6) MONTHS from the mailing date of this communication.
- If NO period for reply is specified above, the maximum statutory period will apply and will expire SIX (6) MONTHS from the mailing date of this communication.
- Failure to reply within the set or extended period for reply will, by statute, cause the application to become ABANDONED (35 U.S.C. § 133).
- Any reply received by the Office later than three months after the mailing date of this communication, even if timely filed, may reduce any earned patent term adjustment. See 37 CFR 1.704(b).

**Status**

1)☑ Responsive to communication(s) filed on <u>December 15, 2022</u>.
    ☐ A declaration(s)/affidavit(s) under **37 CFR 1.130(b)** was/were filed on _____.
2a)☑ This action is **FINAL.**    2b)☐ This action is non-final.
3)☐ An election was made by the applicant in response to a restriction requirement set forth during the interview on _____; the restriction requirement and election have been incorporated into this action.
4)☐ Since this application is in condition for allowance except for formal matters, prosecution as to the merits is closed in accordance with the practice under *Ex parte Quayle*, 1935 C.D. 11, 453 O.G. 213.

**Disposition of Claims***

5) ☑ Claim(s) <u>1-10,12-14,18 and 22</u> is/are pending in the application.
    5a) Of the above claim(s) <u>1-10 and 12</u> is/are withdrawn from consideration.
6) ☐ Claim(s) _____ is/are allowed.
7) ☑ Claim(s) <u>13-14,18 and 22</u> is/are rejected.
8) ☐ Claim(s) _____ is/are objected to.
9) ☐ Claim(s) _____ are subject to restriction and/or election requirement

* If any claims have been determined <u>allowable</u>, you may be eligible to benefit from the **Patent Prosecution Highway** program at a participating intellectual property office for the corresponding application. For more information, please see http://www.uspto.gov/patents/init_events/pph/index.jsp or send an inquiry to **PPHfeedback@uspto.gov.**

**Application Papers**

10)☐ The specification is objected to by the Examiner.
11)☑ The drawing(s) filed on <u>June 2, 2020</u> is/are: a)☑ accepted or b)☐ objected to by the Examiner.
    Applicant may not request that any objection to the drawing(s) be held in abeyance. See 37 CFR 1.85(a).
    Replacement drawing sheet(s) including the correction is required if the drawing(s) is objected to. See 37 CFR 1.121(d).

**Priority under 35 U.S.C. § 119**

12)☐ Acknowledgment is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    **Certified copies:**
        a)☐ All    b)☐ Some**    c)☐ None of the:
        1.☐ Certified copies of the priority documents have been received.
        2.☐ Certified copies of the priority documents have been received in Application No. _____.
        3.☐ Copies of the certified copies of the priority documents have been received in this National Stage application from the International Bureau (PCT Rule 17.2(a)).

** See the attached detailed Office action for a list of the certified copies not received.

**Attachment(s)**

1) ☑ Notice of References Cited (PTO-892)
2) ☑ Information Disclosure Statement(s) (PTO/SB/08a and/or PTO/SB/08b) Paper No(s)/Mail Date _____.
3) ☐ Interview Summary (PTO-413) Paper No(s)/Mail Date _____.
4) ☐ Other: _____.

Application/Control Number: 16/767,134                                          Page 2
Art Unit: 1625

### *Notice of Pre-AIA or AIA Status*

The present application, filed on or after March 16, 2013, is being examined under the first inventor to file provisions of the AIA.

### DETAILED ACTION

This is a response to Applicant's communication filed on December 15, 2022. Application No. 16/767,134, is a 371 of PCT/US2019/023940, filed March 25, 2019, and claims the benefit of U.S. Provisional Applications Nos.: 62/777,625, filed December 10, 2018; 62/777,180, filed December 9, 2018; 62/774,285, filed December 2, 2018; 62/664,761, filed April 30, 2018; and 62/647,794, filed March 25, 2018. In an amendment filed December 15, 2022, Applicant cancelled claims 11, 15-17, and 19-21 and added new claim 22. Claims 1-10, and 12 are currently withdrawn from further consideration pursuant to 37 CFR 1.142(b) as being drawn to a nonelected invention. Claims 13, 14, 18, and 22 are examined below.

### *Rejection Withdrawn*

The rejection of claims 13-21 under 35 U.S.C. 102(a)(1) as being clearly anticipated by Roberts et al., US2013/0225636 A1, is withdrawn in view of Applicant's December 15, 2022, Amendment & Remarks.

### *New Rejection Necessitated by Examiner's Amendment*

### *Claim Rejections - 35 USC § 103*

The following is a quotation of 35 U.S.C. 103 which forms the basis for all obviousness rejections set forth in this Office action:

> A patent for a claimed invention may not be obtained, notwithstanding that the claimed invention is not identically disclosed as set forth in section 102, if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the

Application/Control Number: 16/767,134                                                    Page 3
Art Unit: 1625

claimed invention pertains. Patentability shall not be negated by the manner in which the invention was made.

The factual inquiries for establishing a background for determining obviousness under 35 U.S.C. 103 are summarized as follows:

1. Determining the scope and contents of the prior art.
2. Ascertaining the differences between the prior art and the claims at issue.
3. Resolving the level of ordinary skill in the pertinent art.
4. Considering objective evidence present in the application indicating obviousness or nonobviousness.

Claims 13, 14, 18, and 22 are rejected under 35 U.S.C. 103 as being unpatentable over Roberts et al., US2013/0225636 A1, in view of Trinius, EP 2,815,749 (both reference cited on January 20, 2021, IDS).    Roberts discloses a pharmaceutical composition, comprising a pharmaceutically acceptable carrier and a therapeutically effective amount of rimegepant, or a pharmaceutically acceptable salt thereof, in order to provide an $AUC_{0-t}$ of from about 80-125% of 5000 (hr*ng/ml).  See Roberts et al., '636 publc'n, Abstract; See also Id., para. [0083]-[0109], Pharmaceutical Compositions and Methods of Treatment , for the specific embodiments of dependent claims.  The difference between the prior art and present invention is the that Roberts does not specifically disclose the specific weight percentages for rimegepant hemisulfate sesquihydrate, microcrystalline cellulose; hydroxypropyl cellulose, croscarmellose sodium and magnesium stearate of the composition of the claimed invention.

Nonetheless, Trinius discloses the weight percentages of the claimed invention for the purpose of improving the AUC and Cmax compared to the free base form and reduced variability in bioavailability.  See Trinius, EP '749, para. {0167]-[0168].  Accordingly, all the elements of the present invention were known in the art at the time of the invention.

Application/Control Number: 16/767,134                                              Page 4
Art Unit: 1625

In addition, the specific weight percentages of the present invention would have been obvious in view of the prior art as a matter of routine optimization. In this case, the differences in weight percentages/ratios would not support the patentability of the claimed subject matter over the prior art unless there is evidence indicating these percentages/ratio are critical.

> "[W]here the general conditions of a claim are disclosed in the prior art, it is not inventive to discover the optimum or workable ranges by routine experimentation." In re Aller, 220 F.2d 454, 456, 105 USPQ 233, 235 (CCPA 1955) (Claimed process which was performed at a temperature between 40°C and 80°C and an acid concentration between 25% and 70% was held to be prima facie obvious over a reference process which differed from the claims only in that the reference process was performed at a temperature of 100°C and an acid concentration of 10%.); see also Peterson, 315 F.3d at 1330, 65 USPQ2d at 1382 ("The normal desire of scientists or artisans to improve upon what is already generally known provides the motivation to determine where in a disclosed set of percentage ranges is the optimum combination of percentages."); In re Hoeschele, 406 F.2d 1403, 160 USPQ 809 (CCPA 1969) (Claimed elastomeric polyurethanes which fell within the broad scope of the references were held to be unpatentable thereover because, among other reasons, there was no evidence of the criticality of the claimed ranges of molecular weight or molar proportions.). For more recent cases applying this principle, see Merck & Co. Inc. v. Biocraft Laboratories Inc., 874 F.2d 804, 10 USPQ2d 1843 (Fed. Cir.), cert. denied, 493 U.S. 975 (1989); In re Kulling, 897 F.2d 1147, 14 USPQ2d 1056 (Fed. Cir. 1990); and In re Geisler, 116 F.3d 1465, 43 USPQ2d 1362 (Fed. Cir. 1997).

(MPEP 2144.05.) In this case, there is no evidence in the disclosure indicating the claimed weight percentages/ratios are critical to the invention. Therefore, it would have been obvious to one of ordinary skill in the art at the time of the invention to adjust the weight percentages/ratios to those of the claimed invention to yield the best results as a matter of routine optimization.

### *Conclusion*

No claims are allowed.

Application/Control Number: 16/767,134                                          Page 5
Art Unit: 1625

Applicant's amendment necessitated the new ground(s) of rejection presented in this

Office action. Accordingly, **THIS ACTION IS MADE FINAL**. See MPEP § 706.07(a). Applicant is

reminded of the extension of time policy as set forth in 37 CFR 1.136(a).

A shortened statutory period for reply to this final action is set to expire THREE MONTHS

from the mailing date of this action. In the event a first reply is filed within TWO MONTHS of the

mailing date of this final action and the advisory action is not mailed until after the end of the

THREE-MONTH shortened statutory period, then the shortened statutory period will expire on

the date the advisory action is mailed, and any extension fee pursuant to 37 CFR 1.136(a) will be

calculated from the mailing date of the advisory action. In no event, however, will the statutory

period for reply expire later than SIX MONTHS from the date of this final action.

### *Contact Information*

Any inquiry concerning this communication or earlier communications from the examiner

should be directed to TIMOTHY R ROZOF whose telephone number is (571)270-5992. The

examiner can normally be reached Monday - Friday, 9:00 a.m. -5:00 p.m..

Examiner interviews are available via telephone, in-person, and video conferencing using

a USPTO supplied web-based collaboration tool. To schedule an interview, applicant is

encouraged to use the USPTO Automated Interview Request (AIR) at

http://www.uspto.gov/interviewpractice.

If attempts to reach the examiner by telephone are unsuccessful, the examiner's

supervisor, Andrew Kosar can be reached on (571) 272-0913. The fax phone number for the

organization where this application or proceeding is assigned is 571-273-8300.

Application/Control Number: 16/767,134                                          Page 6
Art Unit: 1625

      Information regarding the status of published or unpublished applications may be obtained from Patent Center. Unpublished application information in Patent Center is available to registered users. To file and manage patent submissions in Patent Center, visit: https://patentcenter.uspto.gov. Visit https://www.uspto.gov/patents/apply/patent-center for more information about Patent Center and https://www.uspto.gov/patents/docx for information about filing in DOCX format. For additional questions, contact the Electronic Business Center (EBC) at 866-217-9197 (toll-free). If you would like assistance from a USPTO Customer Service Representative, call 800-786-9199 (IN USA OR CANADA) or 571-272-1000.

/TIMOTHY R ROZOF/
Primary Examiner, Art Unit 1625



# UNITED STATES PATENT AND TRADEMARK OFFICE

**UNITED STATES DEPARTMENT OF COMMERCE**
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 16/767,134 | 05/27/2020 | Vladimir Coric | 20058-US-PCT | 5353 |

164621          7590          08/29/2023

Pfizer Inc.
Attn: Legal Patent Department, Chief IP Counsel
66 Hudson Boulevard East
Biohaven
New York, NY 10001-2192

| EXAMINER |
|---|
| ROZOF, TIMOTHY R |

| ART UNIT | PAPER NUMBER |
|---|---|
| 1625 | |

| NOTIFICATION DATE | DELIVERY MODE |
|---|---|
| 08/29/2023 | ELECTRONIC |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

Notice of the Office communication was sent electronically on above-indicated "Notification Date" to the following e-mail address(es):

PfizerPatentDocketing@pfizer.com

PTOL-90A (Rev. 04/07)

| *Notice of Abandonment* | Application No. | Applicant(s) |
|---|---|---|
| | 16/767,134 | Coric et al. |
| | **Examiner** | **Art Unit** |
| | TIMOTHY R ROZOF | 1625 |

| *-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--* |
|---|

This application is abandoned in view of:

1. ☑ Applicant's failure to timely file a proper reply to the Office letter mailed on 22 February 2023.

   (a) ☐ A reply was received on _____ (with a Certificate of Mailing or Transmission dated _____), which is after the expiration of the period for reply (including a total extension of time of _____ month(s)) which expired on _____.

   (b) ☐ A proposed reply was received on _____, but it does not constitute a proper reply under 37 CFR 1.113 to the final rejection. (A proper reply under 37 CFR 1.113 to a final rejection consists only of:(1) a timely filed amendment which places the application in condition for allowance; (2) a timely filed Notice of Appeal (with appeal fee); or (3) if this is utility or plant application, a timely filed Request for Continued Examination (RCE) in compliance with 37 CFR 1.114. Note that RCEs are not permitted in design applications.)

   (c) ☐ A reply was received on _____ but it does not constitute a proper reply, or a *bona fide* attempt at a proper reply, to the non-final rejection. See 37 CFR 1.85(a) and 1.111. (See explanation in box 8 below).

   (d) ☑ No reply has been received.

2. ☐ Applicant's failure to timely pay the required issue fee and publication fee, if applicable, within the statutory period of three months from the mailing date of the Notice of Allowance (PTOL-85).

   (a) ☐ The issue fee and publication fee, if applicable, was received on _____ (with a Certificate of Mailing or Transmission dated _____), which is after the expiration of the statutory period for payment of the issue fee (and publication fee) set in the Notice of Allowance (PTOL-85).

   (b) ☐ The submitted fee of $ _____ is insufficient. A balance of $ _____ is due.

      The issue fee required by 37CFR 1.18 is $ _____ . The publication fee, if required by 37 CFR 1.18(d), is $ _____ .

   (c) ☐ The issue fee and publication fee, if applicable, has not been received.

3. ☐ Applicant's failure to timely file corrected drawings as required by, and within the three-month period set in, the Notice of Allowability (PTO-37).

   (a) ☐ Proposed corrected drawings were received on _____ (with a Certificate of Mailing or Transmission dated _____), which is after the expiration of the period for reply.

   (b) ☐ No corrected drawings have been received.

4. ☐ The letter of express abandonment which is signed by the attorney or agent of record or other party authorized under 37 CFR 1.33 (b). See 37 CFR 1.138(b).

5. ☐ The letter of express abandonment which is signed by an attorney or agent (acting in a representative capacity under 37 CFR 1.34) upon the filing of a continuing application.

6. ☐ The decision by the Patent Trial and Appeal Board rendered on _____ and because the period for seeking court review of the decision has expired and there are no allowed claims.

7. ☐ The dismissal of the appeal in an application having no allowed claims. (When an appeal is dismissed in an application having no allowed claims the application stands abandoned. See MPEP 1215.04 subsections I-V for an explanation of the reasons why an appeal is dismissed.)

8. ☐ The reason(s) below:

   _____

| /TIMOTHY R ROZOF/ | |
|---|---|
| Primary Examiner, Art Unit 1625 | |

| Petitions to revive under 37 CFR 1.137, or requests to withdraw the holding of abandonment under 37 CFR 1.181, should be promptly filed to minimize any negative effects on patent term. |
|---|

U.S. Patent and Trademark Office
PTOL-1432 (Rev. 04-19)                **Notice of Abandonment**                Part of Paper No. 20230824

## PATENT APPLICATION FEE DETERMINATION RECORD
### Substitute for Form PTO-875

Application or Docket Number
**16/767,134**

### APPLICATION AS FILED - PART I

| FOR | NUMBER FILED (Column 1) | NUMBER EXTRA (Column 2) | SMALL ENTITY RATE($) | SMALL ENTITY FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY FEE($) |
|---|---|---|---|---|---|---|---|
| BASIC FEE (37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | | | N/A | 300 |
| SEARCH FEE (37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | | | N/A | 140 |
| EXAMINATION FEE (37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | | | N/A | 760 |
| TOTAL CLAIMS (37 CFR 1.16(i)) | 21 minus 20 = | * 1 | | | OR | x 100 = | 100 |
| INDEPENDENT CLAIMS (37 CFR 1.16(h)) | 4 minus 3 = | 1 | | | | x 460 = | 460 |
| APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | | | | 0.00 |
| MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | | | | 0.00 |
| | | | TOTAL | | | TOTAL | 1760 |

* If the difference in column 1 is less than zero, enter "0" in column 2.

### APPLICATION AS AMENDED - PART II

**AMENDMENT A**

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

**AMENDMENT B**

| | CLAIMS REMAINING AFTER AMENDMENT (Column 1) | HIGHEST NUMBER PREVIOUSLY PAID FOR (Column 2) | PRESENT EXTRA (Column 3) | SMALL ENTITY RATE($) | SMALL ENTITY ADDITIONAL FEE($) | OR | OTHER THAN SMALL ENTITY RATE($) | OTHER THAN SMALL ENTITY ADDITIONAL FEE($) |
|---|---|---|---|---|---|---|---|---|
| Total (37 CFR 1.16(i)) | * | Minus ** | = | x = | | OR | x = | |
| Independent (37 CFR 1.16(h)) | * | Minus *** | = | x = | | OR | x = | |
| Application Size Fee (37 CFR 1.16(s)) | | | | | | OR | | |
| FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | OR | | |
| | | | | TOTAL ADD'L FEE | | OR | TOTAL ADD'L FEE | |

* If the entry in column 1 is less than the entry in column 2, write "0" in column 3.
** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20".
*** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3".
The "Highest Number Previously Paid For" (Total or Independent) is the highest found in the appropriate box in column 1.

A759

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>16/767,134 | Filing Date<br>05/27/2020 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☑ LARGE  ☐ SMALL  ☐ MICRO

### APPLICATION AS FILED - PART I

| FOR | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | RATE ($) | FEE ($) |
|---|---|---|---|---|
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | x $100 = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | x $460 = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| AMENDMENT | 12/15/2022 | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * 15 | Minus | ** 21 | = 0 | x $100 = | 0 | |
| | Independent<br>(37 CFR 1.16(h)) | * 3 | Minus | *** 4 | = 0 | x $480 = | 0 | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | | |
| | | | | | | TOTAL ADD'L FEE | 0 | |

| AMENDMENT | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * | Minus | ** | = | x $0 = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus | *** | = | x $0 = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | |

| * If the entry in column 1 is less than the entry in column 2, write "0" in column 3. | LIE |
|---|---|
| ** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20". | /CHRISTINE V MOORE/ |
| *** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3". | |
| The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1. | |

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**
*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

PTO/SB/06 (09-11)
Approved for use through 1/31/2014. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

| PATENT APPLICATION FEE DETERMINATION RECORD<br>Substitute for Form PTO-875 | Application or Docket Number<br>16/767,134 | Filing Date<br>05/27/2020 | ☐ To be Mailed |
|---|---|---|---|

**ENTITY:** ☒ LARGE   ☐ SMALL   ☐ MICRO

### APPLICATION AS FILED - PART I

| FOR | (Column 1)<br>NUMBER FILED | (Column 2)<br>NUMBER EXTRA | RATE ($) | FEE ($) |
|---|---|---|---|---|
| ☐ BASIC FEE<br>(37 CFR 1.16(a), (b), or (c)) | N/A | N/A | N/A | |
| ☐ SEARCH FEE<br>(37 CFR 1.16(k), (i), or (m)) | N/A | N/A | N/A | |
| ☐ EXAMINATION FEE<br>(37 CFR 1.16(o), (p), or (q)) | N/A | N/A | N/A | |
| TOTAL CLAIMS<br>(37 CFR 1.16(i)) | minus 20 = | * | x $100 = | |
| INDEPENDENT CLAIMS<br>(37 CFR 1.16(h)) | minus 3 = | * | x $460 = | |
| ☐ APPLICATION SIZE FEE (37 CFR 1.16(s)) | If the specification and drawings exceed 100 sheets of paper, the application size fee due is $310 ($155 for small entity) for each additional 50 sheets or fraction thereof. See 35 U.S.C. 41(a)(1)(G) and 37 CFR 1.16(s). | | | |
| ☐ MULTIPLE DEPENDENT CLAIM PRESENT (37 CFR 1.16(j)) | | | | |
| * If the difference in column 1 is less than zero, enter "0" in column 2. | | | TOTAL | |

### APPLICATION AS AMENDED - PART II

| AMENDMENT | 12/15/2022 | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * 15 | Minus | ** 21 | = 0 | x $100 = | 0 |
| | Independent<br>(37 CFR 1.16(h)) | * 5 | Minus | *** 4 | = 1 | x $480 = | 480 |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | 480 |

| AMENDMENT | | (Column 1)<br>CLAIMS REMAINING AFTER AMENDMENT | | (Column 2)<br>HIGHEST NUMBER PREVIOUSLY PAID FOR | (Column 3)<br>PRESENT EXTRA | RATE ($) | ADDITIONAL FEE ($) |
|---|---|---|---|---|---|---|---|
| | Total<br>(37 CFR 1.16(i)) | * | Minus | ** | = | x $0 = | |
| | Independent<br>(37 CFR 1.16(h)) | * | Minus | *** | = | x $0 = | |
| | ☐ Application Size Fee (37 CFR 1.16(s)) | | | | | | |
| | ☐ FIRST PRESENTATION OF MULTIPLE DEPENDENT CLAIM (37 CFR 1.16(j)) | | | | | | |
| | | | | | | TOTAL ADD'L FEE | |

| * If the entry in column 1 is less than the entry in column 2, write "0" in column 3. | LIE |
|---|---|
| ** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 20, enter "20". | /DENISE HOPKINS/ |
| *** If the "Highest Number Previously Paid For" IN THIS SPACE is less than 3, enter "3". | |
| The "Highest Number Previously Paid For" (Total or Independent) is the highest number found in the appropriate box in column 1. | |

This collection of information is required by 37 CFR 1.16. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*